## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| ROSE TERRY, TERRY WATT & | ) | |
| ROY PARNELL, JOHANNA GUYTON, | ) | |
| LUISA and JORGE BOLO, SELVIN and | ) | No. 08-cv-2475 |
| BEATRICE QUIRE, JUAN BAEZ and | ) | |
| CRUZ RIVERA, JULIE NORADIN, | ) | |
| ANANAIS & ETHEL COLISTER, | ) | |
| MICHAEL COX & SUSAN LAWRENCE, | ) | Judge Coar |
| RAMSES FAVELA, WENCES GARCIA & | ) | |
| MARIA LARA, ELIZABETH HILL, | ) | Magistrate Judge Mason |
| ALFREDO & ANA VELIA JAIME, | ) | |
| DENISE & CAREY LEE, DARYL | ) | |
| MONSON, LAWRENCE MUELLER, | ) | |
| BENJAMIN NEELEY, JOHN & | ) | |
| CONSTANCE PUGA, JAMES SHEW, | ) | |
| and HAROLD WELLS | ) | |
| | ) | JURY TRIAL DEMAND |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| AMERIQUEST MORTGAGE COMPANY, | ) | |
| | ) | |
| AMERIQUEST CAPITAL CORPORATION | ) | |
| (n/k/a/ SBP CAPITAL CORPORATION), | ) | |
| | ) | |
| ACC CAPITAL HOLDINGS, INC., | ) | |
| | ) | |
| AMERIQUEST MORTGAGE | ) | |
| SECURITIES, INC., | ) | |
| | ) | |
| AGRENT SECURITIES, INC., | ) | |
| | ) | |
| DEUTSCHE BANK NATIONAL TRUST | ) | |
| COMPANY, | ) | |
| | ) | |
| THE ROLAND AND DAWN ARNALL | ) | |
| LIVING TRUST, | ) | |
| | ) | |
| THE ESTATE OF ROLAND ARNALL, | ) | |
| | ) | |
| DAWN ARNALL, | ) | |

WAYNE LEE,                                              )
                                                       )
CITIFINANCIAL,                                         )
                                                       )
CITIGROUP,                                             )
                                                       )
CITIMORTGAGE,                                          )
                                                       )
GREENWICH CAPITAL,                                     )
                                                       )
WM SPECIALTY MORTGAGE, LLC,                            )
                                                       )
CREDIT SUISSE FINANCIAL                                )
CORPORATION,                                           )
                                                       )
DEUTSCHE BANK NATIONAL TRUST                           )
COMPANY, AS TRUSTEE OF                                 )
AMERIQUEST MORTGAGE                                    )
SECURITIES INC ASSET BACKED                            )
PASS THROUGH CERTIFICATES                              )
2005-R6,                                               )
                                                       )
DEUTSCHE BANK NATIONAL TRUST                           )
COMPANY, AS TRUSTEE OF                                 )
AMERIQUEST MORTGAGE                                    )
SECURITIES INC ASSET BACKED                            )
PASS THROUGH CERTIFICATES                              )
2005-R7,                                               )
                                                       )
DEUTSCHE BANK NATIONAL TRUST                           )
COMPANY, AS TRUSTEE OF                                 )
AMERIQUEST MORTGAGE                                    )
SECURITIES INC ASSET BACKED                            )
PASS THROUGH CERTIFICATES                              )
2005-R9,                                               )
                                                       )
DEUTSCHE BANK NATIONAL TRUST                           )
COMPANY, AS TRUSTEE OF                                 )
AMERIQUEST MORTGAGE                                    )
SECURITIES INC ASSET BACKED                            )
PASS THROUGH CERTIFICATES                              )
2005-R10,                                              )
                                                       )
                                                       )
                                                       )

DEUTSCHE BANK NATIONAL TRUST          )
COMPANY, AS TRUSTEE OF                )
AMERIQUEST MORTGAGE                   )
SECURITIES INC ASSET BACKED           )
PASS THROUGH CERTIFICATES             )
2006-R1,                              )
                                      )
DEUTSCHE BANK NATIONAL TRUST          )
COMPANY, AS TRUSTEE OF                )
ARGENT SECURITIES INC ASSET           )
BACKED PASS THROUGH                   )
CERTIFICATES 2006-W3,                 )
                                      )
                    Defendants.       )

## AMENDED COMPLAINT

### INTRODUCTION

1. Plaintiffs seek rescission of their mortgage transactions pursuant to 15 U.S.C. § 1635.
   Plaintiffs also charge defendants with violation of Illinois law.

### JURISDICTION AND VENUE

2. This Court has jurisdiction pursuant to Title 28 of the United States Code, Sections 1331
   and 1337 because plaintiffs' claims under the Truth in Lending Act arise under federal
   law.  This Court has supplemental jurisdiction over plaintiffs' claims under state law
   pursuant to the Judicial Improvements Act of 1990, Pub.L.No. 101-650, 104 Stat. 5089,
   28 U.S.C. § 1367.

3. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because plaintiffs' claims
   arose here. Also, the Judicial Panel on Multi-District Litigation has issued an order
   centralizing predatory lending litigation against Ameriquest before Judge Aspen.

### PARTIES

4. Plaintiff Rose Terry obtained a $223,210 adjustable rate mortgage from Ameriquest that
   closed on May 13, 2005.  The loan had an initial interest rate of 7.850% and could adjust
   to a maximum rate of 13.850%.  Terry paid $12,636.00 in points and fees to obtain this
   loan, of which $10,590.00 went to Ameriquest.  Plaintiff's rights as a creditor under the
   Illinois Uniform Fraudulent Transfer Act ("IUFTA") arose on May 13, 2005.

5.  Plaintiffs Terry Watt and Roy Parnell obtained a $201,974 fixed rate mortgage from Ameriquest that closed on November 12, 2005. The loan had an interest rate of 8.990%. Watt & Parnell paid $10,838.16 in points and fees to obtain this loan, of which $9,642.66 went to Ameriquest. Plaintiffs' rights as a creditor under the IUFTA arose on November 12, 2005.

6.  Plaintiff Johnanna Guyton obtained a $180,000 adjustable rate mortgage from Ameriquest that closed on May 20, 2005. The loan had an initial interest rate of 10.600% and could adjust to a maximum rate of 16.600%. Guyton paid $3,855.35 in points and fees to obtain this loan, of which $1,565.35 went to Ameriquest. Plaintiff's rights as a creditor under the IUFTA arose on May 20, 2005.

7.  Plaintiff Johnanna Guyton obtained another adjustable rate mortgage from Ameriquest in the amount of $194,355.00. This mortgage closed on November 28, 2005. The mortgage had an initial rate 8.750% and could adjust to a maximum rate of 14.750%. Guyton paid $11,319.45 in points and fees to obtain this loan, of which $9,462.45 went to Ameriquest.

8.  Plaintiffs Jorge and Luisa Bolo obtained a $265,500 adjustable rate mortgage from Ameriquest that closed on June 7, 2005. The loan had an initial interest rate of 6.200% and could adjust to a maximum rate of 12.200%. The Bolos paid $12,706.34 in points and fees to obtain this loan, of which $10,949.02 went to Ameriquest. Plaintiffs' rights as a creditor under the IUFTA arose on June 7, 2005.

9.  Plaintiffs Selvin and Beatrice Quire obtained a $195,000 adjustable rate mortgage from Ameriquest that closed on June 6, 2005. The loan had an initial interest rate of 9.100% and could adjust to a maximum rate of 15.100%. The Quires paid $8,488.76 in points and fees to obtain this loan, of which $7,068.76 went to Ameriquest. Plaintiffs' rights as a creditor under the IUFTA arose on June 6, 2005.

10. Plaintiffs Juan Baez and Cruz Rivera obtained a $201,000 adjustable rate mortgage from Ameriquest that closed on April 6, 2005. The loan had an initial interest rate of 7.400% and could adjust to a maximum rate of 13.400%. Baez and Rivera paid $10,203.69 in points and fees to obtain this loan, of which $8,507.69 went to Ameriquest. Plaintiffs' rights as a creditor under the IUFTA arose on May 12, 2008.

11. Plaintiff Julie Noradin obtained a $255,107 adjustable rate mortgage from Ameriquest that closed on May 10, 2005. The loan had an initial interest rate of 6.750% and could adjust to a maximum rate of 12.750%. Noradin paid $10,507.13 in points and fees to obtain this loan, of which $9,290.54 went to Ameriquest. Plaintiff's rights as a creditor under the IUFTA arose on November 12, 2005.

12. Plaintiff Julie Noradin obtained another adjustable rate mortgage from Ameriquest in the amount of $289,500. This mortgage closed on April 20, 2005. The mortgage had an initial rate 6.500% and could adjust to a maximum rate of 12.500%. Noradin paid $13,247.38 in points and fees to obtain this loan, of which $9,514.62 went to Ameriquest.

13. Plaintiffs Ananais and Ethel Colister obtained a $121,500 fixed rate mortgage from Ameriquest that closed on October 20, 2005. The loan had an interest rate of 6.990%. The Colisters paid $5,860.47 in points and fees to obtain this loan, of which $4,082.42 went to Ameriquest. Plaintiffs' rights as a creditor under the IUFTA arose on October 20, 2005.

14. Plaintiffs Michael Cox and Susan Lawrence obtained a $126,000 adjustable rate mortgage from Ameriquest that closed on September 12, 2005. The loan had an initial interest rate of 10.250% and could adjust to a maximum rate of 12.250%. Cox and Lawrence paid $2,856.56 in points and fees to obtain this loan, of which $1,728.56 went to Ameriquest. Plaintiffs' rights as a creditor under the IUFTA arose on September 12, 2005.

15. Plaintiff Ramses Favela obtained a $231,000 adjustable rate mortgage from Ameriquest that closed on February 21, 2006. The loan had an initial interest rate of 6.200% and could adjust to a maximum rate of 12.200%. Favela paid $7,202.72 in points and fees to obtain this loan, of which $5,417.72 went to Ameriquest. Plaintiff's rights as a creditor under the IUFTA arose on February 21, 2006.

16. Plaintiffs Wences Garcia and Maria Lara obtained a $211,498.00 adjustable rate mortgage from Ameriquest that closed on September 9, 2005. The loan had an initial interest rate of 7.950% and could adjust to a maximum rate of 13.950%. Garcia and Lara paid $9,120.15 in points and fees to obtain this loan, of which $6,908.15 went to Ameriquest. Plaintiffs' rights as a creditor under the IUFTA arose on September 9, 2005.

