## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| ROSE TERRY, TERRY WATT, ROY PARNELL, JOHANNA GUYTON, LUISA and JORGE BOLO, SELVIN and BEATRICE QUIRE, JUAN BAEZ, and CRUZ RIVERA and JULIE NORADIN, <br><br>         Plaintiffs <br><br> vs. <br><br> AMERIQUEST MORTGAGE COMPANY, AMERIQUEST CAPITAL CORPORATION, ACC CAPITAL HOLDINGS, INC., AMERIQUEST MORTGAGE SECURITIES, INC., DEUTSCHE BANK NATIONAL TRUST COMPANY, DAWN ARNALL and WAYNE LEE <br><br>         Defendants | Case No.: 08CV2475 <br><br> Honorable David H. Coar <br><br> **DEFENDANT WAYNE LEE'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS UNDER RULE 12(B)(2) FOR LACK OF PERSONAL JURISDICTION AND RULE 12(B)(6) FOR FAILURE TO STATE A CLAIM** |

## INTRODUCTION

This Court should dismiss Defendant Wayne Lee ("Mr. Lee") from this action because it cannot exercise personal jurisdiction over Mr. Lee. The following critical facts mandate this conclusion:

- Lee is a non-resident of Illinois. Plaintiffs have not alleged any facts to support personal jurisdiction over him, and indeed his affidavit establishes that the minimum contacts necessary to exercise personal jurisdiction over him do not exist.

- Even if such minimum contacts did exist, Illinois' "fiduciary shield" doctrine would prohibit this Court from exercising personal jurisdiction in this case.

Even if Mr. Lee were subject to personal jurisdiction in Illinois, this Court should dismiss Plaintiffs' complaint against Mr. Lee pursuant to Rule 12(b)(6). Counts I and II make no

allegations against Mr. Lee and should be dismissed as to him. Count III, alleging a fraudulent conveyance, should be dismissed for the following reasons:

- Plaintiffs do not allege that they have a debtor/creditor relationship with Ameriquest Capital Corporation ("ACC"), the entity alleged to have made the fraudulent transfer, as they must do in order to succeed on such a claim.

- Plaintiffs' claims under Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act ("IUFTA") do not sufficiently allege that any defendant attempted to defraud a creditor.

- Many of Plaintiffs' alleged claims arose after the date of the transfers complained of, and therefore cannot form the basis for a cause of action under Section 6 of the IUFTA.

## I.    FACTUAL BACKGROUND

### A.    Plaintiffs' Allegations

Count I of the Complaint alleges that various lenders and loan servicers violated the federal Truth In Lending Act, 15 U.S.C. Section 1601, and its associated regulations, in connection with loans received by Plaintiffs. Count II alleges that these lenders and servicers violated the Illinois Consumer Fraud Act. Counts I and II do not allege that Mr. Lee committed any misconduct relevant to those Counts, and indeed do not even mention Mr. Lee.

Count III alleges a violation of the Illinois Uniform Fraudulent Transfer Act, 740 ILCS Section 160/5 and 160/6. Plaintiffs allege that Mr. Lee received $34.75 million in transfers from Ameriquest Capital Corporation, and that these payments violated the IUFTA. (*See generally* Complaint at ¶¶ 212-293).

### B.    Lee's Lack of Contact with Plaintiffs or Illinois

Lee is a citizen of the State of California and currently resides in California. (Declaration of Wayne Lee ("Lee Decl."), attached hereto at Tab 1, at ¶ 3). Lee does not own, rent, or possess, nor has he ever owned, rented, or possessed, any property in Illinois. (*Id.* at ¶ 4). Lee does not maintain, nor has he ever maintained, a residence in Illinois. (*Id.* at ¶¶ 3-4). Lee is not, nor has he ever been, registered to vote in Illinois. (*Id.* at ¶ 4). Lee does not personally conduct,

nor has he ever personally conducted, any business in Illinois. (*Id.* at ¶¶ 4,8). Lee does not maintain, nor has he ever maintained, any bank accounts in Illinois. (*Id.* at ¶ 4). Lee has never sued or been sued in an Illinois court, or made any other use of the Illinois court system. (*Id.* at ¶ 5).

Mr. Lee's only connection to some of the loans in this action is as chief executive officer of defendant ACC Capital Holdings, Inc. ("ACCCH") between June of 2004 and May of 2005. (*See id.* at ¶ 7). Only a handful of the twenty-three loan transactions at issue in this case closed during this time. (Complaint, ¶¶ 4-26). As CEO of ACCCH, Mr. Lee at no time interacted with any of the named Plaintiffs in this action. Specifically, he did not serve as the Ameriquest representative who contacted the Plaintiffs to discuss their various loan terms. He did not assist Plaintiffs in processing their mortgage loans, nor was he present at the closing of their respective loans. (Lee Decl. at ¶ 6). While Mr. Lee occasionally traveled to Illinois to visit company facilities during this time period, his visits were solely for the purposes of fulfilling his duties as CEO of ACCCH. (*Id.* at ¶ 8).[1]

In or around June 2005, Mr. Lee left ACCCH after 15 years of service with the company and its affiliates. Given his expertise in this field and his knowledge of ACCCH's proprietary information, Mr. Lee and ACCCH's holding company, Ameriquest Capital Corporation ("ACC"), entered into a consulting agreement whereby Mr. Lee would, *inter alia*: 1) provide consulting services to ACC; and 2) agree not to compete with ACC. (*See id.* at ¶ 9 and Ex. A). This agreement, referenced in the Complaint (*e.g.*, Complaint at ¶ 224), was negotiated and executed in California. The parties to this agreement were both California citizens, and ACC's corporate headquarters were located in California. (*Id.* at ¶¶ 3, 7, 9 and Ex. A). The agreement provided that it would be governed by California law. (*Id.* at Ex. A).

---

[1] Plaintiffs do not allege that Mr. Lee's occasional travels to Illinois were related to their fraudulent conveyance claims.

## II.    ARGUMENT

### A.    Plaintiffs' Complaint Should Be Dismissed For Lack Of Personal Jurisdiction.

#### 1.    Plaintiffs have not, and cannot, allege that Mr. Lee has sufficient "minimum contacts" with Illinois.

Here, plaintiffs bear the burden of showing a *prima facie* case of personal jurisdiction for each and every defendant. *See Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.,* 230 F.3d 934, 939 (7th Cir. 2000).[2]  A federal district court sitting in Illinois may exercise personal jurisdiction over a nonresident defendant only if an Illinois state court would have personal jurisdiction over that defendant.  *See Michael J. Newman & Assocs., Ltd. vs. Florabelle Flowers, Inc.,* 15 F.3d 721, 724 (7th Cir. 1994).  Illinois law extends personal jurisdiction only to the extent permitted by the Illinois Constitution and the Constitution of the United States.  *See* 735 ILCS 5/2-209(c); *Hyatt Int'l Corp. v. Coco,* 302 F.3d 707, 714-15 (7th Cir. 2002).  Accordingly, personal jurisdiction can be analyzed simply on federal due process grounds.  *Hyatt,* 302 F.3d at 715-16; *see also United Fin. Mortgage Corp. v. Bayshores Funding Corp.,* 245 F. Supp. 2d 884, 891-92 (N.D. Ill. 2002) (condensing the personal jurisdiction analysis into a single federal due process inquiry); *Interlease Aviation v. Vanguard Airlines, Inc.,* 262 F. Supp. 2d 898, 905-06 (N.D. Ill. 2003).