17. Plaintiff Elizabeth Hill obtained a $154,700 adjustable rate mortgage from Ameriquest that closed on August 12, 2005.  The loan had an initial interest rate of 10.100% and could adjust to a maximum rate of 16.100%.  Hill paid $3,987.53 in points and fees to obtain this loan, of which $1,860.53 went to Ameriquest.   Plaintiff's rights as a creditor under the IUFTA arose on August 12, 2005

18. Plaintiffs Alfredo and Ana Velia Jaime obtained a $290,000 adjustable rate mortgage from Ameriquest that closed on December 21, 2005.  The loan had an initial interest rate of 8.200% and could adjust to a maximum rate of 14.200%. The Jaimes paid $11,452.60 in points and fees to obtain this loan, of which $9,539.60 went to Ameriquest.   Plaintiffs' rights as a creditor under the IUFTA arose on March 19, 2008.

19. Plaintiffs Denise and Carey Lee obtained a $129,000 adjustable rate mortgage from Ameriquest that closed on June 10, 2005.  The loan had an initial interest rate of 10.300% and could adjust to a maximum rate of 16.300%. The Lees paid $3,901.80 in points and fees to obtain this loan, of which $1,922.80 went to Ameriquest.   Plaintiffs' rights as a creditor under the IUFTA arose on June 10, 2005.

20. Plaintiffs Denise and Carey Lee obtained another adjustable rate mortgage from Ameriquest in the amount of $154,000.  This mortgage closed on January 10, 2006.  The mortgage had an initial interest rate of 9.800% and could adjust to a maximum rate of 15.800%. The Lees paid $9,492.34 in points and fees to obtain this loan, of which $7,396.84 went to Ameriquest.

21. Plaintiff Daryl Monson obtained a $166,500 adjustable rate mortgage from Ameriquest that closed on August 9, 2005.  The loan had an initial interest rate of 10.050% and could adjust to a maximum rate of 16.050%.  Monson paid $1,481.68 in points and fees to obtain this loan, of which $1,395.68 went to Ameriquest.   Plaintiff's rights as a creditor under the IUFTA arose on August 9, 2005.

22. Plaintiff Lawrence Mueller obtained a $255,000 fixed rate mortgage from Ameriquest that closed on September 20, 2005.  The loan had fixed interest rate of 7.350%. Mueller paid $11,651.02 in points and fees to obtain this loan, of which $9,187.02 went to Ameriquest.   Plaintiff's rights as a creditor under the IUFTA arose on April 29, 2008.

23. Plaintiff Benjamin Neeley obtained a $342,000 adjustable rate mortgage from Ameriquest that closed on August 5, 2005.  The loan had an initial interest rate of 10.350% and could adjust to a maximum rate of 16.350%.  Neeley paid $5,627.60 in points and fees to obtain this loan, of which $3,243.60 went to Ameriquest.   Plaintiff's rights as a creditor under the IUFTA arose on August 5, 2008.

24. Plaintiffs John and Constance Puga obtained a $193,000 adjustable rate mortgage from Ameriquest that closed on November 19, 2005.  The loan had an initial interest rate of 6.750% and could adjust to a maximum rate of 12.750%. The Pugas paid $10,174.64 in points and fees to obtain this loan, of which $6,340.32 went to Ameriquest.   Plaintiffs' rights as a creditor under the IUFTA arose on November 19, 2005.

25. Plaintiff James Shew obtained a $209,000 adjustable rate mortgage from Ameriquest that closed on September 21, 2005.  The loan had an initial interest rate of 7.500% and could adjust to a maximum rate of 13.500%.  Shew paid $8,633.30 in points and fees to obtain this loan, of which $6,396.60 went to Ameriquest.   Plaintiff's rights as a creditor under the IUFTA arose on September 21, 2005.

26. Plaintiff Harold Wells obtained a $106,675 adjustable rate mortgage from Ameriquest that closed on March 15, 2006.  The loan had an initial interest rate of 9.950% and could adjust to a maximum rate of 15.950%.  Wells paid $6,212.39 in points and fees to obtain this loan, of which $4,912.39 went to Ameriquest.   Plaintiff's rights as a creditor under the IUFTA arose on March 15, 2006.

27. Defendant Ameriquest Mortgage Company is a corporation organized under the laws of the state of Delaware, with its principal place of business in Orange, CA.  Ameriquest originated plaintiffs' mortgages through a refinancing transaction and took a security interest in plaintiffs' homes.

28. Defendant Ameriquest Capital Corporation ("ACC") n/k/a SBP Capital Corporation is organized under the laws of the state of Delaware, with its principal place of business in Orange, California.  At all relevant times, ACC was a privately-owned company whose shares, directly or indirectly, were owned by Roland Arnall.  ACC is the direct parent corporation of ACC Capital Holdings, Inc., which is in turn the direct parent corporation

of Ameriquest Mortgage Company.

29. Defendant ACC Capital Holdings Corporation (erroneously named as ACC Capital Holdings, Inc.) is a subsidiary of ACC with its principal place of business in Orange, CA.

30. Defendant Ameriquest Mortgage Securities, Inc. is an indirect wholly-owned subsidiary of Ameriquest Mortgage Company.

31. Defendant Ameriquest Mortgage Securities, Inc. holds or held legal title to plaintiffs' loans (except for the Colister, Watt-Parnell, Favela, Wells (loan number ******6207-7301) Lee (loan number ******7848-7341), Hill (loan numbers ******8809-7401 and ******5482-7301), and Noradin (loan number ******2789-7374) loans).

32. Defendant Argent Mortgage Securities, Inc. holds or held legal title to the mortgage loan of Denise and Carey Lee (loan number ******7848-7341) originated by Ameriquest in this lawsuit.

33.  Defendant Deutsche Bank National Trust Company is or was the assignee of plaintiffs' loans (except for the Colister, Watt-Parnell, Favela, Wells (loan number ******6207-7301) Lee (loan number ******7848-7341), Hill (loan numbers ******8809-7401 and ******5482-7301), and Noradin (loan number ******2789-7374) loans).

34. Defendant The Roland and Dawn Arnall Living Trust is a resident of California.

35. Defendant The Estate of Roland Arnall is a resident of California and the successor in interest to the late Roland Arnall.

36. Defendant Dawn Arnall, a resident of California, is the Chairman of the Board of ACC and also the trustee for The Roland and Dawn Arnall Living Trust.

37. Defendant Wayne Lee is a resident of California and is the former chief executive officer of Ameriquest Capital Holdings, Inc.  In June, 2005, Mr. Lee resigned from that position.

38. Defendant Citifinancial was an assignee of the Colister and Watt-Parnell loans.

39. Defendant Citigroup was an assignee of the Wells loan (loan number ******6207-7301).

40. Defendant CitiMortgage was an assignee of the Hill loan (loan number ******8809-7401).

41. Defendant Greenwich Capital was an assignee of Noradin loan (loan number

******2789-7374).

42. Defendant WM Specialty Mortgage, LLC was the assignee for the Favela and Hill (loan number ******5482-7301) loans.

43. Defendant Credit Suisse Financial Corporation, as trustee of Ameriquest Mortgage Securities Inc Asset Backed Pass Through Certificates, Series 2005-R6 was an assignee of the Baez-Rivera and Guyton (loan number ******3663) loans.

44. Defendant Deutsche Bank National Trust Company, as trustee of Ameriquest Mortgage Securities Inc Asset Backed Pass Through Certificates, Series 2005-R6 was an assignee of the Terry and Noradin (loan number ******7485-5798) loans.

45. Defendant Deutsche Bank National Trust Company, as trustee of Ameriquest Mortgage Securities Inc Asset Backed Pass Through Certificates, Series 2005-R7 was an assignee of the Bolo, Quire and Lee (loan number ******5442-7305) loans.

46. Defendant Deutsche Bank National Trust Company, as trustee of Ameriquest Mortgage Securities Inc Asset Backed Pass Through Certificates, Series 2005-R9 was an assignee of the Monson & Neeley loans.

47. Defendant Deutsche Bank National Trust Company, as trustee of Ameriquest Mortgage Securities Inc Asset Backed Pass Through Certificates, Series 2005-R10 was an assignee of the Garcia, Shew and Lawrence loans and is the assignee of the Mueller loan.

48. Defendant Deutsche Bank National Trust Company, as trustee of Ameriquest Mortgage Securities Inc Asset Backed Pass Through Certificates, Series 2006-R1 was an assignee of the Jaime and Guyton (loan number ******0766-7401) loans.

49. Defendant Deutsche Bank National Trust Company, as trustee of Argent Mortgage Securities Inc., Asset Backed Pass Through Certificates, Series 2005-W3 was an assignee of the Lee (loan number ******7848-7341) loan.

## BACKGROUND

50. Ameriquest Mortgage Company was a specialty finance company engaged in the business of originating, purchasing and selling retail and wholesale sub-prime mortgage loans secured by one-to four-family residences.

51. Ameriquest's mortgage business began in 1979 as a savings and loan association and later as a federal savings bank.

52. In 1994, Ameriquest ceased depository operations to focus entirely on its mortgage banking business.

53. In May 1997, Ameriquest sold its wholesale operations and reorganized its retail lending and servicing operations under the name Ameriquest Mortgage Company.

54. In January 2000, Ameriquest recommenced wholesale lending as a separate division while continuing its retail and servicing operations.

55. On December 31, 2004, the loan servicing division of Ameriquest was transferred to an affiliate, AMC Mortgage Services, Inc.

56. In 2005, Ameriquest Capital Corporation offered to sell Ameriquest and Argent to Washington Mutual for $4 billion.

57. In May 2006, ACC Capital Holdings Corporation eliminated 3,800 jobs and closed all of its 229 regional branches.

58. In February 2007, ACC Capital Holdings was provided with working capital from Citigroup and Roland Arnall.

59. In March 2007, ACC Capital Holdings dismissed a significant number of its 6,000 employees.

60. In September 2007, Ameriquest announced that it was closing.

61. In September 2007, Citigroup agreed to buy Argent Mortgage Company and the servicing assets of Ameriquest.

62. Securitization of mortgage loans originated by Ameriquest or its affiliates was an integral part of Ameriquest's management of its capital.

63. Beginning in 2000, Ameriquest has engaged in securitization of mortgage loans that it or its affiliates originated through Ameriquest Mortgage Securities, Inc.

64. Ameriquest sold loans that it had originated and funded to investors through whole-loan sales.

65. Ameriquest received the proceeds from the whole loan sales to investors.

66. Ameriquest transferred the proceeds from the sale of whole-loan sales to ACC Capital Holdings Corporation or Ameriquest Capital Corporation.

67. Ameriquest pooled certain loans that were originated and funded by Ameriquest and sold them to investors.

68. In connection with Ameriquest's offering of pooled loans, or asset-backed securities, prospectuses are filed with the SEC which describe and make certain statements about the loan pool.