Under the federal due process clause, a state court may exercise personal jurisdiction over a nonresident defendant only if the defendant has certain minimum contacts with the forum state such that maintenance of the suit does not offend traditional notions of fair play and substantial justice. *See Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945); *Florabelle Flowers, Inc.,* 15 F.3d at 725.  Critical to this inquiry is whether the defendant purposefully availed himself of the privilege of conducting activities within the forum state, thus invoking the benefits and

---

[2] Thus, where the defendant submits an affidavit contesting personal jurisdiction, a plaintiff asserting the existence of personal jurisdiction "must go beyond the pleadings and submit affirmative evidence supporting the existence of jurisdiction." *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 783 (7th Cir. 2003).

protections of its laws.  *See Asahi Metal Indus. Co. v. Super. Ct. of Cal., Solano County,* 480 U.S. 102, 109 (1987) (quoting *Hanson v. Denckla,* 357 U.S. 235, 253 (1958)).

Forum courts can, in two different ways, properly exercise personal jurisdiction consistent with *International Shoe* and its progeny.  A court may exercise "general jurisdiction" over the citizens of a state and over persons or entities that transact business in the forum state on a systematic and regular basis.  *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 416 (1984); *see also Interlease,* 262 F. Supp. 2d at 906.  When a court exercises general jurisdiction over a defendant, there is no need to show that the action at issue "arises from" the defendant's contacts with the forum.  Alternatively, courts may in some cases exercise "specific jurisdiction."  Specific jurisdiction may be exercised over a defendant only where the action "arise[s] out of or [is] related to the defendant's contacts with the forum."  *Helicopteros*, 466 U.S. at 414 n.8.

Here, Plaintiffs have not alleged, nor can they allege, facts to support general jurisdiction. Plaintiffs do not allege that Mr. Lee transacted business in Illinois.  Further, Mr. Lee's declaration establishes that he does not have the continuous and systematic contacts with Illinois that would be required to justify the exercise of general jurisdiction.  Mr. Lee is a California resident who has never: 1) owned, rented or possessed property in Illinois; 2) maintained a residence in Illinois; 3) registered to vote in Illinois; 4) personally conducted any business in Illinois; 5) maintained any bank accounts in Illinois; or 6) made use of the Illinois court system. (Lee Decl. at ¶¶ 3-5).  On these facts, Mr. Lee cannot be subject to general jurisdiction in Illinois. *See Interlease*, 262 F. Supp. 2d at 907.

Nor have Plaintiffs alleged facts sufficient to show that their action "aris[es] out of or [is] related to the defendant's contacts with the forum," a *sine qua non* for the exercise of specific jurisdiction.  *Helicopteros*, 466 U.S. at 414 fn. 8.  The only allegations as to Mr. Lee, contained in Count III, are not alleged to have occurred in Illinois, and Mr. Lee's declaration establishes that they indeed did not occur there.  Rather, the pivotal acts alleged in the Complaint relating to Plaintiffs' claim of fraudulent conveyance all occurred in California at a time when Mr. Lee was

5

leaving ACCCH, thus specific jurisdiction does not exist here.

> 2.    **Even if Plaintiffs had alleged sufficient minimum contacts, the fiduciary shield doctrine prevents Illinois from exercising personal jurisdiction over Mr. Lee.**

"The fiduciary shield doctrine is a limitation on the reach of the Illinois long-arm statute that protects a non-resident [defendant] from being haled into court in Illinois in his individual capacity when that person's only contact with Illinois is 'by virtue of his acts as a fiduciary of a corporation.'" *Plastics Film Corp. of Am., Inc. v. UNIPAC, Inc.*, 128 F. Supp. 2d 1143, 1146 (N.D. Ill. 2001) (quoting *Alpert v. Bertsch,* 601 N.E.2d 1031, 1037 (Ill. App. Ct. 1992); *see also Dick Corp. v. SNC-Lavalin Constructors, Inc.*, No. 04 C 1043, 2006 WL 1049724, *4 (N.D. Ill. April 20, 2006) ("if an individual has contact with a state only by virtue of his acts as a fiduciary of a corporation, such acts may not form the basis for the exercise of personal jurisdiction in Illinois") (attached at Tab 2).  This doctrine recognizes that an individual whose presence and activity in a forum stems solely from his conduct on behalf of an employer cannot fairly or reasonably be held subject to personal jurisdiction on the basis of such business-related conduct. *Rice v. Nova Biomedical Corp.*, 38 F.3d 909, 912 (7th Cir. 1994); *Rollins v. Ellwood,* 565 N.E.2d 1302, 1318 (Ill. 1990).

Any of Mr. Lee's tangential contacts with Illinois were made in connection with his employment as chief executive officer of defendant ACCCH.  Such contacts were "a product of, and was motivated by, his employment situation and not his personal interests," and it would be "unfair to use this conduct to assert personal jurisdiction over him as an individual." *Rollins,* 565 N.E.2d at 1318.  Accordingly, the fiduciary shield doctrine also prevents an Illinois court from exercising personal jurisdiction over Mr. Lee.

**B.    Plaintiffs' Complaint Should Be Dismissed For Failure to State a Claim.**

Even if this Court did have personal jurisdiction over Mr. Lee, it should still dismiss the Complaint as to him because it fails to state a claim upon which relief can be granted.  To state a claim in federal court, a plaintiff must "give the defendant … the grounds upon which it rests." *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007) (quotation omitted). While the court must assume that a plaintiff's allegations are true on a motion to dismiss, the Court may disregard conclusory allegations and unreasonable inferences. *McCullah v. Gadert*, 344 F.3d 655, 657 (7th Cir. 2003).  Thus, a claim requires "more than … merely creat[ing] a suspicion of a … cause of action," and more than stating "a legal conclusion couched as a factual allegation." *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1965 (2007) (citations omitted).  At the same time, "a plaintiff can plead himself out of court by alleging facts that show there is no viable claim." *Pugh v. Tribune Co.*, 521 F.3d 686, 699 (7th Cir. 2008).  The dismissal does not rest on whether a legal theory has been set forth in the complaint. *Neitzke v. Williams*, 490 U.S. 319, 327 (1989).  Rather, the relevant question is whether the facts alleged are sufficient to prove a claim as a matter of law.  *Id.*

With respect to Counts I and II of the Complaint, Plaintiffs have not made any allegations against Mr. Lee.  Accordingly, those counts should be dismissed as to Mr. Lee.  Count III should also be dismissed as to Mr. Lee.  As an initial matter, Plaintiffs have not alleged that they have a creditor/debtor relationship with ACC, as they must do in order to allege any fraudulent conveyance claim.  Further, with respect to the fraudulent conveyance claims made under Section 5 of the Illinois Uniform Fraudulent Transfer Act ("IUFTA"), these claims fail because Plaintiffs have not alleged, as they must, that the transaction between ACC and Mr. Lee was made with the intent to defraud future creditors.  Finally, with respect to Plaintiffs' claims made

under Section 6 of the IUFTA, these claims fail to the extent that Plaintiffs did not receive their loans prior to the date of the transaction.  Indeed, most of the Plaintiffs' loans closed after the date of the alleged agreement, and cannot claim that their claims "arose before the transfer was made or the obligation was incurred," as Section 6 requires in order to recover.  Mr. Lee hereby incorporates and adopts by reference the legal explanation and arguments made on these points in Part III of Defendants Ameriquest Mortgage Company's, Ameriquest Capital Corporation's, ACC Capital Holdings, Inc.'s, and Ameriquest Mortgage Securities, Inc.'s Motion To Dismiss Pursuant to Rule 12(b)(6) For Failure To State A Claim.