69. Ameriquest received the proceeds from the sale of asset-back securities from investors.

70. Ameriquest transferred the proceeds from the sale of asset-backed securities to ACC Capital Holdings Corporation or Ameriquest Capital Corporation.

71. Ameriquest account executives often pressured real estate appraisers to inflate appraisals in order to justify larger loans.

72. In 2004 and 2005, Ameriquest account executives closed loans by forging customer signatures.

73. Upon information and belief, subject to further investigation, Ameriquest is aware of more than twenty complaints by its customers of forgeries by Ameriquest account executives.

74. In 2004 and 2005, it was a common practice in many Ameriquest branch offices for account executives to make loans by promising prospective customers better deals than the customers actually received.

75. In 2004 and 2005, Ameriquest sent out solicitation letters to prospective customers that did not specify the terms of loan that the customer was being offered.

76. In 2004 and 2005, Ameriquest would not determine certain terms of a mortgage that a customer was being offered until a few days before the closing.

77. In 2004 and 2005, Ameriquest account executives would have mortgage customers sign loan applications at the closing of the loan.

78. Since 2005, upon information and belief, subject to further investigation, Ameriquest has suffered less than $250 million in operating losses.

79. Upon information and belief, subject to further investigation, Ameriquest did not maintain reserves sufficient to pay the full and fair value of pending claims against Ameriquest by aggrieved mortgage customers.

80. Upon information and belief, subject to further investigation, Ameriquest did not maintain reserves sufficient to pay the full and fair value of potential claims by aggrieved mortgage customers and investors.

81. Upon information and belief, subject to further investigation, Ameriquest's net worth is less than the full and fair value of pending claims brought by aggrieved customers against Ameriquest.

82. Upon information and belief, subject to further investigation, between 2004 and the 2008, Ameriquest has transferred monies and/or other assets to its parent corporations, Ameriquest Capital Corporation and ACC Capital Holdings, without receiving adequate consideration in return at a time when its net worth was less then the full and fair value of the potential claims against Ameriquest by aggrieved consumers and investors.

83. Upon information and belief, subject to further investigation, between 2004 and 2008, Ameriquest has transferred monies and/or other assets to its parent corporations, Ameriquest Capital Corporation and ACC Capital Holdings, without the receiving adequate consideration in return at a time with its net worth was less was less than the full and fair value of pending claims against Ameriquest by aggrieved mortgage customers and investors.

## COUNT ONE -- TRUTH IN LENDING ACT

84. Plaintiffs incorporate paragraphs one through eighty-three above.

85. Ameriquest's disclosures to plaintiffs did not comply with the requirements of the Truth in Lending Act.  To understand how the disclosures were defective, some background is helpful.

## REGULATORY FRAMEWORK

86. The Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 et. seq. requires the clear, fair, conspicuous and accurate disclosure of the costs and terms of credit. The statute's purpose is to protect consumers from inaccurate and unfair credit practices, and to assure a meaningful disclosure of credit terms so that the consumers will be able to compare more readily the various credit terms available to them and avoid the uninformed use of credit.

87. Accordingly, the Board of Governors of the Federal Reserve System promulgated Regulation Z to implement the TILA. 12 C.F.R. § 226.1(a).  A creditor is required by Regulation Z to make certain disclosures to the consumer, "clearly and conspicuously in writing, in a form that the consumer may keep." 12 C.F.R. § 226.17(a)(1).  Regulation Z sets out certain guidelines for creditors to follow when disclosing the amount financed,

the finance charge, and the annual percentage rate to the consumer and demands that these disclosures be accurate. 12 C.F.R. § § 226.18, 226.22, 226.5.

88. Regulation Z also requires that "disclosures shall reflect the terms of the legal obligation between the parties" 12 C.F.R. § 226.17(c)(1) and that the creditor accurately disclose "[t]he number, amounts, and timing of payments scheduled to repay the obligation." 12 C.F.R. § 226.18(g)(1).

89. The Truth in Lending Act confers additional rights on home owners who refinance their mortgages with a new lender.  In order to give these borrowers an opportunity to reflect on their other TILA disclosures and to rethink transactions that would put the titles to their homes at risk, the Truth in Lending Act gives home owners who refinance their mortgages with a new lender the right to rescind the transaction until midnight of the third business day following the consummation of the transaction or three business days after receiving their final TILA disclosures or three business days of receiving notice of their right to rescind, whichever is later.  More specifically, the statute provides that:

> Except as otherwise provided in this section, in the case of any consumer credit transaction ... in which a security interest ... is or will be retained or acquired in any property which is used as the principal dwelling of the person to whom credit is extended, the obligor shall have the right to rescind the transaction until midnight of the third business day following the consummation of the transaction or the delivery of the information and
>
> rescission forms required under this section together with a statement containing the material disclosures required under this title, whichever is later, by notifying the creditor, in accordance with regulations of the Board, of his intention to do so.

15 U.S.C. § 1635(a).

90. To ensure that rescission is a viable option, the statute also provides that if the customer elects to rescind, the customer is entitled to the return of all money or property that the customer has given as part of the credit transaction.  More specifically, the statute provides:

> When an obligor exercises his right to rescind under subsection (a), he is not liable for any finance or other charge, and any security interest given by the obligor, including any such interest arising by operation of law,

> becomes void upon such rescission.  Within 20 days after receipt of a
> notice of rescission, the creditor shall return to the obligor any money or
> property given as earnest money, downpayment, or otherwise, and shall
> take any action necessary or appropriate to reflect the termination of any
> security interest created under the transaction.

15 U.S.C. § 1635(b).

91. To ensure that home owner borrowers are aware of these rights, the statute requires

lenders to disclose rescission rights to customers clearly, conspicuously and accurately.

More specifically, the statute provides:

> The creditor shall clearly and conspicuously disclose, in accordance with
> regulations of the Board, to any obligor in a transaction subject to this
> section the rights of the obligor under this section.  The creditor shall also
> provide, in accordance with regulations of the Board, appropriate forms for
> the obligor to exercise his right to rescind any transaction subject to this
> section.

 15 U.S.C. § 1635(a).

92. Regulation Z, promulgated by the Federal Reserve Board pursuant to the Truth in

Lending Act, amplifies the statutory requirements. Subject to exceptions not here

pertinent, the regulation provides:

> In a credit transaction in which a security interest is or will be retained or
> acquired in a consumer's principal dwelling, each consumer whose
> ownership interest is or will be subject to the security interest shall have
> the right to rescind the transaction ....

12 C.F.R. § 226.23(a)(1).

93. The regulation goes on to require that the creditor "deliver" to "each consumer entitled to

rescind" two copies of a document that "clearly and conspicuously disclose[]"  the

consumer's rescission rights. See 12 C.F.R. § 226.23(b)(1)

94. More specifically, the regulation provides:

> In a transaction subject to rescission, a creditor shall deliver two copies of the
> notice of the right to rescind to each consumer entitled to rescind (one copy to
> each if the notice is delivered by electronic communication as provided in
> § 226.36(b)). The notice shall be on a separate document that identifies the
> transaction and shall clearly and conspicuously disclose the following:

> (i) The retention or acquisition of a security interest in the

consumer's principal dwelling.

(ii) The consumer's right to rescind the transaction.

(iii) How to exercise the right to rescind, with a form for that purpose, designating the address of the creditor's place of business.

(iv) The effects of rescission, as described in paragraph (d) of this section.

(v) The date the rescission period expires.

12 C.F.R. § 226.23(b)(1).

95. Paragraph (d) goes on to explain the effects of rescission.  Subparagraph (d)(1) provides:

When a consumer rescinds a transaction, the security interest giving rise to the right of rescission becomes void and the consumer shall not be liable for any amount, including any finance charge.

12 C.F.R. § 226.23(d)(1).

96. Subparagraph (d)(2) states:

Within 20 calendar days after receipt of a notice of rescission, the creditor shall return any money or property that has been given to anyone in connection with the transaction and shall take any action necessary to reflect the termination of the security interest.

12 C.F.R. § 226.23(d)(2).

97. The Federal Reserve Board's commentary of paragraph 23(d)(2) explains that the words

"any money or property" would include an appraisal fee.  The commentary provides:

The consumer cannot be required to pay any amount in the form of money or property either to the creditor or to a third party as part of the credit transaction.  Any amounts of this nature already paid by the consumer must be refunded.  "Any amount" includes finance charges already accrued, as well as other charges, such as broker fees, application and commitment fees, or fees for a title search or appraisal, whether paid to the creditor, paid directly to a third party, or passed on from the creditor to the third party.  It is irrelevant that these amounts may not represent profit to the creditor.

12 C.F.R. part 226 Supp.I para. 23(d)(2)-1.

## TILA DISCLOSURE VIOLATIONS

98. Ameriquest's disclosures to plaintiffs in connection with plaintiffs' mortgage refinancing transactions did not comply with the requirements of the Truth in Lending Act. More specifically, the disclosures were deficient as follows:

99. The Notice of Right to Cancel forms that were delivered to Rose Terry at the closing did not set forth the date that the rescission period expired, which is a violation of 12 C.F.R. § 226.23(b)(1)(v).

100. Also, Ms. Terry was given a document (APPLICATION DISCLOSURE) which indicated that she would owe $200 for an Appraisal/Property Valuation Fee Deposit if she backed out of the deal, which misrepresented the effects of rescission in violation of 12 C.F.R. § 226.23(b)(1)(iv).

101. In addition, Ms. Terry was misinformed as to the cost of credit and payment schedule in that an Ameriquest representative told her that she would be getting a fixed rate loan when, in fact, she was given an adjustable rate mortgage.

102. On March 14, 2008, Ms. Terry sent a rescission request to Ameriquest and Deutsche Bank National Trust Company.

103. The Notice of Right to Cancel forms that were delivered to Terry Watt and Roy Parnell at the closing did not set forth the date that the rescission period expired, which is a violation of 12 C.F.R. § 226.23(b)(1)(v).

104. Also, Terry Watt was told that she would owe $350 for an Appraisal/Property Valuation Fee Deposit if she backed out of the deal, a misrepresentation of the effects of rescission in violation of 12 C.F.R. § 226.23(b)(1)(iv).

105. Terry Watt and Roy Parnell were also misled as to the cost of credit in that the closing costs turned out to be higher than previously represented.

106. On February 28, 2008, Ms. Watt and Mr. Parnell sent a rescission request to Ameriquest and Deutsche Bank National Trust Company.

107. The Notice of Right to Cancel forms that were delivered to Johanna Guyton at her May 2005 closing did not set forth the date that the rescission period expired, which is a violation of 12 C.F.R. § 226.23(b)(1)(v).