## CONCLUSION

Defendant Wayne Lee does not have the requisite contacts with Illinois sufficient to support jurisdiction and no part of Plaintiffs' claim asserted against Mr. Lee arose from his contacts with Illinois.  Consequently, Mr. Lee respectfully submits that this Court should dismiss the Complaint for want of personal jurisdiction under Rule 12(b)(2).  In addition, because Plaintiffs have failed to plead facts sufficient to maintain a cause of action against Mr. Lee, this Court should dismiss all three counts of the Complaint pursuant to Rule 12(b)(6).

DATED:  August 28, 2008

Respectfully submitted,

By: /s/  Thomas J. Wiegand

Thomas J. Wiegand
Gregory J. Miarecki
David E. Dahlquist
Winston & Strawn, LLP
35 West Wacker Drive
Chicago, Illinois  60601-9703
Telephone: (312) 558-5600
Facsimile:  (312) 558-5700
twiegand@winston.com

*Attorneys for Wayne Lee*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 28, 2008, I filed the above and foregoing with the Court's

ECF system and by doing so served a copy on all parties.


/s/ Thomas J. Wiegand
Attorney for Wayne Lee

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ROSE TERRY, TERRY WATT, ROY PARNELL, JOHANNA GUYTON, LUISA and JORGE BOLO, SELVIN and BEATRICE QUIRE, JUAN BAEZ, and CRUZ RIVERA and JULIE NORADIN, | Case No.: 08CV2475 |

Plaintiffs

vs.

AMERIQUEST MORTGAGE COMPANY, AMERIQUEST CAPITAL CORPORATION, ACC CAPITAL HOLDINGS, INC., AMERIQUEST MORTGAGE SECURITIES, INC., DEUTSCHE BANK NATIONAL TRUST COMPANY, DAWN ARNALL and WAYNE LEE

Defendants

Honorable David H. Coar

**DEFENDANT WAYNE LEE'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS UNDER RULE 12(B)(2) FOR LACK OF PERSONAL JURISDICTION AND RULE 12(B)(6) FOR FAILURE TO STATE A CLAIM**

**INDEX OF EXHIBITS**

1.    Declaration of Wayne Lee

2.    *Dick Corp. v. SNC-Lavalin Constructors, Inc.*, No. 04 C 1043, 2006 WL 1049724 (N.D. Ill. April 20, 2006)

1

# Exhibit

# 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

ROSE TERRY, TERRY WATT, ROY
PARNELL, JOHANNA GUYTON,
LUISA and JORGE BOLO, SELVIN and
BEATRICE QUIRE, JUAN BAEZ, and
CRUZ RIVERA and JULIE NORADIN,

                      Plaintiffs

vs.

AMERIQUEST MORTGAGE
COMPANY, AMERIQUEST CAPITAL
CORPORATION, ACC CAPITAL
HOLDINGS, INC., AMERIQUEST
MORTGAGE SECURITIES, INC.,
DEUTSCHE BANK NATIONAL TRUST
COMPANY, DAWN ARNALL and
WAYNE LEE

                      Defendants

Case No.: 08CV2475

**DECLARATION OF DEFENDANT
WAYNE LEE IN SUPPORT OF MOTION
TO DISMISS UNDER RULE 12(B)(2) FOR
LACK OF PERSONAL JURISDICTION
AND RULE 12(B)(6) FOR FAILURE TO
STATE A CLAIM**

---

**DECLARATION OF DEFENDANT WAYNE LEE IN SUPPORT OF MOTION TO
DISMISS UNDER RULE 12(B)(2) FOR LACK OF PERSONAL JURISDICTION AND
RULE 12(B)(6) FOR FAILURE TO STATE A CLAIM**

I, Wayne Lee, hereby declare as follows:

1.      I am a defendant in the above-entitled action. The facts stated herein are based upon my own personal knowledge.

2.      I submit this declaration in support of my Motion to Dismiss under Federal Rules of Civil Procedure Rule 12(b)(2) for lack of personal jurisdiction and Rule 12(b)(6) for failure to state a claim.

3.      I am a citizen of the State of California, and currently reside in California. I have never resided in the State of Illinois.

1

4.      I have never personally leased or owned any real or personal property in Illinois. I have never held a bank account or applied for a loan in Illinois. I have never maintained an Illinois telephone number or mailing address, nor have I ever registered to vote in Illinois. I have never personally conducted any business in Illinois.

5.      I have never sued or been sued in an Illinois court, or made any other use of the Illinois court system, other than in connection with this case.

6.      I have reviewed the Amended Complaint filed against me in *Terry, et al. v. Ameriquest Mortgage Company, et al.*, No. 08-cv-2475. I do not recognize any of the named Plaintiffs in this matter. I have never had any contact with the Plaintiffs regarding their loans and was not present at the closing of their respective loans.

7.      From June of 2004 to May of 2005, I served as CEO of ACC Capital Holdings, Inc. ("ACCCH"). During this time, I maintained my main office at 1100 Town & Country Road, Orange, California. I mainly operated out of that address and my employees reported to me at that address.

8.      During my tenure as CEO of ACCCH, I occasionally traveled to Illinois to visit company facilities and for the sole purpose of fulfilling my duties. However, I have never conducted any personal business in Illinois.

9.      In May of 2005, I left my employment at ACCCH. At that time, Ameriquest Capital Corporation ("ACC") and I entered into an agreement, a true and correct copy of which is attached as Exhibit "A."

10.     The Consulting Agreement was negotiated and signed entirely in California, not in Illinois. I did not execute any documents relating to this agreement in Illinois.

2

I solemnly affirm under the penalties of perjury that the contents of the foregoing are true

to the best of my knowledge, information, and belief.

_____
Wayne Lee

SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned notary public, this 28 th day of August 2008.

_____
Notary Public

My Commission Expires: 6-6-2011

YOUNG C. PARK
Commission # 1744265
Notary Public - California
Orange County
My Comm. Expires Jun 6, 2011

3

# EXHIBIT A

## CONSULTING AGREEMENT

This CONSULTING AGREEMENT is entered into as of the 22nd day of June, by and between AMERIQUEST CAPITAL CORPORATION, a Delaware corporation (the "Company"), and Wayne Lee ("Consultant").

WHEREAS, the Company is, directly and/or through entities controlled by and under common control with it (the "Company Affiliates") engaged in the mortgage lending and other businesses; and

WHEREAS, Consultant has previously served as an executive officer, director and/or in other key capacities of or with the Company and/or the Company Affiliates, is in a position to provide knowledge and expertise in connection with the business and affairs of the Company and the Company Affiliates; and

WHEREAS, the parties hereto desire that a Consulting relationship be established between the Company and Consultant so that the Company and the Company Affiliates can continue to have the benefit of his knowledge and expertise notwithstanding his retirement from the Company and the Company Affiliates.

NOW, THEREFORE, in consideration of the promises, covenants and conditions herein contained, the parties mutually agree as follows:

### 1.    CONSULTING AGREEMENT.

The Company hereby engages Consultant to perform, and consultant accepts such engagement and agrees to perform, for a term commencing as of June 15, 2005 and ending on June 14, 2010, those consulting services which are described in Section 3 hereof.

### 2.    COMPENSATION.

The Company agrees to pay Consultant, and Consultant agrees to accept as full compensation for the performance of consulting services hereunder, the sum of Fifty Million Dollars ($50,000,000.00), payable, provided that this Agreement has not theretofore terminated by reason of any breach of its terms by Consultant and if, but only if, Consultant has not breached any of his covenants or agreements under Section 5 hereof, Twenty Million Dollars ($20,000,000.00) on the eight day following execution and delivery of this Agreement and Six Million Dollars ($6,000,000.00) on the 14th day of June in each of 2006, 2007, 2008, 2009 and 2010. Provided that Consultant shall not be in breach of any of his obligations under Section 5 hereof, the Company's obligation to make these payments shall survive Consultant's death or permanent disability. The Company shall also, through June 14, 2010, provide Consultant with medical and dental benefits substantially comparable to those which he enjoyed as an employee of the Company and/or the Company Affiliates.