108. Also, Ms. Guyton was given a document (APPLICATION DISCLOSURE) which indicated that she would owe $500 for an Appraisal/Property Valuation Fee Deposit if she backed out of the deal, which misrepresented the effects of rescission in violation of 12 C.F.R. § 226.23(b)(1)(iv).

109. In addition, Ms. Guyton was misinformed as to the cost of credit in that she was originally told by an Ameriquest that her interest rate would be something like 5%, but she ended up with an initial interest rate 10.600% and a maximum possible rate of 16.600%.

110. At the closing her December 2005 loan, Ms. Guyton was given Notice of Right to Cancel forms based on the Federal Reserve Board's Model H-8 form and not the Model H-9 form required for borrowers refinancing with the same lender.

111. Ms. Guyton was given two documents (APPLICATION DISCLOSURE) misrepresenting the effects of rescission in violation of 12 C.F.R. § 226.23(b)(1)(iv).  One of which said she would owe a $475 appraisal fee deposit if she backed out of the deal.  The other said she would owe a $700 appraisal fee deposit if she backed out of the deal.

112. Ms. Guyton was also misinformed as to cost of credit.  According to the Good Faith Estimate, her fees and points were supposed to be $11,319.45, in fact they were $15,210.78, on a loan with a maximum possible interest rate of 14.500%.

113. On February 22, 2008, Ms. Guyton sent a rescission request to Ameriquest and Deutsche Bank National Trust Company.

114. The Notice of Right to Cancel form that was delivered to Luisa Bolo and Jorge Bolo at the closing did not set forth the date that the rescission period expired, which is a violation of 12 C.F.R. § 226.23(b)(1)(v).  Moreover, Ameriquest only delivered one copy of the Notice of Right to Cancel form to the Bolos, which is a separate violation of TILA.  See 12 C.F.R. § 226.23(b)(1).

115. In addition, the Bolos were misinformed as to the cost of credit and payment schedule by being told by Ameriquest that they would be getting a fixed rate loan when, in fact, they were given an adjustable rate mortgage.

116. The Notice of Right to Cancel form that was delivered to Selvin Quire and Beatrice Quire at the closing did not set forth the date that the rescission period expired, which is a

violation of 12 C.F.R. § 226.23(b)(1)(v).  Ameriquest also violated 12 C.F.R. §226.18 by including "Padding at 3%" in the amount financed, rather than the finance charge. This misclassification resulted in understatement of the applicable finance charge and the APR.

117. On March 14, 2008, Mr. and Mrs. Bolo sent a rescission request to Ameriquest and Deutsche Bank National Trust Company.

118. Also, an Ameriquest representative told Beatrice Quire that the Quires would owe $350 for an appraisal if they backed out of the deal, misrepresenting the effects of rescission in violation of 12 C.F.R. § 226.23(b)(1)(iv).

119. In addition, Beatrice Quire was misinformed as to the cost of credit and payment schedule.  Mrs. Quire was told by Ameriquest that she would be getting a fixed rate mortgage with an interest rate between 8% and 9%.  In fact, the Quires received an adjustable rate mortgage with an initial interest rate of 9.100% and a maximum possible rate of 15.100%.

120. On April 8, 2008, Mr. and Mrs. Quire sent a rescission request to Ameriquest and Deutsche Bank National Trust Company.

121. The Notice of Right to Cancel form that was delivered to Juan Baez and Cruz Rivera at the closing did not set forth the date that the rescission period expired, which is a violation of 12 C.F.R. § 226.23(b)(1)(v).  The Notice of Right to Cancel forms delivered to Mr. Baez and Ms. Rivera at the April 2005 closing were on H-8 forms, rather than H-9 forms that should have been provided.

122. Ameriquest gave Juan Baez and Cruz Rivera a document (APPLICATION DISCLOSURE) which stated that they were being charged $207 for an Appraisal/Property Valuation Fee Deposit if they backed out of the deal, which misrepresented the effects of rescission in violation of 12 C.F.R. § 226.23(b)(1)(iv).

123. On April 22, 2008, Mr. Baez and Ms. Rivera sent a rescission request to Ameriquest and Deutsche Bank National Trust Company.

124. Julie Noradin entered into her first refinancing transaction with Ameriquest on May 11, 2005.  At the closing on May 11, 2005  Ms. Noradin received five Notice of Right to Cancel forms. One of the Notice of Right to Cancel forms listed the document signing

18

date of "5-10-05" and the final date to cancel as "5-13-05."  Another Notice of Right to
Cancel form listed the document signing date as "5" and the final date to cancel
"5-1(illegible mark)-05."  Ms. Noradin also received three copies of the Notice of Right
to Cancel form that did not set forth the date that the rescission period expired.  Ms.
Noradin was not provided with two copies of the Notice of Right to Cancel form that
clearly and conspicuously disclosed her rescission rights in violation of 12 C.F.R §
226.23(b)(1).

125. At the closing on May 11, 2005, Ameriquest gave Julie Noradin a document
(APPLICATION DISCLOSURE) which stated that she was being charged $207 for an
Appraisal/Property Valuation Fee Deposit if she backed out of the deal, which
misrepresented the effects of rescission in violation of 12 C.F.R. § 226.23(b)(1)(iv).

126. Julie Noradin refinanced again with Ameriquest on April 20, 2006.  The Notice of Right
to Cancel forms left with Ms. Noradin at the closing did not set forth the date that the
rescission period expired, which is a violation of 12 C.F.R. § 226.23(b)(1)(v).

127. At the closing her April 2006 loan, Ms. Noradin was given Notice of Right to Cancel
forms based on the Federal Reserve Board's Model H-8 form and not the Model H-9 form
required for borrowers refinancing with the same lender.

128. Ms. Noradin was once again given a document (APPLICATION DISCLOSURE) which
indicated that she would owe $207 for an Appraisal/Property Valuation Fee Deposit if she
backed out of the deal, which misrepresented the effects of rescission in violation of 12
C.F.R. § 226.23(b)(1)(iv).

129. On April 10, 2008, Ms. Noradin sent a rescission request to Ameriquest and Deutsche
Bank National Trust Company.

130. The Notice of Right to Cancel forms that were delivered to Ananais & Ethel Colister at
the closing did not set forth the date that the rescission period expired, which is a
violation of 12 C.F.R. § 226.23(b)(1)(v).

131. At the closing of the loan, Ameriquest gave Ananais & Ethel Colister a document
(APPLICATION DISCLOSURE) which stated that they were being charged $350 for an
Appraisal/Property Valuation Fee Deposit if they backed out of the deal, which
misrepresented the effects of rescission in violation of 12 C.F.R. § 226.23(b)(1)(iv).

132. In addition, the Mr. & Mrs. Colister were misinformed as to the cost of credit and payment schedule by being told that the interest rate and payments on their Ameriquest Mortgage would be lower than the 7.9% rate and the $640 payment on their current mortgage.  Although the interest rate went down to 6.9%, the Colisters' mortgage payments increased $160 per month.

133. On May 21, 2008, Mr. and Mrs. Colister sent a rescission request to Ameriquest and Deutsche Bank National Trust Company.

134. The Notice of Right to Cancel forms that were delivered to Michael Cox and Susan Lawrence at the closing did not set forth the date that the rescission period expired, which is a violation of 12 C.F.R. § 226.23(b)(1)(v). Moreover, Ameriquest only delivered two copies of the Notice of Right to Cancel form to the Cox and Lawrence, not the required two copies for each borrower, which is a separate violation of TILA. See 12 C.F.R. § 226.23(b)(1).

135. At the closing of their loan, Ameriquest gave Michael Cox & Susan Lawrence a document (APPLICATION DISCLOSURE) which stated that they were being charged $350 for an Appraisal/Property Valuation Fee Deposit if they backed out of the deal, which misrepresented the effects of rescission in violation of 12 C.F.R. § 226.23(b)(1)(iv).

136. In addition, Cox and Lawrence  were misinformed as to the cost of credit.  Cox and Lawrence  were told that they would get a mortgage with a low rate around 7-8% However, the loan that Cox and Lawrence obtained from Ameriquest had an initial interest rate of 10.25% which could increase to a maximum rate of 16.250%.

137. On July 7, 2008, Mr. Cox and Ms. Lawrence sent a rescission request to Ameriquest and Deutsche Bank National Trust Company.

138. The Notice of Right to Cancel forms that were delivered to Ramses Favela at the closing did not set forth the date that the rescission period expired, which is a violation of 12 C.F.R. § 226.23(b)(1)(v).

139. At the closing of his loan, Ameriquest gave Mr. Favela a document (APPLICATION DISCLOSURE) which stated that he was being charged $200 for an Appraisal/Property Valuation Fee Deposit if he backed out of the deal, which misrepresented the effects of

rescission in violation of 12 C.F.R. § 226.23(b)(1)(iv).

140. In addition, the Mr. Favela was misinformed as to the cost of credit and payment schedule in that he was told that his interest rate would be lower than the 8.3% rate of his previous mortgage. The initial interest rate of Mr. Favela's Ameriquest mortgage was 9.85% and could increase to a maximum rate of 15.85%.

141. On March 11, 2008, Mr. Favela sent a rescission request to Ameriquest and Deutsche Bank National Trust Company.

142. Ameriquest only delivered one properly completed Notice of Right to Cancel form to Wences Garcia and Maria Lara at the closing of their loan. Ameriquest's failure to deliver two properly completed copies of the Notice of Right to Cancel form to each owner of the property is a violation of TILA. See 12 C.F.R. § 226.23(b)(1).

143. At the closing, Mr. Garcia and Ms. Lara were given a document (APPLICATION DISCLOSURE) which stated that they were being charged $207 for an Appraisal/Property Valuation Fee Deposit if they backed out of the deal, which misrepresented the effects of rescission in violation of 12 C.F.R. § 226.23(b)(1)(iv).

144. In addition, Garcia and Lara were misinformed as to the cost of credit and payment schedule. Garcia and Lara were informed through the preliminary disclosures that the loan's rate would be fixed for five years and initial interest rate would be 6.5% and could increase to 12.5%. The mortgage that Garcia and Lara obtained at a fixed rate for only two years and had an initial rate of 7.95% which could increase to a maximum rate of 13.95%.

145. On March 13, 2008, Mr. Garcia and Ms. Lara sent a rescission request to Ameriquest and Deutsche Bank National Trust Company.

146. A Notice of Right to Cancel form that was delivered to Elizabeth Hill at the August 12, 2005 closing set forth an incorrect date on which the rescission period expired. This is violation of 12 C.F.R. § 226.23(b)(1)(v).