### 3.    DUTIES.

In consideration of the payments to be made hereunder, Consultant agrees to consult with and advise the Company with respect to its affairs and those of the Company Affiliates and to be available to do so for no more than ten (10) hours in any single day and upon no less than two (2) business days advance written notice, with the aforementioned services to include attendance if requested to be present at meetings at the Company's and/or Company Affiliates' offices and/or at meetings of their Boards of Directors and/or Committees thereof. In so doing, Consultant shall not be required to render any more than 25 hours of service hereunder per calendar quarter, non-cumulative, and it is specifically understood and agreed that Consultant shall be in compliance with his obligations under this Section 3 if he has made himself ready, willing and able with respect thereto, notwithstanding that the Company and Company Affiliates may not have required Consultant's services as to any increment or period. Consultant also agrees to serve, if elected, on the Board of Directors of Argent Mortgage Company, LLC and on the Board of any entity which might succeed to substantially all of its business and to devote such time thereto as might reasonably be required, with time spent attending Board meetings to be credited against the hours required above. Subject to the provisions of Section 5 hereof, Consultant shall be free to engage or possess an interest in, consult with or render other services to other business ventures, independently or with others, and neither the Company nor the Company Affiliates shall have any right in or to such other ventures or to the income or profits derived by any person therefrom or any right to estop such other activities of Consultant subject to Section 5 hereof.

### 4.    INDEPENDENT CONTRACTOR.

In performance hereunder Consultant is an independent contractor. Consultant shall perform all services hereunder according to its own means and methods of work to the best of its abilities, which shall be in its exclusive charge and control and not be subject to the control or supervision of the Company excepting as to the results of the work. Consultant shall be entirely and solely responsible for its acts while engaged in the performance of services hereunder.

The parties hereto agree that payments to be made by the Company to Consultant are for services as an independent contractor. The Company shall not make any deduction from the fees to be paid Consultant, including but not limited to social security, withholding taxes, unemployment insurance and other such deductions. Consultant assumes full responsibility for all such taxes, contributions and assessments and for workers' compensation insurance, agrees to indemnify the Company with respect thereto and agrees to meet all requirements which may be specified under regulations of administrative officials or bodies charged with enforcement of any relevant state or Federal act. Consultant also agrees to furnish the Company, upon request, a certificate or other evidence of compliance with the state or Federal laws governing contributions, taxes and assessments on payrolls.

5.    **CONDUCT OF CONSULTANT.**

5.1    Records and Confidential Information.

(a)    Return of Records. All memoranda, notices, files, records, and other documents that Consultant makes or compiles during the term of his engagement, or are made available to him concerning the business of the Company and/or any Company Affiliate, shall be the Company's property and shall be delivered to the Company at its request therefor or automatically on the termination of Consultant's engagement.

(b)    Confidential Information. Consultant acknowledges and agrees that, in and as a result of Consultant's engagement by the Company, Consultant will make use of and will acquire confidential or proprietary information developed by the Company and/or Company Affiliates that is of a special and unique nature and value to the Company and/or Company Affiliates including, but not limited to, the nature and material terms of business methods and opportunities and the business and financial records of the Company and/or Company Affiliates and owners, members and employees of the Company and/or Company Affiliates (the "Confidential Information"). Consultant shall not at any time, directly or indirectly, disclose to any person or entity any Confidential Information (regardless of whether such information qualifies as "trade secret" under applicable law) which Consultant has obtained or which has been disclosed to Consultant as a result of his engagement hereunder unless

(i)    Authorized in writing by the Company;

(ii)    Such information, knowledge, or data is available to the public generally without breach of this Section 5.1; or

(iii)    Disclosure is required to be made pursuant to an order of any court or government agency, subpoena, or legal process.

(c)    Certain Procedures. Consultant shall immediately supply the Company with a copy of any legal process delivered to Consultant requesting Confidential Information. Prior to any disclosure of Confidential Information, Consultant shall as soon as practicable notify the Company, and shall permit the Company to seek an order protecting the confidentiality of such information. Consultant further agrees that, in addition to any other remedy available to the Company in the event of any breach of this Section 5.1, the Company will be entitled (without posting bond or security) to injunctive or other equitable relief, as deemed appropriate by any court or tribunal, to prevent a breach of Consultant's obligations under this Section 5.1. Consultant's obligations under this Section 5.1 shall survive the termination of Consultant's engagement by the Company.

5.2    Non-Competition and Non-Solicitation. Consultant agrees that, throughout the course of his engagement by the Company and provided that the Company is not in material breach of its obligations under this Agreement, he will not, directly or indirectly, without the prior written consent of the Company:

(a)    Competition. Own, operate or participate in any way as an employee, consultant or otherwise in any business, enterprise or undertaking which acts, directly

or indirectly, as a wholesale or retail residential mortgage lender, Affiliate, even if the Company Affiliate is then not a Company Affiliate (provided such business, enterprise or undertaking was engaged in by such Affiliate when it was a Company Affiliate).

(b)    Solicitation.    Induce any employee, shareholder, member, or partner of the Company or of any Company Affiliates to become an employee, member or partner of, or to establish a business relationship with Consultant or any person or entity who employs Consultant, or with whom Consultant is a member, or partner, or a business affiliate.

(c)    Certain Procedures.    Consultant acknowledges and agrees that the restrictions set forth in this Section 5.2 are reasonable and necessitated by legitimate and legally protected business needs.   In the event any provision of this Section 5.2 is held by a court or tribunal to be unenforceable or invalid for any reason Consultant agrees that this Section 5.2 shall be interpreted to extend over the maximum period of time for which and the maximum territory over which it may be enforceable, all as determined by such court or tribunal. Consultant further agrees that, in addition to any other remedy available to the Company in the event of any breach of this Section 5.2, the Company will be entitled (without posting bond or security) to injunctive or other equitable relief, as deemed appropriate by any such court or tribunal, to prevent a breach of Consultant's obligations set forth in this Section 5.2. The obligations under this Section 5.2 shall survive the termination of Consultant's engagement by the Company.

5.3    Non-Disparagement.   Consultant agrees, provided that the Company is not in material breach of its obligations under this Agreement, not to publish or communicate to any person or entity any Disparaging (as defined herein) remarks, comments or statements concerning the Company or any Company Affiliates.   "Disparaging" remarks, comments or statements are those that impugn the character, honesty, integrity, morality, business acumen or abilities in connection with any aspect of the operation of the business of the individual or entity being disparaged.   This provisions will not apply, however, in the case of any disparagement which is made:

(i)    in testimony pursuant to a court order, subpoena, or legal

(ii)    process; or

(iii)    to a court, mediator, or arbitrator in connection with any litigation or dispute between the parties.

Consultant further agrees that, in addition to any other remedy available to the Company in the event of any breach of this Section 4.3, the Company will be entitled (without posting bond or other security) to injunctive or other equitable relief, as deemed appropriate by the court or tribunal involved, to prevent a breach of Consultant's obligations set forth in this Section 5.3. The obligations under this Section 4.3 shall survive the expiration or termination of Consultant's engagement hereunder.