147. At the closing of her loan, Ameriquest gave Elizabeth Hill a document (APPLICATION DISCLOSURE) which stated that she was being charged $350 for an Appraisal/Property Valuation Fee Deposit if she backed out of the deal, which misrepresented the effects of rescission in violation of 12 C.F.R. § 226.23(b)(1)(iv).

148. Elizabeth Hill refinanced again with Ameriquest on December 23, 2005. At the closing Ms. Hill was given Notice of Right to Cancel forms based on the Federal Reserve Board's Model H-8 form and not the Model H-9 form required for borrowers refinancing with the same lender.

149. In addition, Ms. Hill was once again told that she would owe $207 for an Appraisal/Property Valuation fee deposit if they backed out of the deal, a misrepresentation of the effects of rescission in violation of 12 C.F.R. § 226.23(b)(1)(iv).

150. Ms. Hill was misinformed as to the cost of credit. Before the closing of the August 12, 2005 loan, Ms. Hill was told that she would be getting a fixed-rate loan at around 8% interest. However, she received an adjustable-rate loan at 10.1% interest with a maximum possible rate of 12.1%. Before the December 23, 2005 closing, Ms. Hill told that she would be getting a fixed-rate loan at around 7% interest. However, Ms. Hill got a fixed-rate loan at 8.5%.

151. On June 26, 2008, Ms. Hill sent a rescission request to Ameriquest and Deutsche Bank National Trust Company.

152. The Notice of Right to Cancel forms that were delivered to Alfredo & Ana Velia Jaime at the closing did not set forth the date that the rescission period expired, which is a violation of 12 C.F.R. § 226.23(b)(1)(v). Also, the Notice of Right to Cancel forms delivered at the closing were on H-8 forms, rather than H-9 forms as should have been provided since the Jaimes were refinancing their mortgage with the same lender.

153. The Notice of Right to Cancel forms delivered at the closing makes it appear that only Alfredo Jaime has the right to cancel. In fact, Ana Velia Jaime, co-owner of the home and therefore a consumer under 12 C.F.R. § 226.2(a)(11), also had and has the right to cancel. The notice, therefore, did not properly disclose her rescission rights, a violation of 12 C.F.R. § 226.23(b)(1). The mortgage transaction at issue granted Ameriquest a security interest in Ana Velia Jaime's principal dwelling. Each consumer whose ownership interest is subject to a security interest shall have the right to rescind the transaction. 12 C.F.R. § 226.23(a)(1).

154. Regulation Z provides that when multiple consumers are involved in a rescindable transaction, the required disclosures shall be made to each consumer who has

the right to rescind.  See 12 C.F.R. §226.17(d).  Failure to provide Ana Velia Jaime, a co-owner of the mortgaged property, with notice of her right to cancel the transaction is a basis for rescission.  12 C.F.R. § 226.23(b)(1).

155. At the closing of their loan, Ameriquest gave Mr. & Mrs. Jaime a two separate documents (APPLICATION DISCLOSURE) which stated that they were being charged either $200 or $350 for an Appraisal/Property Valuation and that this "deposit is refundable only if the loan is denied or withdrawn prior to the Lender ordering the Appraisal/Property Valuation."  The documents misrepresented the effects of rescission in violation of 12 C.F.R. § 226.23(b)(1)(iv).

156. On February 28, 2008, Mr. and Mrs. Jaime sent a rescission request to Ameriquest and Deutsche Bank National Trust Company.

157. The Notice of Right to Cancel forms delivered at the closing to Carey Lee at the June 2005 closing makes it appear that only Carey Lee has the right to cancel.  In fact, Denise Lee, co-owner of the home and therefore a consumer under 12 C.F.R. § 226.2(a)(11), also had and has the right to cancel.  The notice, therefore, did not properly disclose her rescission rights, a violation of 12 C.F.R. § 226.23(b)(1). The mortgage transaction at issue granted Ameriquest a security interest in Denise Lee's principal dwelling.  Each consumer whose ownership interest is subject to a security interest shall have the right to rescind the transaction.  12 C.F.R. § 226.23(a)(1).

158. Regulation Z provides that when multiple consumers are involved in a rescindable transaction, the required disclosures shall be made to each consumer who has the right to rescind.  See 12 C.F.R. §226.17(d).  Failure to provide Denise Lee, a co-owner of the mortgaged property, with notice of her right to cancel the transaction is a basis for rescission.  12 C.F.R. § 226.23(b)(1).

159. The Notice of Right to Cancel forms that were delivered to Denise Lee at the June 2005 closing did not set forth the date that the rescission period expired, which is a violation of 12 C.F.R. § 226.23(b)(1)(v).

160. At the closing of their loan, Ameriquest gave Denise & Carey Lee a document (APPLICATION DISCLOSURE) which stated that they were being charged $350 for an Appraisal/Property Valuation Fee Deposit if they backed out of the deal, which

misrepresented the effects of rescission in violation of 12 C.F.R. § 226.23(b)(1)(iv).

161. Denise & Carey Lee refinanced again with Ameriquest in January 2006.  At the closing the Lees were given Notice of Right to Cancel forms based on the Federal Reserve Board's Model H-8 form and not the Model H-9 form required for borrowers refinancing with the same lender.  Moreover, Ameriquest only delivered two copies of properly completed the Notice of Right to Cancel forms to the Cox and Lawrence, not the required two copies for each borrower, which is a separate violation of TILA. See 12 C.F.R. § 226.23(b)(1).

162. Mr. & Mrs. Lee were misinformed as to their payment amounts.  Before the closing of the January 2006 loan, the Lees were told that refinancing would reduce their mortgage payments.  However, their mortgage payments went up by $220.68 a month.

163. On March 28, 2008, Mr. and Mrs. Lee sent a rescission request to Ameriquest and Deutsche Bank National Trust Company.

164. The Notice of Right to Cancel forms that were delivered to Daryl Monson at the closing did not set forth the date that the rescission period expired, which is a violation of 12 C.F.R. § 226.23(b)(1)(v).

165. At the closing of his loan, Ameriquest gave Daryl Monson a document (APPLICATION DISCLOSURE) which stated that he was being charged $350 for an Appraisal/Property Valuation Fee Deposit if he backed out of the deal, which misrepresented the effects of rescission in violation of 12 C.F.R. § 226.23(b)(1)(iv).  Mr. Monson was also told verbally by the broker, Mr. Armando Vega, that the appraisal fee was non-refundable.

166. Daryl Monson was misinformed as to the cost of credit.  Before the closing of the loan, Monson was told that he would be getting a fixed-rate loan at 8% interest and his payments would be around $1,000.  He was also told he would be receiving between $28,000 and $30,000 in cash out of the refinance.  However, Monson received an adjustable-rate loan with an interest rate of 10.05% which could increase to a maximum rate of 16.05% and did not receive any of the $28,000 to $30,000 he was promised.

167. On February 21, 2008, Mr. Monson sent a rescission request to Ameriquest and Deutsche Bank National Trust Company.

168. The Notice of Right to Cancel forms that were delivered to Lawrence Mueller at the closing did not set forth the correct date that the rescission period expired, which is a violation of 12 C.F.R. § 226.23(b)(1)(v).

169. At the closing of his loan, Ameriquest gave Lawrence Mueller a document (APPLICATION DISCLOSURE) which stated that he was being charged $500 for an Appraisal/Property Valuation Fee Deposit if he backed out of the deal, which misrepresented the effects of rescission in violation of 12 C.F.R. § 226.23(b)(1)(iv).

170. On April 9, 2008, Mr. Mueller sent a rescission request to Ameriquest and Deutsche Bank National Trust Company.

171. Only one Notice of Right to Cancel form that was delivered to Benjamin Neeley at the closing set forth the correct date that the rescission period expired, which is a violation of 12 C.F.R. § 226.23(b)(1)(v).  Mr. Neeley was not provided with two copies of the Notice of Right to Cancel form that clearly and conspicuously disclosed his rescission rights, which is a violation of 12 C.F.R § 226.23(b)(1).

172. At the closing of his loan, Ameriquest gave Benjamin Neeley a document (APPLICATION DISCLOSURE) which stated that he was being charged $350 for an Appraisal/Property Valuation Fee Deposit if he  backed out of the deal, which misrepresented the effects of rescission in violation of 12 C.F.R. § 226.23(b)(1)(iv).

173. Benjamin Neeley was misinformed as to the cost of credit.  Before the closing of the loan, Neeley was told that he would be getting a loan at 7% interest.  However, the loan turned out to have a 10.35% interest rate.  Neeley was also charged several thousand dollars more in settlement charges than he was led to believe before the closing.

174. On April 4, 2008, Mr. Neeley sent a rescission request to Ameriquest and Deutsche Bank National Trust Company.

175. Ameriquest did not deliver any Notice of Right to Cancel forms to John and Constance Puga at the closing of their loan.  In fact, Ameriquest only delivered a settlement statement to the Pugas at the closing.  Ameriquest's failure to deliver two properly completed Notice of Right to Cancel forms and the TILA disclosure to each owner of the property is a violation of TILA.  See 12 C.F.R. § 226.23(b)(1).

176.In addition, the Pugas were misinformed as to the cost of credit and payment schedule by being told by Ameriquest that they would be getting 15 year mortgage with an interest rate of 6.75%. The Pugas were also told that for the first five years, the loan would be interest only and the payments would stay the same. Further, the Pugas were told that the entire amount of their payments for the final ten years of the loan would go toward principal. In fact, the mortgage that the Pugas obtained from Ameriquest is a 30 year mortgage, which is "interest only" for the first five years and could adjust up to 12.750% after that. Also, the payments that the Puga are to make after the first five years of the loan go toward both principal and interest. This is contrary to what Mr. Puga was told by the Ameriquest representative.

177.On May 20, 2008, Mr. and Mrs. Puga sent a rescission request to Ameriquest and Deutsche Bank National Trust Company.

178.The Notice of Right to Cancel forms that were delivered to James Shew at the closing did not set forth the date that the rescission period expired, which is a violation of 12 C.F.R. § 226.23(b)(1)(v).

179.At the closing of his loan, Ameriquest gave James Shew a document (APPLICATION DISCLOSURE) which stated that he was being charged $350 for an Appraisal/Property Valuation Fee Deposit if he backed out of the deal, which misrepresented the effects of rescission in violation of 12 C.F.R. § 226.23(b)(1)(iv).

180.In addition, James Shew was misinformed as to the cost of credit. Before the closing of the loan, Shew was told by an Ameriquest representative that he would be getting a loan at 7% interest. However, the loan turned out to have a 7.5 % interest rate.

181.On May 19, 2008, Mr. Shew sent a rescission request to Ameriquest and Deutsche Bank National Trust Company.

182.The Notice of Right to Cancel forms that were delivered to Harold Wells at the closing did not set forth the date that the rescission period expired, which is a violation of 12 C.F.R. § 226.23(b)(1)(v).