6.     EFFECT OF MERGER TRANSFER OF ASSETS ETC. SUMS DUE YOU UPON DEATH.

This Agreement shall not be terminated by any voluntary or involuntary dissolution of the Company resulting from either a merger or consolidation in which the Company is not the consolidated or surviving corporation, or by a transfer of all or substantially all of the assets of the Company. In the event of any such merger or consolidation or transfer of assets, the Company's rights, benefits and obligations hereunder shall be assigned to and assumed by the surviving or resulting corporation or the transferee of the Company's assets. Thus, this letter shall either survive intact and bind the successor (in which case the survivor and not the Company shall thereafter be liable hereunder). Any sums that may be due Consultant from the Company under this letter following the date of Consultant's death shall be paid to Consultant's executors, administrators, heirs, personal representatives, successors and assigns.

7.     COMPLETE RELEASE.

As a material inducement to the Company to enter into this Agreement, Consultant hereby irrevocably and unconditionally releases the Company and each Company Affiliate, and each and all of their respective owners, stockholders, predecessors, successors, assigns, agents, directors, officers, employees, representatives, attorneys, benefit plans, insurers, parent companies, divisions, subsidiaries, affiliates and all persons acting by, through, or under or in concert with any of them (collectively, "Releasees") from all claims or demands that Consultant may have (other than for fully vested benefits under the 401(k) plan in which he was a participant and other than for fully earned amounts standing in his name in his account under the Company's deferred compensation plan) related to his employment with the Company and/or any Company Affiliate, or any matters relating to his retirement from the Company. This release also includes a release of any rights or claims Consultant may have under the Age Discrimination in Employment Act, which prohibits age discrimination in employment; Title VII of the Civil Rights Act of 1964 and the Civil Rights Act of 1991, which prohibit discrimination in employment based on race, color, national origin, religion or sex; the Americans with Disabilities Act, which prohibits discrimination against individuals with disabilities; the Equal Pay Act, which prohibits paying men and women unequal pay for equal work; the California Fair Employment and Housing Act, which prohibit employment discrimination, including age discrimination; and any other federal, state or local law or regulation prohibiting employment discrimination. This release covers both claims that Consultant knows about and those he may not know about.

Consultant expressly waives all rights afforded by any statute (such as Section 1542 of the Civil Code of the State of California) which limits the effect of a release with respect to unknown claims. Consultant understands the significance of his release of unknown claims and his waiver of statutory protection against a release of unknown claims (such a under Section 1542). Section 1542 of the Civil Code of the State of California states as follows:

"A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."

## 8.   MISCELLANEOUS.

**8.1   Successors, Etc.** This Agreement shall bind and inure to the benefit of the successors, assigns, personal representatives, heirs or legatees of the respective parties.

**8.2   Further Agreements.** Each party agrees to perform any further acts and execute and deliver any documents which may be necessary to carry out the provisions of this Agreement

**8.3   Amendment.** This Agreement may be amended or modified at any time only by the written agreement of the Company and Consultant.

**8.4   Number and Gender.** Throughout this Agreement, whenever the context so requires, the singular shall include the plural, and the masculine gender shall include the feminine and neuter genders.

**8.5   Governing Law.** The parties hereby agree that this Agreement has been executed and delivered in the State of California and shall be construed, enforced and governed by the laws thereof.

**8.6   Attorneys' Fees.** In the event of any action, suit or proceeding brought under or in connection with this Agreement, the prevailing party therein shall be entitled to recover, and the nonprevailing party thereto agrees to pay, the prevailing party's costs and expenses in connection therewith, including reasonable attorneys' fees.

**8.7   Severability.** In the event that any provision of this Agreement shall be held invalid or unenforceable, such provision shall e severable from, and such invalidity or unenforceability shall not be construed to have any effect on, the remaining provisions of this Agreement.

**8.8   Notices.** All notices, requests, consents and other communications required or permitted hereunder will be in writing and will be deemed given: (i) when delivered if delivered personally (including by courier); (ii) on the third day after mailing, if mailed, postage prepaid, by registered or certified mail (return receipt requested); (iii) on the day after mailing of sent by a nationally recognize overnight delivery service which maintains records of the time, place and recipient of delivery; or (iv) upon receipt of a confirmed transmission, if sent by telecopy or facsimile transmission.

**8.9   Entire Agreement.** This Agreement constitutes the entire agreement between the parties hereto pertaining to the subject matter hereof. This Agreement supersedes all prior agreements, written or oral, and all contemporaneous oral agreements and understandings of the parties, and there are no warranties, representations or other agreements between the parties in connection with the subject matter hereof except as set forth or referred to herein. No waiver of any of the provisions of this Agreement shall constitute a waiver of any other provision hereof (whether or not similar), nor shall such waiver constitute a continuing waiver.

8.10    Acknowledgement.  In signing this Agreement, containing a general release, Consultant acknowledges that: (a) he has read and understands this Agreement and he is hereby advised in writing to consult with an attorney prior to signing this Agreement; (b) he has signed this Agreement voluntarily and knowingly, following consult with and the opportunity to advice from an attorney of his own choosing, and he understands that this Agreement contains a full and final release of all his claims; (c) he has been offered at least twenty-one (21) calendar days to consider this Agreement; and (d) this Agreement is not made in connection with an exit incentive or other employee termination program offered to a group or class of employees.

8.11    Review and Revocation Rights.  Consultant shall have twenty-one (21) days from his receipt of this Agreement to consider signing it, he shall have seven (7) days following his signing of this Agreement to revoke it in writing, and this Agreement shall not be enforceable until the revocation period has expired.

IN WITNESS WHEREOF, the parties have signed this Agreement.

"THE COMPANY"
AMERIQUEST CAPITAL CORPORATION,
a Delaware corporation

By: _____

"CONSULTANT"

By: _____
WAYNE LEE

# Exhibit

## 2

Not Reported in F.Supp.2d　　　　　　　　　　　　　　　　　Page 1
Not Reported in F.Supp.2d, 2006 WL 1049724 (N.D.Ill.)

Dick Corp. v. SNC-Lavalin Constructors, Inc.
N.D.Ill.,2006.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
DICK CORPORATION, a Pennsylvania corpora-
tion, Plaintiff,
v.
SNC-LAVALIN CONSTRUCTORS, INC., a
Delaware corporation and PCL Industrial Construc-
tion, Inc., a Colorado Corporation, John Gillis and
Michael Ranz, Defendants.
No. 04 C 1043.

April 20, 2006.

Lawrence R. Moelmann, Timothy Allen Hickey,
Hinshaw & Culbertson, Chicago, IL, Jeffrey P.
Macharg, Kirsten R. Rydstrom, Tarek F. Abdalla,
Reed Smith Shaw & McClay, Pittsburgh, PA, for
Plaintiff.
David T. Pritikin, Thomas David Rein, Christopher
Braddock Seaman, Douglas I. Lewis, Jamie L.
Secord, Sidley Austin LLP, Donald A. Tarkington,
Andrew Dylan Campbell, Novack & Macey, Chica-
go, IL, Peter J. Gleekel, Philip R. Mahowald,
Samuel T. Lockner, Winthrop & Weinstine, P.A.,
Minneapolis, MN, for Defendants.

*MEMORANDUM ORDER AND OPINION*

ASPEN, J.
**\*1** Plaintiff Dick Corporation's Fourth Amended
Complaint against Defendants SNC-Lavalin Con-
structors, Inc., PCL Industrial Construction, Inc.,
John Gillis, and Michael Ranz, alleges copyright in-
fringement, tortious interference with prospective
business relations, tortious interference with con-
tractual relations, conversion, and misappropriation
of trade secrets. Presently before us is defendants
Gillis' and Ranz's ("Defendants") motion to dismiss
for lack of personal jurisdiction and for failure to

state a claim upon which relief can be granted. As
set forth below, we find that the fiduciary shield
doctrine prevents us from exercising personal juris-
diction over Defendants.