183.In addition, Harold Wells was misinformed as to the cost of credit and his payment amounts. Before the closing of the loan, Wells was told by an Ameriquest representative that he would be getting a mortgage with a lower interest rate than his current rate of

8.5%.  However, the interest rate on the Ameriquest mortgage was 9.95%

184. On June 23, 2008, Mr. Wells sent a rescission request to Ameriquest and Deutsche Bank National Trust Company.

185. Under the Truth in Lending Act, if the rescission disclosures or material TILA disclosures are deficient, then the rescission period is extended for up to three years. See 12 C.F.R. § 226.23(a)(3) ("If the required notice or material disclosures are not delivered, the right to rescind shall expire 3 years after consummation, upon transfer of all of the consumer's interest in the property, or upon sale of the property, whichever occurs first").

186. Ameriquest's rescission and material TILA disclosures were defective.  Accordingly, plaintiffs are entitled to rescission of their mortgage transactions.

**COUNT TWO -- VIOLATION OF ILLINOIS CONSUMER FRAUD ACT**

187. Plaintiffs (except Julie Noradin, Juan Baez & Cruz Rivera, Alfredo & Ana Velia Jaime and Lawrence Mueller) incorporate paragraphs one through eighty-threee above.

188. In connection with trade or commerce, Ameriquest made false and misleading statements to the plaintiffs (except Julie Noradin, Juan Baez & Cruz Rivera, Alfredo & Ana Velia Jaime and Lawrence Mueller) intending to induce reliance.  Ameriquest baited plaintiffs into a mortgage transaction by offering a relatively favorable set of terms and then switching to more expensive terms. More specifically, plaintiffs were misled as follows:

189. In or about May 2005, an Ameriquest representative told Rose Terry that she would be getting a fixed rate mortgage with an interest rate between 7% and 8%.  In fact, Ms. Terry received an adjustable rate mortgage with a maximum possible rate of 13.850%.

190. In or about, October 2005, an Ameriquest representative told Terry Watt to expect closing costs of about $10,000, in fact they were closer to $12,000.

191. In or about May 2005, an Ameriquest representative told Johanna Guyton that her interest rate would be something like 5%, but instead she ended up with an initial interest rate 10.600% which could increase to a maximum possible rate of 16.600%.

192. In or about December 2005, Ameriquest provided Johanna Guyton with a Good Faith Estimate for a new loan which projected fees and points of $11,319.45.  In fact they were $15,210.78, on a loan with a maximum possible interest rate of 14.500%.

193. In or about June 2005, an Ameriquest representative told Luisa Bolo that she would be getting a fixed rate mortgage with an interest rate of 6.25%. In fact, the Bolos received an adjustable rate mortgage with an initial interest rate of 6.200% which could increase to a maximum possible rate of 12.200%.

194. In or about June 2005, an Ameriquest representative told Beatrice Quire that she would be getting a fixed rate mortgage with an interest rate between 8% and 9%. In fact, the Quires received an adjustable rate mortgage with an initial interest rate of 9.100% which could increase to a maximum possible rate of 15.100%.

195. In or about October 2005, an Ameriquest representative told Ananasis & Ethel Colister that they would be getting a loan with an interest rate and payments that would be lower than the 7.9% rate and the $640 payment on their current mortgage. Although the interest rate went down to 6.9%, the Colisters' mortgage payments increased $160 per month.

196. In or about September 2005, an Ameriquest representative told Michael Cox and Susan Lawrence that they would be getting a loan with a low interest rate around 7-8%. In fact, the loan that Cox and Lawrence obtained from Ameriquest had an initial interest rate of 10.25% which could increase to a maximum rate of 16.250%.

197. In or about February 2006, an Ameriquest representative told Mr. Favela that he would be getting an interest rate that would be lower than the 8.3% of his previous mortgage. In fact, Mr. Favela's received a mortgage with an initial interest rate of 9.85% which could increase to a maximum possible rate of 15.85%.

198. In or about September 9, 2005, Ameriquest provided Wences Garcia and Maria Lara with preliminary disclosures stating that the loan's rate would be fixed for five years and the initial interest rate would be 6.5% which could increase to a maximum rate of 12.5%. In fact, the mortgage that Garcia and Lara obtained was only fixed for two years and had an initial rate of 7.95% which could increase to a maximum rate of 13.95%.

199. In or about August 2005, an Ameriquest representative told Ms. Hill that she would be getting a fixed-rate loan at around 8% interest. In fact, she received an adjustable-rate loan at 10.1% interest which could increase to a maximum possible rate of 12.1%.

200. In or about December 2005, an Ameriquest representative told Ms. Hill that she would be getting a fixed-rate loan at around 7% interest. In fact, Ms. Hill got a fixed-rate loan at

8.5%.

201. In or about January 2006, an Ameriquest representative told Denise & Carey Lee that their monthly mortgage payments would go down if they refinanced their mortgage. In fact, the Lees' monthly mortgage payments increased by $220.68 as a result of the second refinancing transaction with Ameriquest.

202. In or about August 2005, an Ameriquest representative told Daryl Monson that he would be getting a fixed-rate loan at 8% interest and his payments would be around $1,000. He was also told he would be receiving between $28,000 and $30,000 out of the refinance. In fact, Monson received an adjustable-rate loan with an interest rate of 10.05% which could increase to a maximum rate of 16.05% and did not receive any of the $28,000 to $30,000 he was promised.

203. In or about August 2005, an Ameriquest representative told Benjamin Neeley that he would be getting a loan at 7% interest and that he would be paying an approximate amount in settlement charges. In fact, the mortgage had an interest rate of 10.35% interest rate. Neeley was also charged several thousand dollars more in settlement charges than he led to believe before the closing.

204. In or about November 2005, an Ameriquest representative told Mr. Puga that he would be getting 15 year mortgage with an interest rate of 6.75%. The Pugas were also told that for the first five years, the loan would be interest only and the payments would stay the same. Further, the Pugas were told that the entire amount of their payments for the final ten years of the loan would go toward principal. In fact, the mortgage that the Pugas obtained from Ameriquest is a 30 year mortgage, which is "interest only" for the first five years and could adjust up to 12.750% after that. Also, the payments that the Puga are to make after the first five years of the loan go toward both principal and interest. This is contrary to what Mr. Puga was told by the Ameriquest representative.

205. In or about September 2005, an Ameriquest representative told James Shew that he would be getting a loan at 7% interest. In fact, the mortgage turned out to have an interest rate of 7.5%.

206. In or about March 2006, an Ameriquest representative told Harold Wells that he would be getting a mortgage with a lower interest rate than his current rate of 8.5%. However,

the interest rate on mortgage that Mr. Wells received was 9.95%

207. Ameriquest's false and misleading statements to plaintiffs violated plaintiffs' rights under the Illinois Consumer Fraud Act.

208. Ameriquest's false and misleading statements deceived plaintiffs and proximately caused them injury.

209. Ameriquest's violation of plaintiffs' rights was part of a pattern and practice of illegal behavior by Ameriquest. Defendants Deutsche Bank, Ameriquest Capital Corporation, ACC Capital Holdings, Inc. and Ameriquest Mortgage Securities knowingly participated in and aided and abetted this pattern and practice of illegal behavior and are therefore also liable to plaintiffs.

210. Assuming a 30 year mortgage, the present value damages associated with monthly overcharges (comparing what is being charged to the promised payments) of $2,500, $2,000, $1,500, $1,000 and $500 per month and assumed discount rates of 1%, 2%, 3%, 4% and 5% are listed in the table below:

|         | 1%       | 2%       | 3%       | 4%       | 5%       |
|---------|----------|----------|----------|----------|----------|
| $2,500  | $777,268 | $676,371 | $592,973 | $523,653 | $465,704 |
| $2,000  | $621,814 | $541,097 | $474,379 | $418,922 | $372,563 |
| $1,500  | $466,361 | $405,823 | $355,784 | $314,192 | $279,422 |
| $1,000  | $310,907 | $270,549 | $237,189 | $209,461 | $186,282 |
| $500    | $155,454 | $135,274 | $118,595 | $104,731 | $93,141  |

211. Assuming a 30 year adjustable rate mortgage sold as a fixed rate mortgage in more general terms he present value damages associated with monthly overcharges after the first two years (comparing what is being charged to the promised payments) of $1,200, $800, $400, $200 and $100 per month and assuming discount rates of 1%, 2%, 3%, 4% and 5% are shown in the table below:

|         | 1%        | 2%        | 3%        | 4%        | 5%        |
|---------|-----------|-----------|-----------|-----------|-----------|
| $1,200  | $351,545  | $308,538  | $272,562  | $242,320  | $216,773  |
| $800    | $234,363  | $205,692  | $181,708  | $161,547  | $144,515  |
| $400    | $117,182  | $102,846  | $90,854   | $80,773   | $72,258   |
| $200    | $58,591   | $51,423   | $45,427   | $40,387   | $36,129   |
| $100    | $29,295   | $25,711   | $27,713   | $20,193   | $18,064   |

## COUNT THREE – VIOLATION OF 740 ILCS § 160/5 & 6

212. Plaintiffs incorporate paragraphs one through two hundred eleven above.

213. Ameriquest transferred monies to its parent corporations and corporate insiders in violation of 740 ILCS § 160/5 & 6 ("IUFTA").

214. Upon information and belief, subject to further investigation, Roland and Dawn Arnall received over $500 million in prohibited transfers from Ameriquest Capital Corporation and its affiliated companies since January 1, 2005.

215. Since January 1, 2005, Wayne Lee has received at least $34.75 million in prohibited transfers from Ameriquest Capital Corporation.

216. Plaintiffs are creditors and have claims under the IUFTA. The IUFTA provides that a creditor is a person who has a claim. 740 ILCS §160/2(d). A "claim" under the IUFTA is a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured. 740 ILCS § 160/2(c).

## AMERIQUEST'S VIOLATION OF SECTION 5(a)(1) OF THE IUFTA

217. Section 5(a)(1) of the IUFTA prohibits transfers of assets or monies, regardless of whether the creditor's claim arose before or after the transfer was made, if the debtor made the transfer with the actual intent to hinder or delay any creditor of the debtor. *See* 740 ILCS §160/5(a)(1).

218. Defendants Ameriquest Capital Corporation,  ACC Capital Holdings, Ameriquest Mortgage Securities, Wayne Lee and Dawn Arnall have conspired with Ameriquest and others to have money or property transferred from the company for the purpose of hindering its creditors.

219. In 2001, Mr. Lee became the first President of Argent Mortgage Company, a direct subsidiary of ACC Capital Holdings and an indirect subsidiary of Ameriquest Capital Corporation.  Argent Mortgage Company was a wholesale mortgage lender.