BACKGROUND

Plaintiff Dick Corporation ("Dick") is a company
registered and organized under the laws of
Pennsylvania with its principal place of business in
Large, Pennsylvania. (Fourth Am. Compl. ¶ 1.)
Around May 12, 1999, Dick entered into a joint
venture with the National Energy Production Cor-
poration ("NEPCO"), a Delaware corporation, to
serve as the general engineering, procurement and
construction contractor for the Kendall County
Generation Facility ("Kendall"), a power plant loc-
ated in Minooka, Illinois. (Id. ¶¶ 2, 12-13.)"As part
of the [j]oint [v]enture, Dick and NEPCO created
certain engineering designs, drawings, design data,
calculations, specifications, intellectual property
and other related documents [ ("Drawings") ] ...
[and] certain scheduling information, cost projec-
tions, cost information, bidding information and
other financial reports ... [ ("Data") ] for the pur-
pose of constructing the Kendall facility."(Id. ¶¶
18-19.)The Dick/NEPCO joint venture agreement
included exclusivity provisions, such as "all docu-
ments produced for or by the [j]oint [v]enture shall
be owned by the [j]oint [v]enture ... [N]either party
shall use the documents for other projects without
the prior written consent of the others."(Id. ¶
17.)The agreement also prohibited either party from
transferring or assigning any joint venture work
product without prior written consent. (Id. ¶ 16.)

On December 21, 2000, NEPCO executed a con-
tract with LSP-Nelson to perform engineering, pro-
curement, and construction services for the Nelson
facility ("Nelson"), a power plant located in Dixon,
Illinois. (Id. ¶¶ 12, 21.)NEPCO created a joint ven-
ture with PCL Industrial Construction, Incorporated
("PCL"), a Colorado corporation, regarding per-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

formance of the Nelson contract on February 28, 2002, at which time LSP-Nelson and PCL entered into an "Amended and Restated Turnkey Engineering, Procurement and Construction Agreement dated as of December 21, 2000 ("Restated Nelson Contract")."(*Id.* ¶ 22.)The Restated Nelson Contract provides that "major power block design, equipment layout, building general arrangement, condensate/feedwater/steam piping design, and electrical design for the [Nelson] [f]acility are substantially similar to that for the Kendall Project."(*Id.* ¶ 24.)In the spring of 2002, SNC Lavalin Constructors, Inc. ("SNC"), SNC Lavalin's subsidiary, "entered into an arrangement to perform construction-related services at the Nelson [f]acility."(*Id.* ¶ 23.)

**\*2** Dick filed a five count complaint in the Northern District of Illinois alleging that SNC, PCL, John Gillis, and Michael Ranz improperly and without consent copied, distributed, misappropriated, used, and created derivative works from the joint venture Drawings and Data to construct Nelson. (*Id.* ¶ 29.)Gillis, former President of NEPCO and current Chief Operating Officer at SNC, and Ranz, former Vice President of NEPCO and current Senior Vice President of SNC-both residents of Redmond, Washington-moved to dismiss the charges against them claiming a lack of personal jurisdiction. (Mot. to Dismiss at 5, 6.) Dick counters that both individual defendants established minimum contacts with Illinois since they each knew about the restrictive covenants in the Dick/NEPCO joint venture agreement, executed and/or participated in the negotiation and performance of the Kendall and Nelson contracts, and managed and supervised both Illinois projects. (Fourth Am. Compl. ¶¶ 20-31, 34-41; Pl. Resp. to Mot. to Dismiss at 9-19.)

## STANDARD OF REVIEW

In a motion to dismiss under Federal Rule of Civil Procedure 12(b)(2), the plaintiff bears the burden of showing a *prima facie* case of personal jurisdiction. *Purdue Research Found. v. Sanofi-Synthelabo,*

*S.A.,* 338 F.3d 773, 782 (7th Cir.2003); *see RAR, Inc. v. Turner Diesel, Ltd.,* 107 F.3d 1272, 1276 (7th Cir.1997); *Wasendorf v. DBH Brokerhaus AG,* No. 04 C 1904, 2004 WL 2872763, at \*2 (N.D.Ill.Dec.13, 2004). In determining whether we have personal jurisdiction, we may receive and consider affidavits and other materials submitted by the parties. *See Turnock v. Cope,* 816 F.2d 332, 333 (7th Cir.1987), *superceded by statute on other grounds as stated in*FMC Corp. v. Varonos, 892 F.2d 1308, 1310 (7th Cir.1990). For purposes of a motion to dismiss based on personal jurisdiction, we "accept all allegations of the complaint as true except those controverted by defendants' affidavits."*Northwestern Corp. v. Gabriel Mfg. Co.,* No. 96 C 2004, 1996 WL 73622, at \*2 (N.D.Ill. Feb.6, 1996). Where the defendant submits an affidavit contesting personal jurisdiction, "the plaintiff *must go beyond the pleadings and submit affirmative evidence* supporting the existence of jurisdiction."*Purdue,* 338 F.3d at 783 (emphasis added). We resolve all factual disputes in the record in plaintiff's favor, but we may accept as true those facts presented by defendant that remain uncontested. *Id.;RAR,* 107 F.3d at 1275.

## ANALYSIS

### I. Personal Jurisdiction

In a case based on diversity of citizenship, a federal court sitting in Illinois may exercise personal jurisdiction over a nonresident defendant only to the extent that an Illinois court could do so. *Klump v. Duffus,* 71 F.3d 1368, 1371 (7th Cir.1995); *see Michael J. Neuman & Assoc., Ltd. v. Florabelle Flowers, Inc.,* 15 F.3d 721, 724 (7th Cir.1994). Therefore, to survive a motion to dismiss the plaintiff must make a *prima facie* showing that exercising jurisdiction over a nonresident party complies with the Illinois long-arm statute, the Illinois Constitution, and federal constitutional due process requirements. *See Cent. States, Southeast & Southwest Areas Pension Fund v. Reimer Express World*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

*Corp.,* 230 F.3d 934, 939 (7th Cir.2000); *see also RAR,* 107 F.3d at 1276.

**\*3** The Illinois long-arm statute permits Illinois courts to exercise jurisdiction over a defendant where the cause of action arises from the transaction of business, commission of a tort, "making or performance of any contract or promise substantially connected with this State[,]" or any basis permitted by the state and federal Constitutions. 735 Ill. Comp. Stat. 5/2-209 (a) (1, 2, 7), (c); *Cent. States,* 230 F.3d at 940;*RAR,* 107 F.3d at 1276. The record demonstrates that Gillis and Ranz each established minimum contacts with Illinois subjecting themselves to this court's jurisdiction. For example, Gillis executed and Ranz was involved with negotiating and overseeing the two contracts at issue, which were to be performed in Illinois.[FN1]

> **FN1.** More specifically, Gillis executed the Dick/NEPCO joint venture agreement, the NEPCO/LSP-Kendall contract, and the Nelson contract. (Resp. to Mot. to Dismiss at 3-4, 6-7.) Ranz executed a services agreement for engineering work on Kendall, the joint venture with PCL, and the subcontract for construction on Nelson. (*Id.* at 5,152 Ill.Dec. 384, 565 N.E.2d 1302.) Also, Gillis was a member and Ranz was an alternate member of the "Executive Committee" for the Dick/NEPCO joint venture and the PCL agreement. (*Id.* at 3, 6, 152 Ill.Dec. 384, 565 N.E.2d 1302.) Additionally, Ranz "led the discussions" while negotiating with PCL and used Kendall Drawings and Data in developing an estimate for Nelson.(*Id.* at 4, 5, 152 Ill.Dec. 384, 565 N.E.2d 1302; Ranz Dep. at 91.) While Ranz did not directly supervise or participate in the construction of either project, he was responsible for general oversight of the project managers and project directors. (Resp. to Mot. to Dismiss at 5-6.) For example, he visited Illinois three times to participate in

Kendall and/or Nelson meetings about schedule status, staffing, safety, quality, financial status, and client relations. (*Id.* at 6, 152 Ill.Dec. 384, 565 N.E.2d 1302; Ranz Dep. at 40.) Finally, Gillis and Ranz received periodic status reports on Kendall and Nelson, both defendants attended monthly meetings where all pending projects were discussed, and both individuals were aware at all times that Kendall and Nelson were in Illinois. (Resp. to Mot. to Dismiss at 4, 6-7.)