220. On June 18, 2004, Mr. Lee became the CEO of ACC Capital Holdings.  As CEO, Mr. Lee was supposed to have the responsibility for the operations of Argent and Ameriquest. Lee was assured by Roland Arnall that he would have the authority to make crucial decisions and changes necessary to fix the business and legal challenges that were facing Ameriquest, most notably the Attorneys General investigation.

221. As CEO of ACC Capital Holdings, Mr. Lee received an annual salary of around $330,000.

222. In the ensuing months after Mr. Lee became CEO of ACC Capital Holdings and contrary to his prior assurances, Roland Arnall repeatedly blocked Mr. Lee's attempts to implement reforms at Ameriquest.

223. In June 2005, Mr. Lee was told by Roland Arnall that he should focus on Argent while he (Arnall) would handle Ameriquest's retail operations.  Faced with Roland Arnall's usurping of his authority, Mr. Lee resigned as CEO of ACC Capital Holdings Corporation on or about June 5, 2005.

224. On June 22, 2005, Ameriquest Capital Corporation and Wayne Lee entered into a so-called "Consulting Agreement" whereby Mr. Lee, among other things, agreed to not to disparage Ameriquest or any of its affiliated companies.  In exchange for this agreement, Mr. Lee was to be paid $50 million.

225. On or about June 30, 2005, Ameriquest Capital Holdings made an initial payment of $20 million to Mr. Lee under the Consulting Agreement.

226. Mr. Lee was never called upon by Ameriquest Capital Corporation or any of its affiliated companies to perform any consulting under the agreement.

227. In 2006, Ameriquest Capital Corporation failed to pay the $6 million yearly payment that was to be made to Mr. Lee through 2010.

228. On January 26, 2007, Mr. Lee filed suit in the Superior Court of the State of California for the County of Orange seeking to enforce his rights under the Consulting Agreement and for a release from any obligation not to compete against Ameriquest Capital Corporation or its affiliated companies.

229. To settle the suit filed by Mr. Lee, Ameriquest Capital Corporation paid Mr. Lee $14.75 million of the remaining $30 million that Mr. Lee was due and eliminated the non-compete provision from the Consulting Agreement.  However, the non-disparagement provision remained in the agreement until 2010 and Mr. Lee agreed that Ameriquest Capital Corporation would represent him in both a personal and professional capacity in all legal matters arising out of his time as CEO of ACC Capital Holdings.

230. Between January 26, 2007 and May 9, 2007,  Ameriquest Capital Corporation transferred $14.75 million to Mr. Lee, making the total transfers after June 5, 2005 $34.75 million.

231. Ameriquest paid for Mr. Lee's silence because Ameriquest believed that Mr. Lee possessed disparaging information about Ameriquest, such as its insolvency and wrongdoing., the disclosure of which would be helpful to creditors of Ameriquest (such as aggrieved customers and investors).

232. For example, the prospectuses used to market Ameriquest mortgages were replete with false representations, a fact which Ameriquest wished to conceal.

233. For example, in June 2005 Ameriquest represented in a prospectus for a pool of loans that it was offering that private lawsuits "will not result in monetary damages which will have a material adverse effect on the financial condition or results of the Seller [Ameriquest]."  The Ameriquest Mortgage Securities, Inc. Asset-Backed Pass-Through Certificates Series 2005-R5 prospectus supplement prospectus also represented the following:

> Each mortgage loan seller, or a party in its behalf, will have made representations and warranties in respect of the mortgage loans sold by that mortgage loan seller.  The following material representations and warranties as to the mortgage loans will be made by or on the behalf of each mortgage loan seller:
>
> ***

- that each mortgage loan was made in compliance with, and is enforceable under, all applicable local, state and federal laws and regulations in all material respects.

234. Adam Bass, who was senior executive Vice President of Ameriquest, approved the above representations in the Ameriquest Mortgage Securities, Inc. Asset-Backed Pass-Through Certificates Series 2005-R5 prospectus supplement.

235. The above representations in the Ameriquest Mortgage Securities, Inc. Asset-Backed Pass-Through Certificates Series 2005-R5 prospectus supplement were false.

236. At the time the above representations were made in the prospectus supplement, upon information and belief, subject to further investigation, Ameriquest had settled more than fifteen lawsuits filed on behalf of individual borrowers for the amounts in excess of $100,000 in cash or credits.

237. At the time the above representations were made in the prospectus supplement, upon information and belief, subject to further investigation, Ameriquest had paid more than $5 million in cash or credits to settle lawsuits filed on behalf of individual borrowers.

238. At the time the above representations were made in the prospectus supplement, Ameriquest knew that there were private individual suits pending against Ameriquest on behalf of more than 300 individual customers.

239. At the time the above representations were made in the prospectus supplement, Ameriquest  knew that there were more than ten putative class action suits pending against Ameriquest.

240. At the time the above representations were made in the prospectus supplement, Ameriquest knew that there were more than twenty putative class action suits pending against Ameriquest.

241. At the time the above representations were made in the prospectus supplement, upon information and belief, subject to further investigation, Ameriquest had less than $15 million in its bank accounts.

242. At the time the above representations were made in the prospectus supplement, upon information and belief, subject to further investigation, more than 10,000 Ameriquest mortgage customers had complained (in writing or by telephone) to Ameriquest or AMC Mortgage Services about Ameriquest. For the most part, the complaints alleged bait and

switch practices by Ameriquest account executives and/or loans based on inflated appraisals.  Some customers accused Ameriquest of forgery.

243. At the time the above representations were made in the prospectus supplement, a task force of Attorneys General from at least 30 states were conducting an investigation into the lending practices of Ameriquest. ("AG Settlement")  The lending practices that were being investigated include representations, misrepresentations, omissions, disclosures or any other acts, events, facts, transactions, occurrences, or conduct, whether oral, written or otherwise, by an Ameriquest Party, including its employees or agents, arising out of, in connection with, or relating to any of the following:

- Loan types and terms, including Discount Points, interest rates, origination-related fees, monthly payment amounts, terms of Adjustable Rate and Fixed Rate Mortgages and Prepayment Penalties.
- Written disclosures, including the Good Faith Estimate and other documents required to be provided to a potential borrower by any law or otherwise, provided by an Ameriquest Party.
- The borrower benefits of obtaining a loan from an Ameriquest party or from a repeat refinancing transaction from a repeat refinancing with an Ameriquest Party.
- Coordination with Debt Collectors.
- The timely completion of the Underwriting functions and funding of a loan.
- Closing of a loan.
- Appraisals.
- Stated Income Loans.
- Disclosures to non-English speaking Borrowers and Potential Borrowers.

244. False representations using the same language as in the June 2005 prospectus were made in at least ten other prospectuses issued between June 2004 and March 2006, including prospectuses issued after Ameriquest entered into the AG Settlement.

245. The transfers from Ameriquest Capital Corporation to Mr. Lee were made with the intention of preventing Mr. Lee of disclosing disparaging information about Ameriquest that would be helpful to its creditors.  The elimination of the non-compete provision in the Consulting Agreement shows that the main, if not sole, consideration Ameriquest Capital Corporation received for the $34.75 million was Mr. Lee's promise not to disclose disparaging information about Ameriquest that would be helpful to its creditors, such as information about insolvency and wrongdoing.

246. The transfers to Mr. Lee from Ameriquest Capital Corporation after June 1, 2005 should be avoided to allow plaintiffs, who are creditors, to recover the value of their TILA and ICFA claims.

## AMERIQUEST'S VIOLATION OF SECTION 5(a)(2) OF THE IUFTA

247. Section 5(a)(2) of the IUFTA prohibits transfers of assets or monies, regardless of whether the creditor's claim arose before or after the transfer was made, if the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer and the debtor (a) was engaged or was about to engage in a ...transaction for which the remaining assets of the debtor were unreasonably small in relation to the...transaction; or (b) intended to incur, or believed or reasonably should have believed that he would incur debts beyond his ability to pay as they became due. *See* 740 ILCS §160/5(a)(2).

248. Ameriquest generated enormous amounts of revenues and profits, virtually all of which were transferred to parent companies and corporate insiders. The transfers from Ameriquest to its parent companies, the Arnalls, The Roland and Dawn Arnall Living Trust, and Lee left Ameriquest in the position where its remaining assets were unreasonably small in relation to the transfers.

249. Between 2002 and 2004, Ameriquest generated at least $7.6 billion in revenue.

250. Between 2002 and 2004, Ameriquest earned at least $2.7 billion in profits, after expenses.

251. In 2003, Ameriquest earned at least $900 million in profit.

252. In 2003, Ameriquest funded at least $20 billion in mortgages.

253. In 2003, Argent Mortgage Company funded at least $21 billion in mortgages.

254. In 2004, Ameriquest funded at least $35 billion in mortgages.

255. In 2004, Argent Mortgage Company funded at least $47 billion in mortgages.

256. In 2004, Ameriquest generated at least $1.3 billion in profit.

257. In 2004, Ameriquest generated at least $4.13 billion in revenue.

258. In 2004, Ameriquest generated at least $1.79 billion in interest income.

259. In 2005, Ameriquest funded at least $29 billion in mortgages.

260. In 2005, Argent Mortgage Company funded at least $45 billion in mortgages.

261. In 2005, Ameriquest generated at least $250 million in profit.

262. In 2005, Ameriquest generated at least $3.67 billion in revenue.

263. In 2005, Ameriquest generated at least $1.24 billion in interest income.

264. In 2006, Ameriquest funded at least $5 billion in mortgages.

265. In 2006, Argent Mortgage Company funded at least $12 billion in mortgages.

266. Upon information and belief, subject to further investigation, Ameriquest, its parent companies and/or its insurers paid over $50 million in cash and credits to settle lawsuits brought by Ameriquest borrowers.