Gillis' and Ranz's lack of material presence in Illinois does not preclude finding that they established the requisite minimum contacts because the Supreme Court has held that an individual who never physically enters the forum state could nonetheless be subject to its jurisdiction if he purposefully directs conduct towards residents of the forum state. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472-73, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (finding personal jurisdiction in Florida where the defendant knowingly engaged in a business relationship with the plaintiff, a Florida company, even though he never entered Florida to conduct business); *see also Calder v. Jones,* 465 U.S. 783, 788, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984) (finding that despite the lack of physical contacts with the forum state, an editor and journalist of a Florida-based tabloid periodical were subject to personal jurisdiction in California in an action arising out of an allegedly defamatory article regarding a California resident). Gillis and Ranz purposefully directed their actions toward Illinois by entering into contracts that called for performance in the state and by participating in and overseeing performance in Illinois.[FN2]

> **FN2.**See n. 3, *supra.*In addition, based on the uncontroverted allegations in the complaint, Gillis and Ranz knew "the restrictions on the use, assignment and transfer of [the] Drawings and Data[, they] ... were in a position to control the use, copying,

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1049724 (N.D.Ill.)

modification, assignment and transfer of the [information, and they] authorized, induced, contributed and/or approved or were otherwise a moving force behind the copying modification and use of the [information] to construct the Nelson Facility."(Resp. to Mot. to Dismiss. at 12.)

Defendants argue that the above described principle, coined "the effects doctrine," does not apply because plaintiff is not an Illinois resident. We disagree. In applying the effects doctrine, the Seventh Circuit focuses on the location of the alleged injury rather than the plaintiff's residency. *See Janmark, Inc. v. Reidy,* 132 F.3d 1200, 1202 (7th Cir.1997) ("[T]he state in which the injury (and therefore the tort) occurs may require the wrongdoer to answer for its deeds even if events were put in train outside its borders."); *see also Interlease Aviation Investors II (ALOHA) L.L.C. v. Vanguard Airlines, Inc.,* 262 F.Supp.2d 898, 910 (N.D.Ill.2003) (quoting and applying *Janmark*); *see also Spank! Music & Sound Design, Inc. v. Hanke,* No. 04 C 6760, 2005 WL 300390, at *3 (N.D.Ill. Feb.7, 2005) ("The Seventh Circuit has interpreted the effects doctrine broadly to permit the state in which the victim of a tort suffers injury to entertain the suit, even if all other relevant conduct occurred outside the state."). Discussing its reasoning in *Janmark,* the Seventh Circuit noted that if a California corporation injured an Illinois corporation in New Jersey, New Jersey would retain jurisdiction despite the fact that the victim would suffer financial consequences in Illinois. *Id.* at 1202.Similarly, a Pennsylvania corporation doing business in Illinois can be injured in Illinois, thus allowing Illinois to exercise jurisdiction upon the wrongdoers. Plaintiff allegedly suffered harm in Illinois, *inter alia,* because the Nelson power plant-located in Illinois-was built using Kendall's Drawings and Data in violation of the agreement with NEPCO, which prohibited transfer, distribution, or use of intellectual property created by the Dick/NEPCO joint venture for Kendall.[FN3]

FN3. The cases cited by defendant are in-

apposite. Gillis and Ranz knew the Kendall and Nelson contracts called for performance in Illinois, the alleged wrongful use of the Drawings and Data occurred in Illinois (evidenced by the existence of the Nelson power plant), and plaintiff allegedly lost its competitive advantage in Illinois. *Cf. Continental Cas. Co. v. Marsh,* No. 01 C 0160, 2002 WL 31870531, at *6 (N.D.Ill.Dec.23, 2002) (finding that defendant would not reasonably anticipate being haled to court in Illinois where no evidence supported the argument that defendant's allegedly wrongful activities regarding a financing agreement with a Maryland corporation were directed to that company's Illinois, as opposed to Maryland, office.)

*4 Gillis and Ranz "purposefully availed [themselves] of the privilege of conducting activities within [Illinois], thus invoking the protections and benefits of its laws."*See Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). Dick's claims arose from and relate to Gillis' and Ranz's contacts with Illinois, justifying the exercise of specific jurisdiction.[FN4]*Helicopteros,* 466 U.S. at 414 n. 8;*RAR,* 107 F.3d at 1278. The deposition testimony and unrefuted allegations in the complaint show that Gillis and Ranz were substantially involved (in their official capacity) with the execution and performance of the two contracts to build power plants in Illinois. Consequently, the defendants "should [have] reasonably anticipate[d] being haled into court" in Illinois. *See Hyatt Int'l Corp. v. Coco,* 302 F.3d 707, 716 (7th Cir.2002) (quoting *Burger King Corp.,* 471 U.S. at 474 (internal citations omitted)).

FN4. Plaintiff does not contend that Gillis' and Ranz's contacts with Illinois are sufficiently pervasive to subject them to general jurisdiction, which requires "continuous and systematic general business contacts" with the forum state. *Helicopteros*

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1049724 (N.D.Ill.)

*Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 416, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); (Resp. to Mot. to Dismiss at 9, n. 5.). Rather, plaintiff submits that we have specific jurisdiction because its claims arose from and relate to Gillis' and Ranz's contacts with Illinois. *Id.* at 414 n. 8;*RAR,* 107 F.3d at 1278.

Nonetheless, exercising jurisdiction over Gillis and Ranz would offend traditional notions of fair play and substantial justice under Illinois law. *See Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945); *see also Rollins v. Ellwood,* 141 Ill.2d 244, 275, 152 Ill.Dec. 384, 565 N.E.2d 1302, 1316 (Ill.1990) ("[J]urisdiction is to be asserted only when it is fair, just, and reasonable to require a non-resident defendant to defend an action in Illinois, considering the quality and nature of the defendant's acts which occur in Illinois or which affect interests located in Illinois."). Generally, "[t]he most important factors relevant to this inquiry are the interests of the states involved and the relative convenience of litigating in each state."[FN5]*Spank!,* 2005 WL 300390, at *3. However, if an individual has contact with a state only by virtue of his acts as a fiduciary of a corporation, such acts may not form the basis for the exercise of personal jurisdiction in Illinois. *Brujis v. Shaw,* 876 F.Supp. 975, 978 (N.D.Ill.1995) (citation omitted). This "fiduciary shield" gives effect to the concept of limited liability in corporations.

FN5. If our inquiry were limited to the interests/burden analysis, exercising jurisdiction over defendants would be proper. Dick correctly points out that Illinois has an interest in this action because it involves the development of properties and services within its boundaries and protecting foreign companies conducting business with an Illinois license (which in turn helps encourage foreign investment). In addition, the majority of alleged wrongdoing and resulting injury occurred in Illinois. While

defendants would likely prefer to adjudicate the claims in their home state, it is not unduly burdensome to travel and litigate in Illinois, especially since they would most likely be called as witnesses in the pending action in Illinois against their employer.