267. On December 13, 2005, the Judicial Panel on Multi-District Litigation ordered pursuant to 28 U.S.C. §1407 that five putative class action cases be transferred to the Judge Aspen in the Northern District of Illinois and consolidated for pretrial proceedings. Those cases are:

> *Burggraff v. Ameriquest Capital Corp., et al.*, U.S. District Court for the Central District of California;

> *Knox, et al. v. Ameriquest Mortgage Co., et al.*, U.S. District Court for the Northern District of California;

> *Williams, et al. v. Ameriquest Mortgage Co.,* U.S. District Court for the Middle District of Florida;

> *Murphy, et al. v. Ameriquest Mortgage Co.*, U.S. District Court for the District of Massachusetts;

> *Williams, et al. v. Ameriquest Mortgage Co.*, U.S. District Court for the Southern District of New York;

268. On December 6, 2006, the "Borrowers' Consolidated Class Action Complaint" was filed in the U.S. District Court for the Northern District of Illinois. The class action complaint consolidated 20 class actions that were transferred to Judge Aspen. Those cases are:

> *Barber v. Ameriquest Capital Corp.*, U.S. District Court for the Middle District of Florida;

> *Becker v. J.M. Closing Services, Inc., et al.*, U.S. District Court for the District of Maryland;

> *Brown v. Ameriquest Capital Corp.*, U.S. District Court for the Central District of California;

*Campbell v. Ameriquest Mortgage Co.*, U.S. District Court for the Middle District of Georgia;

*Capasso v. Ameriquest Mortgage Co.*, U.S. District Court for the District of New Jersey;

*Carlson v. Ameriquest Mortgage Co.*, U.S. District Court for the District of Minnesota;

*D'Ambrogi v. Ameriquest Mortgage Co.*, U.S. District Court for the Eastern District of Pennsylvania;

*Doherty v. Town & Country Credit Corp.*, U.S. District Court for the District of Minnesota;

*Harless v. Ameriquest Mortgage Co.,* U.S. District Court for the Southern District of Indiana;

*Jewell v. Ameriquest Mortgage Co.*, U.S. District Court for the Northern District of Illinois;

*Juillerat v. Ameriquest Mortgage Co.*, U.S. District Court for the Central District of California;

*Kahrer v. Ameriquest Mortgage Co.*, U.S. District Court for the Western District of Pennsylvania;

*Knox v. Ameriquest Mortgage Co.*, U.S. District Court for the Northern District of California;

*Madrazo v. Ameriquest Mortgage Co.*, U.S. District Court for the Eastern District of New York;

*Montanez v. Ameriquest Mortgage Co.*, U.S. District Court for the District of Massachusetts;

*Murphy v. Ameriquest Mortgage Co.*, U.S. District Court for the District of Massachusetts;

*Saunders v. Ameriquest Mortgage Co.*, Case No. U.S. District Court for the Northern District of Ohio;

*Ungar v. Ameriquest Mortgage Co.*, U.S. District Court for the Middle District of Florida;

*Williams v. Ameriquest Mortgage Co.*, U. S. District Court for the Southern District of New York; and

*Williams v. Ameriquest Mortgage Co.*, U.S. District Court for the Middle District of Florida.

269. As of August 4, 2008, there have been over 350 individual lawsuits filed against Ameriquest that have been transferred to Judge Aspen and consolidated for pretrial proceedings.

270. In or about March 2005, Ameriquest agreed to settle the cases *Pierceall v. Ameriquest Mortgage Company and Ameriquest Capital Corporation* and *Bryan v. Ameriquest Mortgage Company* that were coordinated in The Superior Court for the State of California in and for the County of San Mateo, J.C.C.P. No. 4162. The Ameriquest defendants agree to pay claimants at least $15 million and up to $50 million and class counsel's fees and expenses in an amount of $10 million.

271. In June or July 2005, ACC Capital Holdings Corporation recorded a provision of $325 million to resolve an investigation by the Attorneys General of 30 states.

272. In November 2005, a judgment in Oklahoma state court was entered against Ameriquest and in favor of Melba Gilean in the amount of $1.94 million in actual damages and $3 million in punitive damages.

273. In January 2006, Ameriquest agreed to pay $325 million to settle a two year investigation by a task force of Attorneys General from 49 states and the District of Columbia ("AG Settlement") .

274. In August 2006, a class action lawsuit was filed in Baltimore City Circuit Court alleging that Ameriquest instructed its affiliated settlement companies to charge borrowers an illegal notary fee from which Ameriquest received a kickback.

275. In April 2007, a Hennepin County Minnesota judge granted class action status to a lawsuit that alleges Ameriquest engaged in abusive and fraudulent lending practices.

276. In September 2007, Wachovia Bank filed suit against Ameriquest Mortgage Company alleging that at least 135 of the loans Wachovia bought in 2005 for $125 million were "non-performing.."  Wachovia also alleged that some of the loans were funded even though incorrect credit scores, false employment status and misstatements of the kind of

home that was being financed were used in the application and underwriting process.

277. In November 2007, Ameriquest paid a civil penalty of $1 million to the FTC for calls to people on the "DO NOT CALL" list.

278. In February 2008, class certification was granted in a case filed in Pinellas County, Florida alleging that Ameriquest charged and collected a higher rate for title insurance associated with home purchases instead of a lower "reissue rate" for refinancing transactions.

279. Upon information and belief, subject to further investigation, the net worth or shareholder equity figure reported on Ameriquest's balance sheet at the end of 2005, 2006, and 2007 was less than the amount of money that Ameriquest, its parent companies or their insurers have paid in cash or credits to resolve private litigation against Ameriquest.

280. Despite these liabilities, Ameriquest transferred monies and/or other assets to its parent companies and, through them, to the Arnalls, The Roland and Dawn Arnall Living Trust and Lee.

281. Upon information and belief, subject to further investigation, the transfers from Ameriquest to the Arnalls, The Roland and Dawn Arnall Living Trust, and Lee left the remaining assets of Ameriquest unreasonably small in relation to the full and fair value of pending claims against Ameriquest by aggrieved mortgage customers.

282. Upon information and belief, subject to further investigation, the transfers from Ameriquest to the Arnalls and Lee occurred when Ameriquest believed or reasonably should have believed that it would incur debts beyond their ability to pay as they become due.  Some of these debts include the full and fair value of the putative class actions and the over 350 individual actions that are currently pending against it in the Northern District of Illinois.

283. The transfers to the Arnalls and Mr. Lee from Ameriquest Capital Corporation after June 1, 2004 should be avoided to allow plaintiffs, who are creditors, to recover the value of their TILA and ICFA claims.

### AMERIQUEST'S VIOLATION OF SECTION 6(a) OF THE IUFTA

284. Section 6(a) of the IUFTA prohibits transfers of assets or monies if the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer and the debtor was insolvent at the time or the debtor became insolvent as a result of the transfer. *See* 740 ILCS §160/5(a)(2).

285. Plaintiffs' incorporate by reference paragraphs 249-266 above.

286. Ameriquest generated enormous amounts of revenues and profits, virtually all of which were transferred to parent companies and corporate insiders.  The transfers from Ameriquest to its parent companies, the Arnalls, The Roland and Dawn Arnall Living Trust, and Lee left Ameriquest insolvent.

287. Insolvency, under the IUFTA, occurs when the liabilities of a debtor are greater than its existing assets at the time of the transfers of money.  Ameriquest had enormous liabilities as illustrated by paragraphs 267-280, which are incorporated here by reference.

288. Since June 1, 2004, Ameriquest has been insolvent, The fair value of its potential liabilities to aggrieved customers and investors has exceeded its net worth (separate and apart from those potential liabilities).

289. Upon information and belief, subject to further investigation, the amount of money that Ameriquest has reserved to pay for the settlement of pending litigation by mortgage customers is less than the amount of money that Ameriquest, its parent companies and/or their insurers have paid to resolve past litigation by mortgage customers.

290. Since June 1, 2004, Ameriquest's net worth (separate from its potential liability to aggrieved customers and investors) has been less than the fair value of Ameriquest's potential liability to aggrieved customers and investors

291. Despite its insolvency, Ameriquest has transferred money to affiliates and insiders (both directly and indirectly) without receiving adequate consideration in return.

292. Ameriquest did not receive reasonably equivalent value for the transfers that were made to Ameriquest Capital Corporation ACC Capital Holdings, Roland and Dawn Arnall and The Roland and Dawn Arnall Living Trust. Upon information and belief, subject to further investigation, Ameriquest transferred monies received from the sale of mortgages it originated and fees generated from these mortgages to their parent companies,

Ameriquest Capital Holdings and ACC Capital Holdings, who then transferred the funds to Roland and Dawn Arnall and The Roland and Dawn Arnall Living Trust. These parties did not provide full consideration to Ameriquest in exchange for the funds transferred. The transfers therefore should be avoided.

293. Ameriquest did not receive reasonably equivalent value for the transfers that were made to Wayne Lee pursuant to the so-called Consulting Agreement and the settlement of his suit to enforce it. Mr. Lee was paid $34.75 million even though he never performed any consulting duties. The only provision of the Consulting Agreement of any consequence was the non-disparagement provision. Ameriquest paid Lee $34.75 million not to disclose information regarding Ameriquest's insolvency and wrongdoing. Lee did not provide full and fair legitimate consideration to Ameriquest in exchange for $34.75 million and the transfer should be avoided.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs request that the Court grant judgment against defendants as follows

a. canceling the appropriate defendants' security interest in appropriate plaintiffs' homes and ordering those defendants to provide plaintiffs with the money to which plaintiffs are entitled to under 12 C.F.R. § 226.23(d)(2);

b. awarding plaintiffs actual damages proximately caused by defendants' failure to comply with 12 C.F.R. § 226.23(d)(2);

c. awarding appropriate statutory damages;

d. ordering defendants to pay costs, penalties, and attorneys fees;

e. awarding plaintiffs actual and punitive damages;

f. avoidance of the transfer of funds to Ameriquest Capital Corporation, ACC Capital Holdings, Roland and Dawn Arnall, The Roland and Dawn Arnall Living Trust, and Wayne Lee to the extent necessary to satisfy plaintiffs' claims under TILA and the ICFA;

g.      imposition of a constructive trust on the funds transferred to Ameriquest Capital

Corporation, ACC Capital Holdings, Roland and Dawn Arnall, The Roland and

Dawn Arnall Living Trust, and Wayne Lee to the extent necessary to satisfy

plaintiffs' claims under TILA and the ICFA;

h.      entry of a temporary restraining order, and preliminary and permanent injunction,

restraining defendants from further transfers or encumbrances of any other asset

that in law or in equity is or ought to be subject to the plaintiffs' claims;

i.      granting such other relief as the Court deems just and proper.


Date:  August 5, 2008                    Respectfully submitted by:


                                         /s/ Anthony P. Valach, Jr.
                                         Counsel for the Plaintiffs

                                         THE LAW OFFICES OF DANIEL HARRIS
                                         Daniel Harris
                                         Anthony Valach
                                         150 N. Wacker Dr., Suite 3000
                                         Chicago, IL 60606
                                         Telephone: (312) 960-1802
                                         Facsimile: (312) 960-1936


## CERTIFICATE OF SERVICE

I, Anthony P. Valach, Jr., hereby certify that on this 5th day of August 2008, a true and correct copy plaintiffs' **AMENDED COMPLAINT** of was served, via the Court's electronic filing system, upon counsel of record.


                                         /s/ Anthony Valach
                                         Anthony Valach