When assessing applicability of the equitable doctrine, courts consider the fiduciary's discretionary actions, personal interest, and whether the fiduciary is merely the corporation's alter-ego. *See Interlease Aviation,* 262 F.Supp.2d at 912;*TruServe Corp. v. St. Yards, Inc.,* No. 99 C 6806, 2001 WL 743642, at *6 (N.D.Ill. June 29, 2001). There is no clear consensus in Illinois over the significance of each factor when applying the doctrine to high ranking corporate officials.[FN6]Although, the most recent string of cases have allowed high ranking officers with discretionary authority to benefit from the fiduciary shield doctrine so long as they did not have an appreciable ownership interest in the company.[FN7]

FN6.*See, e.g., Cons.Benefit Svcs., Inc. v. Encore Marketing Int'l,* No. 01 C 6985, 2002 WL 31427021, *3 (N.D.Ill. Oct.30, 2002) (quoting *Plastic Film Corp. of Am., Inc. v. Univac, Inc.,* 128 F.Supp.2d 1143, 1147 (N.D.Ill.2001) ("The determinative factor is the individual's status as a shareholder, not merely as an officer or director.")); *Shapo v. Engle,* No. 98 C 7909, 1999 WL 1045086, at *22 (N.D.Ill. Nov.12, 1999) (ruling that the fiduciary shield doctrine does not apply to high ranking corporate officers); *Brujis,* 876 F.Supp. at 979 (declaring no one factor determinative).

FN7.*Benda v. Per-Se Technologies, Inc.,* No. 04 C 952, 2004 WL 1375361, at *2 (N.D.Ill. June 17, 2004) (reiterating that the "determinative factor is the individual's status as a shareholder, not merely as an officer or director") (quotation omitted); *Interlease Aviation,* 262 F.Supp.2d at 912

(holding that being a high ranking officer of a company was insufficient to bar application of the fiduciary shield doctrine absent evidence of a personal stake in the company); *Continental Cas. Co.,* 2002 WL 31870531, at *6-7 (determining that a vice president of a corporation was covered by the fiduciary shield doctrine despite being a high ranking official with discretion because he had no financial stake in the company); *Plastics Film Corp.,* 128 F.Supp.2d at 1147 (holding that a CEO was protected by the fiduciary shield doctrine because he was not a shareholder of the corporation); *but see Margulis v. Med. Parts Int'l, Inc.,* No. 98 C 0714, 1999 WL 183648, at *5 (N.D.Ill. Mar.25, 1999) (barring use of fiduciary shield doctrine for high-ranking officers because they had a stake in the company merely as a result of their position).

Gillis and Ranz were (and still are) high ranking officials of NEPCO/SNC who established contacts with Illinois in their roles as corporate fiduciaries. In their official capacities, defendants were endowed with discretionary authority, and in fact used their discretion to enter into, execute, and monitor contracts [FN8] calling for performance in Illinois. *See* n. 1, *supra.*However, the evidence shows that Gillis' involvement with the contracts at issue was perfunctory: he executed the contracts without close inspection, he could not recall any involvement in soliciting, negotiating, or performing the contracts, and he never copied or distributed (or directed anyone else to do so) the Drawings and Data. (Gillis Aff. ¶¶ 11-12; Gillis Dep. at 15-21, 23-24, 30.) Ranz took a more active role in the Illinois ventures: he engaged in the negotiating process for Nelson and visited Illinois on three occasions related to the Kendall project. (Ranz Dep. at 40.) The disparity between the defendants' involvement with Kendall and Nelson is inconsequential since "[t]he determinative factor is the individual's status as a shareholder [.]"*Plastic Film Corp.,* 128

F.Supp.2d at 1147.

FN8. Both defendants participated in monthly meetings to review schedule status, staffing, safety quality, finances, and client relations for all projects, including Kendall and Nelson, but neither Gillis nor Ranz directly supervised construction of the Illinois power plants. (Gillis Dep. at 13-15; Ranz Dep. at 48.)

**\*5** Gillis and Ranz received stock options in Enron, NEPCO's parent company, and owned Enron stock through their respective 401-K programs. (Gillis Dep. at 34-35; Ranz Dep. at 107-08.) After 2002, Gillis also held stock options for shares in SNC-Lavalin, Inc., SNC's parent company. (Gillis Dep. 36-37.) The evidence, however, does not suggest that the issuance of stock options was related to the corporate officials' performance or company profitability. (Ranz Dep. at 107-08.) Moreover, most courts infer personal interest only where corporate officers have a direct, meaningful financial stake in the company.[FN9] Dick does not allege that Gillis or Ranz owned a direct interest in NEPCO and/or SNC, nor does it allege that either defendant held an appreciable interest in their employers' parent companies. Defendants' stock options and 401-K shares do not evince the kind of meaningful, direct financial stake and/or personal interest contemplated by *Benda, Plastic Film Corp, and Continental Casualty Company.*[FN10]

FN9.*See, e.g., Cons.Benefit Servs.,* 2002 WL 31427021, at *4 (refusing to apply the fiduciary shield doctrine to the CEO and President where both officers exercised discretion and respectively owned 32.49% and 20.35% of the company); *see also Brujis,* 876 F.Supp. at 979 (finding personal interest where the president owned the vast majority of the company's stock).

FN10. Recognizing the limited nature of defendants' ownership interest, Dick points to Gillis and Ranz's compensation to sup-

port a finding of personal interest. Ranz and Gillis speculated that bonuses were based on the company's profitability; if awarded, bonuses could comprise 10% or 25% of defendants' total compensation. (Gillis Dep. at 33; Ranz Dep. at 102-03.) However, defendants' interest in remuneration and job security is not the type of personal stake that warrants denial of the fiduciary shield. *See Glass v. Kemper Corp., 930 F.Supp. 332, 342 (N.D.Ill.1996)* ( "[T]he Illinois Supreme Court has expressly foreclosed [plaintiff's] argument that [defendant] benefitted financially from his Illinois contacts in that he was attempting to curry favor with his employer, presumably to remain employed and earn a salary or salary increase.") Defendants did not benefit from a profit-sharing arrangement with the company, nor could they even specify how Kendall and Nelson (a small fraction of the company's projects) would factor into their overall compensation.

Additionally, the Fourth Amended Complaint contains no allegations that Gillis and/or Ranz acted "to advance personal rather than employer interests[,]" nor do the pleadings or the evidence support such an inference. *See Benda,* 2004 WL 1375361, at *2 (quotation omitted). The allegations in the pleadings, the affidavits, and the deposition testimony all indicate that Gillis's and Ranz's actions were "a product of, and [were] motivated by, [their] employment situation and not [their] personal interest, ... [Thus] it would be unfair to use [such] conduct to assert personal jurisdiction over [them] as [ ] individual[s]." *Cons.Benefit Svcs., Inc.,* 2002 WL 31427021, at *2 (quoting *Rollins,* 141 Ill.2d at 280, 152 Ill.Dec. 384, 565 N.E.2d at 1318). Absent a showing of meaningful, direct personal interest in NEPCO or SNC, barring application of the fiduciary shield would not comport with fair play and substantial justice. FN11

FN11. Dick does not allege that NEPCO and/or SNC were sham corporations or that Gillis and/or Ranz acted as the companies' alter egos.

CONCLUSION

For the reasons discussed above, defendants' motion to dismiss for lack of personal jurisdiction is granted. FN12 It is so ordered.

FN12. As a result of our ruling, we need not consider defendants' motions to dismiss for failure to state a claim.

N.D.Ill.,2006.

Dick Corp. v. SNC-Lavalin Constructors, Inc.

Not Reported in F.Supp.2d, 2006 WL 1049724 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.