**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ROSE TERRY, TERRY WATT, ROY PARNELL, JOHANNA GUYTON, LUISA and JORGE BOLO, SELVIN and BEATRICE QUIRE, JUAN BAEZ and CRUZ RIVERA and JULIE NORADIN, | Case No. 08 CV 2475<br><br>Honorable David H. Coar |
| Plaintiffs,<br><br>v.<br><br>AMERIQUEST MORTGAGE COMPANY, AMERIQUEST CAPITAL CORPORATION, ACC CAPITAL HOLDINGS, INC., AMERIQUEST MORTGAGE SECURITIES, INC., DEUTSCHE BANK NATIONAL TRUST COMPANY, DAWN ARNALL and WAYNE LEE, | **DEFENDANTS AMERIQUEST MORTGAGE COMPANY'S, AMERIQUEST CAPITAL CORPORATION'S, ACC CAPITAL HOLDINGS, INC.'S, AND AMERIQUEST MORTGAGE SECURITIES, INC.'S MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO SEVER** |
| Defendant. | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
OR, IN THE ALTERNATIVE, TO SEVER**

## I.      INTRODUCTION

This action is brought by thirty-two unrelated and individually joined Plaintiffs against twenty-two separate Defendants arising out of twenty-three unique loan transactions. For the following three reasons, Defendants respectfully request that the Court either 1) dismiss the Amended Complaint, without prejudice, against all but the first named Plaintiff; or 2) sever Plaintiffs' claims and order that each Plaintiff's claims proceed to trial separately:

- Plaintiffs' claims, as bundled in the Amended Complaint, do not arise out of the same transaction or occurrence, or series of transactions or occurrences, as required by Federal Rule of Civil Procedure 20.

- Plaintiffs' claims fail to present a common question of law or fact, as required by Rule 20.

1

- Dismissal without prejudice and/or severance will not prejudice Plaintiffs. By contrast, failing to separate these claims will cause Defendants enormous prejudice.

## II.     STATEMENT OF FACTS

The Amended Complaint is actually a compilation of grievances by thirty-two different Plaintiffs regarding their own distinct and separately negotiated loan transactions with Ameriquest Mortgage Company ("Ameriquest"). Most Plaintiffs complain about just one of the twenty-three loans at issue and no Plaintiff complains about more than two loans. (Amended Complaint, ¶¶ 4-26.) Moreover, not every Plaintiff has a complaint against every Defendant. Rather, many of the Defendants were merely assignees of one or two of the subject loans and had no involvement with the remaining transactions. For example, Defendants Citigroup, CitiMortgage and Greenwich Capital are each named simply in their capacity as the assignee of a single loan made to a single Plaintiff. (Amended Complaint, ¶¶ 39-41.) Several defendants are named solely as the assignee of two of the twenty-three loans at issue. (Amended Complaint at ¶¶ 38, 42, 43, 44, 46, 48.) And each assignee's liability is distinct from the liability of the lender. Thus, each loan transaction involves a unique combination of Plaintiffs, Defendants, factual inquiries and legal inquiries.

It necessarily follows that Plaintiffs' claims vary greatly even within single Counts of the Amended Complaint. In Count I, Plaintiffs assert violations under the Truth-In-Lending Act ("TILA"), but the specific violations complained of vary greatly from Plaintiff to Plaintiff. For example, lead Plaintiff Rose Terry asserts that Ameriquest failed to deliver dated Notices of Right to Cancel forms, misrepresented the effects of rescission, and misinformed her of the terms of her mortgage loan. (*See id.*, ¶¶ 99-101). Another plaintiff, Beatrice Quire, however, alleges only that Ameriquest violated TILA by misrepresenting the effects of rescission and the terms of her mortgage loan. (*Id.*, ¶¶ 118-19). Others allege that Ameriquest failed to provide them with certain forms or the correct number of forms. (*See id.*, ¶¶ 110, 114).

BN 2220075v1

In Count II, Plaintiffs allege violations of the Illinois Consumer Fraud Act ("ICFA"). (*See id.*, ¶¶ 188-208). The alleged misrepresentations again vary greatly depending on each Plaintiff's individual circumstances. Some complain of misrepresented amounts of closing costs, others complain of misrepresentations concerning fixed versus adjustable rate loans and interest rates, and still others complain of misrepresented amounts paid to principal and interest and misrepresented monthly payment amounts. (*See id.*, ¶¶ 99-206). Plaintiffs' claims as to Count II do not include every plaintiff; Plaintiffs Julie Noradin, Juan and Cruz Rivera, Alfredo and Ana Velia Jaime, and Lawrence Mueller are not parties to Count II. (*See id*, ¶¶ 187-88).

Count III asserts a claim for fraudulent conveyance against some, but possibly not all Defendants. Plaintiffs allege that some Defendants engaged in some fraudulent conveyances, but specifically identifies only one. Moreover, only a handful of Plaintiffs received their loans before the date this transfer allegedly took place. (*See id.*, ¶¶ 284-93).

The evidence will show that each of the Plaintiffs obtained their mortgage loans from Ameriquest on different terms, on different dates, for different amounts, and for different properties. Different Ameriquest account executives dealt with different Plaintiffs in connection with these transactions. (*See* Declaration of Diane E. Tiberend ("Tiberend Decl."), ¶¶ 5(b)–27(b)) (attached as Exhibit A). Plaintiffs' mortgage loans were obtained from a wide variety of Ameriquest branches. (*See id.*, ¶¶ 5(c)-27(c)). Different closing agents were present at Plaintiff's loan closings. (*See id.*, ¶¶ 5(d)-27(d)). And finally, different assignees currently hold title to Plaintiffs' mortgage loans, with many assignees holding title to only one or two of the loans. (*See id.*, ¶¶ 5(g)-27(g)).

## III.    PLAINTIFFS' CLAIMS ARE IMPROPERLY JOINED AND SHOULD EITHER BE DISMISSED OR SEVERED.

Federal Rule of Civil Procedure 20(a) permits joinder in a single action only when all plaintiffs can meet two criteria. First, the joined claims must arise out of the same transaction or occurrence or series of transactions or occurrences. Second, the joined claims must present

common questions of law and/or fact. *See* Fed. R. Civ. P. 20(a). Misjoinder occurs when the plaintiff fails to satisfy either requirement. *Randlell v. Pizza Hut of America, Inc.*, 182 F.R.D. 542, 543 (N.D.Ill. 1998). The purpose of Rule 20 is to "promote trial convenience and expedite the final determination of disputes, thereby preventing unnecessary multiple lawsuits." *See* 7 *Federal Practice and Procedures*, Section 1652.

Rule 21, in turn, provides guidance for handling improper joinder: "On motion or on its own, the court may at any time, on just terms, add or drop a party. The court may also sever any claim against a party." Fed. R. Civ. P. 21. Some courts have held that where plaintiffs would not be prejudiced in bringing individual actions, all but the first named plaintiff may be dismissed from a case. *Coughlin v. Rogers*, 130 F.3d 1348, 1350 (9th Cir. 1997); *see also DirecTV, Inc. v. Joe Serio*, No. 03C3491, 2003 WL 22682354, * 1 (N.D.Ill. Nov. 12, 2003) (Coar, J.) (attached as Exhibit B) Others have held that, in such cases, severance is appropriate. *Hussain v. TCF Bank*, No. 03 C 9404, 2004 WL 1470282, *2 (N.D.Ill. June 30, 2004) (attached as Exhibit C). In fact, a court may drop or sever claims that actually meet the standards of Rule 20(a) in order to avoid prejudice to the parties or confusion to the jury. *See Applewhite v. Reichhold Chemicals, Inc.*, 67 F.3d 571, 574 (5th Cir. 1995); *Bailey v. Northern Trust Co.*, 196 F.R.D. 513, 514 (N.D. Ill. 2000) (severing action because "[t]he jury may simply resolve the confusion [created by different factual situations] by considering all the evidence to pertain to all the plaintiffs' claims, even when it is relevant to only one plaintiff's case").

Consistent with this authority, courts in this district have required litigants to dismiss some claims of those that have "impermissibly joined forces as plaintiffs." For example, in *Papagiannis v. Pontikis*, 108 F.R.D. 177, 178 (N.D.Ill. 1985), plaintiffs alleged that they were each defrauded by defendants to invest in oil wells, but that they entered into separate purchase contracts at different times involving different oil wells. *Id.* Judge Shadur noted that "nothing in the Complaint even hints at any linking between the plaintiffs or between the making of the separate representations to each of them." *Id.* In requiring plaintiffs to drop the misjoined claims, he explained that "[t]hough the allegedly fraudulent scheme may have been the same as

to both victims, the face-to-face fraud (as contrasted for example with a securities prospectus misrepresentation) necessarily requires individualized proof.  Thus joinder of the present claims would not satisfy the Rule 20(a) goal of 'permit[ting] all reasonably related claims for relief by … different parties to be tried in a single proceeding.'" *Id.*  Courts in other districts have applied a similar analysis.  *See, e.g., McFarland v. State Farm Fire & Casualty Co.*, 06CV466-LTS-RHW, 2006 WL 2577852, *1 (S.D.Miss. Sept. 6, 2006) (holding that joinder of hundreds of Hurricane Katrina victims was inappropriate, despite the fact that the overwhelming majority of the plaintiffs' claims centered around the proper interpretation of identical policy language, because each plaintiff's claims stemmed from a separate insurance policy and "any alleged negligent or fraudulent misrepresentations by insurance agents constituted separate transactions and occurrences.") (attached as Exhibit D.)

The fact that joined plaintiffs' legal theories are similar does not meet the "transaction or occurrence" test.  While legal theories might be similar, the factual basis for the claims could vary significantly, making joinder inappropriate:

> The facts relating to the transaction of one Defendant are distinct from the facts relating to the transaction of each of the other Defendants. Under these circumstances, it is possible and even likely that each Defendant will present separate and unique defenses. The claims against the Defendants arise out of different, albeit similar, facts. The only connection between them is that they each allegedly violated provisions of federal law relating to the piracy of cable television.

*DirecTV, Inc. v. Joe Serio*, *supra*, 2003 WL 22682354, * 1; s*ee also, Tapsott v. MS Dealer Service Corp.*, 77 F.3d 1353, 1360 (11th Cir. 1996) (holding that the fact that defendants allegedly violated the same statutes was a mere "facial commonality" insufficient to justify joinder); *see also Grennel v. Western Southern Life Ins. Co.*, 298 F.Supp.2d 390, 398 (S.D.W.Va. 2004) (holding that allegations that plaintiffs "were fraudulently induced to purchase the same thing does not satisfy the requirements of Rule 20(a)").

A.      **Plaintiffs' Claims Do Not Arise Out of the "Same Transaction, Occurrence or Series of Transactions or Occurrences"**

Plaintiffs' attempt to join their claims into a single action fails because their claims do not arise from the same transaction or occurrence, or series of transactions or occurrences.  Plaintiffs do not allege that any of the Plaintiffs knew each other before they were all named in the instant lawsuit.   And indeed, the facts and circumstances supporting Plaintiffs' claims are wholly unrelated.  Each Plaintiff obtained a different mortgage loan, through different negotiations, on different terms, on a different date, for a different amount, and on different properties.  (*See* Amended Complaint, ¶¶ 4-26).   Different Ameriquest account executives dealt with different Plaintiffs in connection with their mortgage loan.   (*See* Tiberend Decl., ¶¶ 5(b)-27(b)). Plaintiffs' mortgage loans were obtained from different Ameriquest Mortgage Company branches.  (*See id.*, ¶¶ 5(c)-27(c)).

Just as Ameriquest's negotiations with each Plaintiff differed, different plaintiffs complain of different alleged misconduct against different Defendants.   Some allege failure to disclose rescission dates, some complain of misrepresentations regarding the effects of rescission, and still others complain of misstatements regarding closing costs or failure to receive the correct forms or the correct number of forms.  (*See* Amended Complaint, ¶¶ 99, 104, 105, 110, 114, 116).   Some plaintiffs do not even assert a claim under some counts of the Amended Complaint.  And not every Plaintiff asserts the same claims against the same Defendants.  These sorts of mix and match allegations are exactly the type of allegations that cannot be lumped together into a single action. *E.g.*, *Papagiannis,* 108 F.R.D. 177, 178

B.      **Plaintiffs' Claims Do Not Satisfy Rule 20's Common Question of Law Or Fact Requirement.**

Even if Plaintiffs' amalgamation of claims did stem from the same transaction or occurrence, joinder would still be improper because they involve separate and distinct questions of law and fact.  See *Bailey*, 196 F.R.D. at 514. (holding that even though the plaintiffs brought similar legal claims against the defendant, the claims did not satisfy the common question of law

or fact requirement because "each decision affecting the plaintiffs in these cases was a discrete act by the defendant," and therefore "the factual and legal questions between the plaintiffs and the defendant [we]re based upon wholly separate acts of the defendant with respect to each plaintiff.")

Here, as in *Bailey*, Plaintiffs' claims arise out of wholly separate acts. To try each claim, the parties will need to rely on different documents and different witnesses. Plaintiffs' purported damages flowing from Defendants' alleged wrongful acts will also be different. The legal analysis for Plaintiffs' Illinois Uniform Fraudulent Transfer Act ("IUFTA") analysis will differ depending on the date each Plaintiff's loan closed.[1] Defenses to each Plaintiff's claim may likewise differ depending on each Plaintiff's facts and circumstances.

Likewise, Plaintiffs' claims against the assignees of their loans, and the assignees' corresponding defense, will turn on the specific facts of the transaction. For example, to determine the extent of the assignees' liabilities for Ameriquest Mortgage Company's alleged TILA violations, a specific inquiry will be necessary to determine whether the defects are apparent on the face of the various loan documents. 15 U.S.C. § 1641(a). Again, given the different assignees involved and the unique facts of each transaction, common questions of law or fact cannot exist.

Given the need for separate proof and separate legal analyses, Plaintiffs' claims do not contain common questions of law and fact. *See Direct TV, Inc. v. Delaney,* No. 03-C-3444, 2003 WL 24232530, at *5 (N.D.Ill. Nov.20, 2003) (holding that the second requirement of Rule 20(a) was not met where "the questions of law and fact [would] have to be tailored to the particulars of each individual defendant's action, rather than being common to all") (attached as Exhibit E). Therefore, their joinder is improper under Rule 20.

---

[1] As outlined in Defendants' Motion to Dismiss pursuant to Rule 12(b)(6), not all Plaintiffs can move under Section 6(a) of the IUFTA to contest the various transfers because their claims did not exist when the transfer was made. See Defendants' Motion to Dismiss Pursuant to Rule 12(b)(6), Section III(5).

### C. Joinder Would Not Promote Trial Convenience And Would Prejudice Defendants, While Dismissal of Misjoined Parties Will Not Prejudice Plaintiffs.

Dismissing misjoined Plaintiffs without prejudice would not unduly hinder Plaintiffs' ability to present their case. This action is still in the early pleading stage and each Plaintiff can re-file an independent complaint against their specific Defendants. *Coughlin*, 130 F.3d at 1350. Given that each claim is specific to the individual and does not affect any other Plaintiff named in the amended Complaint, Plaintiffs do not need discovery from one another, or from the many unrelated Defendants, to prosecute their individual claims. Further, as discussed below, failing to dismiss misjoined Plaintiffs would be highly prejudicial to Defendants.

## IV. EVEN IF NOT IMPROPERLY JOINED, PLAINTIFFS' CASES SHOULD BE SEVERED BECAUSE DEFENDANTS ARE LIKELY TO EXPERIENCE SEVERE PREJUDICE.

Federal Rule of Civil Procedure 21 empowers a court to sever claims to promote the efficient administration of justice and ensure that parties receive a fair trial. *Applewhite*, 67 F.3d at 574. Even if joinder were proper under Rule 20, this Court should still sever Plaintiffs' claims under Rule 21 because a single trial of Plaintiffs' various claims would be unwieldy and prejudicial to Defendants' right to a fair trial. It will be very difficult, if not impossible, for a jury to keep twenty-three separate fact patterns straight – especially given that each one will feature different plaintiffs, different defendants, different witnesses and different applicable legal theories. Such a trial would be unfair to both sides because the jury would hear evidence that is relevant to one plaintiff's claims against one defendant, but completely irrelevant and potentially prejudicial to another Plaintiff's claims or another Defendant's defenses. *See Bailey*, 196 F.R.D. at 518 (N.D. Ill. 2000) (severing action because "[t]he jury may simply resolve the confusion [created by different factual situations] by considering all the evidence to pertain to all the plaintiffs' claims, even when it is relevant to only one plaintiff's case").

## V.     CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss the Amended Complaint, without prejudice, against all but the first-named Plaintiff.   In the alternative, Defendants request that the Court sever Plaintiffs' claims and order that each Plaintiff's claims proceed to trial separately.


DATED:  August 28, 2008                    Respectfully submitted,

                                           By: /s/  Joanne N. Davies

                                           *Attorneys for Defendants Ameriquest Mortgage Company; Ameriquest Capital Corporation; ACC Capital Holdings, Inc.; and Ameriquest Mortgage Securities, Inc.*

                                           Joanne N. Davies (admitted *pro hac vice*)
                                           Buchalter Nemer
                                           18400 Von Karman Ave., Ste. 800
                                           Irvine, California 92612-0514
                                           Telephone: (949) 760-1121
                                           Facsimile:  (949) 720-0182

BN 2220075v1

**CERTIFICATE OF SERVICE**

I, Joanne N. Davies, hereby certify that on this 28th day of August 2008, a true and correct copy of the foregoing document was filed electronically.  Notice of this filing will be sent by electronic mail to all counsel of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.


By:  _____/s/  Joanne N. Davies_____

BN 2220075v1

This document was created with Win2PDF available at http://www.daneprairie.com.
The unregistered version of Win2PDF is for evaluation or non-commercial use only.

EXHIBIT "A"

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

ROSE TERRY, TERRY WATT & ROY PARNELL, JOHANNA GUYTON, LUISA & JORGE BOLO, SELVIN & BEATRICE QUIRE, JUAN BAEZ & CRUZ RIVERA, JULIE NORADIN, ANANAIS & ETHEL COLISTER, MICHAEL COX & SUSAN LAWRENCE, RAMSES FAVELA, WRENCH GARCIA & MARIA LARA, ELIZABETH HILL, ALFREDO & ANA VELIA JAIME, DENISE & CAREY LEE, DARYL MONSON, LAWRENCE MUELLER, BENJAMIN NEELEY, JOHN & CONSTANCE PUGA, JAMES SHEW, and HAROLD WELLS,

Plaintiffs

vs.

AMERIQUEST MORTGAGE COMPANY, AMERIQUEST CAPITAL CORPORATION, ACC CAPITAL HOLDINGS, INC., AMERIQUEST MORTGAGE SECURITIES, INC., DEUTSCHE BANK NATIONAL TRUST COMPANY, THE ROLAND AND DAWN ARNALL LIVING TRUST, THE ESTATE OF ROLAND ARNALL, DAWN ARNALL, WAYNE LEE, CITIFINANCIAL, CITIGROUP, CITIMORGAGE, GREENWICH CAPITAL, WM SPECIALTY MORTGAGE, LLC, CREDIT SUISSE FINANCIAL CORPORATION,

Defendants

Case No.: 08CV2475

**DECLARATION OF DIANE E. TIBEREND IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO SEVER**

### Declaration Of Diane E. Tiberend

1.    I am over 18 years of age and believe in the obligations of an oath.

2.    I am the Secretary of ACC Capital Holdings Corporation ("ACCH"), the parent company of the defendant in this action, Ameriquest Mortgage Company ("Ameriquest"). I am authorized to make this declaration on Ameriquest's behalf. The following facts are true of my own knowledge and, if called upon to do so, I could and would testify competently to the truth thereof.

- 1 -

3.    I make this Declaration in support of Defendants' Motion To Dismiss Or, In The
Alternative, To Sever.

4.    I have reviewed documents maintained by Ameriquest, including the loan files,
for each of the transactions referenced herein.

5.    A review of Rose Terry's ("Terry") loan documents reveal:

    a.    Terry entered into a loan agreement with Ameriquest that was secured by
    real property located at 712 Hartrey Avenue, Evanston, Illinois 60202.

    b.    The Account Executive who assisted Terry with her loan was Kevin
    Schilling.

    c.    Terry's mortgage loan was originated from the Ameriquest branch located
    in Skokie, Illinois.

    d.    The closing of Terry's loan was performed by Cesar Gaitan.

    e.    Terry's loan closed on May 13, 2005.

    f.    LSI Market Intelligence provided the value on the property for Terry's
    loan.

    g.    Terry's loan was transferred to Ameriquest Mortgage Securities, Inc.
    Asset Backed Pass Through Certificates, Series 2005-R6.

6.    A review of Terry Watt and Roy Parnell's ("Watt and Parnell") loan documents
reveal:

    a.    Watt and Parnell entered into a loan agreement with Ameriquest that was
    secured by real property located at 1424 North Central Park, Chicago,
    Illinois 60651.

    b.    The Mortgage Specialist who assisted Watt and Parnell with their loan
    was Angela Bartucci.

    c.    Watt and Parnell's mortgage loan was originated from the Ameriquest
    branch located in Schaumburg, Illinois.

    d.    The closing of Watt and Parnell's loan was performed by Melissa Thomas.

    e.    Watt and Parnell's loan closed on November 12, 2005.

    f.    Brian Negro of American Family Property Services Inc. conducted the
    appraisal on the property for Watt and Parnell's loan.

BN 2213707v2

    g.    Watt's and Parnell's loan was transferred to CitiFinancial Mortgage Company.

7.    A review of Johanna Guyton's ("Guyton") loan documents reveal:

    a.    Guyton entered into a loan agreement with Ameriquest that was secured by real property located at 2949 West Warren Boulevard, Chicago, Illinois 60612.

    b.    The Mortgage Specialist who assisted Guyton with her loan was Terrence Lang.

    c.    Guyton's mortgage loan was originated from the Ameriquest branch located in Westchester, Illinois.

    d.    The closing of Guyton's loan was performed by Tia M. Martin.

    e.    Guyton's loan closed on May 20, 2005.

    f.    Dan Mannion of Mannion Appraisals conducted the appraisal on the property for Guyton's loan.

    g.    Guyton's loan was transferred to Ameriquest Mortgage Securities, Inc. Asset Backed Pass Through Certificates, Series 2005-R6.

8.    A review of Johanna Guyton's ("Guyton") loan documents reveal:

    a.    Guyton entered into a loan agreement with Ameriquest that was secured by real property located at 2949 West Warren Boulevard, Chicago, Illinois 60612.

    b.    The Mortgage Specialist who assisted Guyton with her loan was Scott Trotter.

    c.    Guyton's mortgage loan was originated from the Ameriquest branch located in Rancho Cordova, California (Portfolio Retention 18).

    d.    The closing of Guyton's loan was performed by Joan M. Pridgeon.

    e.    Guyton's loan closed on December 9, 2005.

    f.    Richard F. Snow of J.P. Shea & Associates conducted the appraisal on the property for Guyton's loan.

    g.    Guyton's loan was transferred to Ameriquest Mortgage Securities, Inc. Asset Backed Pass Through Certificates, Series 2006-R1.

BN 2213707v2

9.  A review of Jorge and Luisa Bolo's (the "Bolos") loan documents reveal:

    a.  The Bolos entered into a loan agreement with Ameriquest that was secured by real property located at 8150 West Fullerton Avenue, River Grove, Illinois 60171.

    b.  The Account Executive who assisted the Bolos with their loan was Kevin Tijerina.

    c.  The Bolos' mortgage loan was originated from the Ameriquest branch located in Schaumburg, Illinois.

    d.  The closing of the Bolos' loan was performed by Angela Bartucci.

    e.  The Bolos' loan closed on June 7, 2005.

    f.  Stephen J. Allmart conducted the appraisal on the property for the Bolos' loan.

    g.  The Bolos' loan was transferred to Ameriquest Mortgage Securities, Inc. Asset Backed Pass Through Certificates, Series 2005-R7.

10. A review of Selvin and Beatrice Quire's (the "Quires") loan documents reveal:

    a.  The Quires entered into a loan agreement with Ameriquest that was secured by real property located at 2304 Emerson Street, Evanston, Illinois 60201.

    b.  The Account Executive who assisted the Quires with their loan was Sontae Brooks.

    c.  The Quires' mortgage loan was originated from the Ameriquest branch located in Skokie, Illinois.

    d.  The closing of the Quires' loan was performed by Cesar Gaitan.

    e.  The Quires' loan closed on June 6, 2005.

- 4 -

f.     Ronald Mosena conducted the appraisal on the property for the Quires' loan.

g.     The Quires' loan was transferred to Ameriquest Mortgage Securities, Inc. Asset Backed Pass Through Certificates, Series 2005-R7.

11.    A review of Juan Baez and Cruz Rivera's ("Baez and Rivera") loan documents reveal:

a.     Baez and Rivera entered into a loan agreement with Ameriquest that was secured by real property located at 1516 North 36th Avenue, Melrose Park, Illinois 60160.

b.     The Account Executive who assisted Baez and Rivera with their loan was Ryan McMahon.

c.     Baez and Rivera's mortgage loan was originated from the Ameriquest branch located in Schaumburg, Illinois.

d.     The closing of Baez and Rivera's loan was performed by Helen F. Mitchell-Carter.

e.     Baez and Rivera's loan closed on April 6, 2005.

f.     Brian Negro of EPIC Appraisal Services conducted the appraisal on the property for Baez and Rivera's loan.

g.     Baez and Rivera's loan was transferred to Ameriquest Mortgage Securities, Inc. Asset Backed Pass Through Certificates, Series 2005-R7.

12.    A review of Julie Noradin's ("Noradin") loan documents reveal:

a.     Noradin entered into a loan agreement with Ameriquest that was secured by real property located at 6349 West Touhy, Chicago, Illinois 60646.

b.   The Mortgage Specialist who assisted Noradin with her loan was John Oertel.

c.   Noradin's mortgage loan was originated from the Ameriquest branch located in Schaumburg, Illinois.

d.   The closing of Noradin's loan was performed by Helen F. Mitchell-Carter.

e.   LSI Market Intelligence provided the value on the property for Noradin's loan.

f.   Noradin's loan was transferred to Ameriquest Mortgage Securities, Inc. Asset Backed Pass Through Certificates, Series 2005-R6.

13.   A review of Julie Noradin's ("Noradin") loan documents reveal:

a.   Noradin entered into a loan agreement with Ameriquest that was secured by real property located at 6349 West Touhy, Chicago, Illinois 60646.

b.   The Mortgage Specialist who assisted Noradin with her loan was Eduard Medeiros.

c.   Noradin's mortgage loan was originated from the Ameriquest branch located in Rancho Cordova, California (Portfolio Retention 07).

d.   The closing of Noradin's loan was performed by Vincent L. Davis.

e.   Noradin's loan closed on April 20, 2006.

f.   LSI Market Intelligence provided the value on the property for Noradin's loan

g.   Noradin's loan was transferred to Greenwich Capital Commercial Mortgage.

14.    A review of Ananais and Ethel Colister's (the "Colisters") loan documents reveal:

    a.    The Colisters entered into a loan agreement with Ameriquest that was secured by real property located at 2854 East 223rd Street, Sauk Village, Illinois 60411.

    b.    The mortgage specialist who assisted the Colisters with their loan was James Bystrzycki.

    c.    The Colisters' mortgage loan was originated from the Ameriquest branch located in Matteson, Illinois.

    d.    The closing of the Colisters' loan was performed by Lynne A. Love.

    e.    The Colisters' loan closed on October 20, 2005.

    f.    Steven M. Bigel conducted the appraisal on the property for the Colisters' loan.

    g.    The Colisters' loan was transferred to CitiFinancial Mortgage Company.

15.    A review of  Michael Cox and Susan Lawrence's ("Cox and Lawrence") loan documents reveal:

    a.    Cox and Lawrence entered into a loan agreement with Ameriquest that was secured by real property located at 16126 South Cottage Grove, South Holland, Illinois 60473.

    b.    The Mortgage Specialist who assisted Cox and Lawrence with the loan was Dominick DeCicco.

    c.    Cox and Lawrence's mortgage loan was originated from their Ameriquest branch located at Matteson, Illinois.

    d.    The closing of Cox and Lawrence's loan was performed by Lynne A. Love.

- 7 -

e.     Cox and Lawrence's loan closed on September 12, 2005.

f.     Steven M. Bigel conducted the appraisal on the property for Cox and Lawrence's loan.

g.     Cox and Lawrence's loan was transferred to Ameriquest Mortgage Securities, Inc. Asset Backed Pass Through Certificates, Series 2005-R10.

16.   A review of Ramses Favela's ("Favela") loan documents reveal:

a.     Favela entered into a loan agreement with Ameriquest that was secured by real property located at 5735 South Mayfield, Chicago, Illinois 60638.

b.     The Mortgage Specialist who assisted Favela with his loan was Ralph Ruis.

c.     Favela's mortgage loan was originated from the Ameriquest branch located in Burr Ridge, Illinois.

d.     The closing of Favela's loan was performed by Kiley King.

e.     Favela's loan closed on February 21, 2006.

f.     LSI Market Intelligence provided the value on the property for Favela's loan.

g.     Favela's loan was transferred to WM Specialty Mortgage, LLC.

17.   A review of Wences Garcia and Maria Lara's ("Garcia and Lara") loan documents reveal:

a.     Garcia and Lara entered into a loan agreement with Ameriquest that was secured by real property located at 5153 South Hamlin, Chicago, Illinois 60632.

BN 2213707v2

    b.    The Mortgage Specialist who assisted Garcia and Lara with their loan was Rolando Garcia.

    c.    Garcia and Lara's mortgage loan was originated from the Ameriquest branch located in Westchester, Illinois.

    d.    The closing of Garcia and Lara's loan was performed by Jackie Vasquez.

    e.    Garcia and Lara's loan closed on September 9, 2005.

    f.    LSI Market Intelligence provided the value on the property for Garcia and Lara's loan.

    g.    Garcia and Lara's loan was transferred to Ameriquest Mortgage Securities, Inc. Asset Backed Pass Through Certificates, Series 2005-R10.

18.    A review of Elizabeth Hill ("Hill's") loan documents reveal:

    a.    Hill entered into a loan agreement with Ameriquest that was secured by real property located at 2227 South Kildare Avenue, Chicago, Illinois 60623.

    b.    The Mortgage Specialist who assisted Hill with her loan was Marc Henry.

    c.    Hill's mortgage loan was originated from the Ameriquest branch located in Rancho Cordova, California (Portfolio Retention 18).

    d.    The closing of Hill's loan was performed by Joan M. Pridgeon.

    e.    Hill's loan closed on December 23, 2005.

    f.    LSI Market Intelligence provided the value on the property for Hill's loan.

    g.    Hill's loan was transferred to CitiFinancial Mortgage Company.

BN 2213707v2

19.    A review of Alfredo and Ana Velia Jaime's (the "Jaimes") loan documents reveal:

    a.    The Jaimes entered into a loan agreement with Ameriquest that was secured by real property located at 5112 West Fletcher, Chicago, Illinois 60641.

    b.    The Mortgage Specialist who assisted the Jaimes with their loan was Rolando Garcia.

    c.    The Jaimes' mortgage loan was originated from the Ameriquest branch located in Hillside, Illinois.

    d.    The closing of the Jaimes' loan was performed by Jackie Vasquez.

    e.    The Jaimes' loan closed on December 21, 2005.

    f.    LSI Market Intelligence provided the value on the property for the Jaimes' loan

    g.    The Jaimes' loan was transferred to Ameriquest Mortgage Securities, Inc. Asset Backed Pass Through Certificates, Series 2006-R1.

20.    A review of Denise and Carey Lee's (the "Lees") loan documents reveal:

    a.    The Lees entered into a loan agreement with Ameriquest that was secured by real property located at 7233 South Rockwell Street, Chicago, Illinois 60629.

    b.    The Account Executive who assisted the Lees with their loan was Hussain Lakhani.

    c.    The Lees' mortgage loan was originated from the Ameriquest branch located in Burr Ridge, Illinois.

    d.    The closing of the Lees' loan was performed by Kiley King.

e.  The Lees' loan closed on June 7, 2005.

f.  Steven M. Bigel conducted the appraisal on the property for the Lees' loan.

g.  The Lees' loan was transferred to Ameriquest Mortgage Securities, Inc. Asset Backed Pass Through Certificates, Series 2005-R7.

21.  A review of Denise and Carey Lee's (the "Lees") loan documents reveal:

a.  The Lees entered into a loan agreement with Ameriquest that was secured by real property located at 7233 South Rockwell Street, Chicago, Illinois 60629.

b.  The Mortgage Specialist who assisted the Lees with their loan was Shannon Hoff.

c.  The Lees' mortgage loan was originated from the Ameriquest branch located in Rancho Cordova, California (Portfolio Retention 22).

d.  The closing of the Lees' loan was performed by Isiah P. Ward.

e.  The Lees' loan closed on January 28, 2006.

f.  Richard F. Snow of J.P. Shea & Associates conducted the appraisal on the property for the Lees' loan.

g.  The Lees' loan was transferred to Ameriquest Mortgage Securities, Inc. Asset Backed Pass Through Certificates, Series 2006-R2.

22.  A review of Daryl Monson's ("Monson") loan documents reveal:

a.  Monson entered into a loan agreement with Ameriquest that was secured by real property located at 8426 South Euclid Avenue, Chicago, Illinois 60617.

BN 2213707v2

b.　The Mortgage Specialist who assisted Monson with his loan was Armando Vera.

c.　Monson's mortgage loan was originated from the Ameriquest branch located in Burr Ridge, Illinois.

d.　The closing of Monson's loan was performed by Tia M. Martin.

e.　Monson's loan closed on August 9, 2005.

f.　Steven M. Bigel conducted the appraisal on the property for Monson's loan.

g.　Monson's loan was transferred to Ameriquest Mortgage Securities, Inc. Asset Backed Pass Through Certificates, Series 2005-R9.

23.　A review of Lawrence Mueller's ("Mueller") loan documents reveal:

a.　Mueller entered into a loan agreement with Ameriquest that was secured by real property located at 838 Elgin Avenue, Forest Park, Illinois 60130.

b.　The Mortgage Specialist who assisted Mueller with the loan was Rolando Garcia while the Loan Origination Officer was Brandon Albracht.

c.　Mueller's mortgage loan was originated from his Ameriquest branch located at Westchester, Illinois.

d.　The closing of Mueller's loan was performed by Jackie Vasquez.

e.　Mueller's loan closed on September 20, 2005.

f.　Steven M. Bigel conducted the appraisal on the property for Mueller's loan.

g.　Mueller's loan was transferred to Ameriquest Mortgage Securities, Inc. Asset Backed Pass Through Certificates, Series 2005-R10.

- 12 -

24.     A review of Benjamin Neeley's ("Neeley") loan documents reveal:

   a.     Neeley entered into a loan agreement with Ameriquest that was secured by real property located at 680 North Green, Unit 602, Chicago, Illinois 60622.

   b.     The Mortgage Specialist who assisted Neeley with his loan was Terrence Lang.

   c.     Neeley's mortgage loan was originated from the Ameriquest branch located in Westchester, Illinois.

   d.     The closing of Neeley's loan was performed by Michael R. Smith.

   e.     Neeley's loan closed on August 5, 2005.

   f.     Andrew B. Remus of Andrew Remus Appraisals conducted the appraisal on the property for Neeley's loan.

   g.     Neeley's loan was transferred to Ameriquest Mortgage Securities, Inc. Asset Backed Pass Through Certificates, Series 2005-R9.

25.     A review of John and Constance Puga's (the "Pugas") loan documents reveal:

   a.     The Pugas entered into a loan agreement with Ameriquest that was secured by real property located at 297 Braemar Glen, Bolingbrook, Illinois 60440.

   b.     The Mortgage Specialist who assisted the Pugas with their loan was Scott Trotter.

   c.     The Pugas' mortgage loan was originated from the Ameriquest branch located in Rancho Cordova, California (Portfolio Retention 18).

   d.     The closing of the Pugas' loan was performed by Donna M. Jacobs.

e.    The Pugas' loan closed on November 19, 2005.

f.    LSI Market Intelligence provided the value on the property for the Pugas' loan.

g.    The Pugas' loan was transferred to Goldman Sachs Mortgage Company. .

26.    A review of James Shew's ("Shew") loan documents reveal:

a.    Shew entered into a loan agreement with Ameriquest that was secured by real property located at 4556 South Union Avenue, Chicago, Illinois 60609.

b.    The Mortgage Specialist who assisted Shew with his loan was Terrence Lang.

c.    Shew's mortgage loan was originated from the Ameriquest branch located in Westchester, Illinois.

d.    The closing of Shew's loan was performed by Tia M. Martin.

e.    Shew's loan closed on September 21, 2005.

f.    Andrew B. Remus of Andrew Remus Appraisals conducted the appraisal on the property for Shew's loan.

g.    Shew's loan was transferred to Ameriquest Mortgage Securities, Inc. Asset Backed Pass Through Certificates, Series 2005-R10.

27.    A review of Harold Wells' ("Wells") loan documents reveal:

a.    Wells entered into a loan agreement with Ameriquest that was secured by the real property located at 216 South 20th Avenue, Maywood, Illinois 60153.

- 14 -

b.    The Mortgage Specialist who assisted Wells with his loan was Brandon
      Albracht.

c.    Wells' mortgage loan was originated from the Ameriquest branch located
      in Westchester, Illinois.

d.    The closing of Wells' loan was performed by Tia M. Martin.

e.    Wells' loan closed on March 15, 2006.

f.    Leon Hamilton of Hamilton Appraisal conducted the appraisal on the
      property for Wells' loan

g.    Wells' loan was transferred to Citigroup Global Markets, Inc.

28.    The factual background of each of the twenty-three Ameriquest mortgage loan
transactions included in Plaintiffs' Amended Complaint is distinct and distinguishable in several
material respects, including:

a.    Each of the mortgage loan transactions were closed on different dates;

b.    Plaintiffs' loans were secured by different properties;

c.    Various account executives or mortgage specialists assisted Plaintiffs'
      with their mortgage loans;

d.    The mortgage loans were originated from various branches;

e.    Various appraisers or companies performed the appraisals or provided the
      property values for the loans;

f.    Various closing agents conducted the closings; and

g.    Plaintiffs' loans were transferred to various entities.

- 15 -

I declare, under the pains and penalties of perjury and false statement, that the information provided in this Declaration is true and correct to the best of my knowledge, information and belief.

DATED: August 28, 2008

By: _____
Diana E. Tiberend
Secretary

## CERTIFICATE OF SERVICE

I, Joanne N. Davies, hereby certify that on this 28th day of August 2008, a true and correct copy of the foregoing document was filed electronically. Notice of this filing will be sent by electronic mail to all counsel of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

By: _____ /s/ Joanne N. Davies _____

BN 2213707v2

EXHIBIT "B"

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22682354 (N.D.Ill.)

Page 1

©Directv, Inc. v. Serio
N.D.Ill.,2003.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
DIRECTV, INC., Plaintiff,
v.
Joe SERIO, et al. Defendants.
**No. 03 C 3491.**

Nov. 12, 2003.

Paul Alan Rettberg, Timothy R. Rabel, Anne M.
Belanger, David L. LaPorte, Ernie Burden, Adam C.
Toosley, Brandon K. Lemley, Querrey & Harrow,
Ltd., Chicago, IL, for Plaintiff.
Raymond J. Prosser, Law Office of Raymond J.
Prosser, Chicago, IL, for Defendant.

*MEMORANDUM OPINION AND ORDER*

COAR, J.
**\*1** In this lawsuit, Plaintiff DIRECTV, Inc., has sued
several Defendants for violations of, among other
statutes, provisions of 18 U.S.C. § 2512 under 18
U.S.C. § 2520. The Court issued Plaintiff a rule to
show cause as to why this case should not be
dismissed for improper joinder, raising the same
issue that Defendant Prassel raised in his motion.
Plaintiff submitted its brief in answer to the rule to
show cause and the issue is now ripe for decision.

Defendants may be joined in the same action if (1)
"there is asserted against them jointly, severally or in
the alternative, any right to relief in respect of or
arising out of the same transaction, occurrence, or
series of transactions or occurrences;" and (2) "if any
questions of law or fact common to all defendants
will arise in the action."Fed.R.Civ.P. 20. Misjoinder
occurs when a plaintiff fails to satisfy either of these
two requirements. Under Federal Rule of Civil
Procedure 21, the court may dismiss a misjoined
party from an action "on such terms as are just."

The Plaintiff's Complaint readily meets the second
requirement of Rule 20. It is beyond dispute that
there will be questions of law that are common to all

the defendants in this lawsuit. It is equally clear,
though, that Plaintiff's Complaint cannot meet the
first requirement of the Rule. Each Defendant is
alleged to have obtained devices for intercepting
DirecTV's satellite signal and to have intercepted the
signal without participating in the DirecTV
subscriber network. DirecTV also alleges that they
each received their devices from the same
distribution center. It is there, however, that the
similarities end. None of the Defendants are alleged
to have acted in concert with any of the others, nor
are any of them even alleged to have known one
another before they were all named in the same
lawsuit. The facts relating to the transaction of one
Defendant are distinct from the facts relating to the
transaction of each of the other Defendants. Under
these circumstances, it is possible and even likely that
each Defendant will present separate and unique
defenses. The claims against the Defendants arise out
of different, albeit similar, facts. The only connection
between them is that they each allegedly violated
provisions of federal law relating to the piracy of
cable television.

DirecTV asserts that under the permissive joinder
rules in their broadest form, the Defendants are
properly joined because their behavior amounts to a
series of transactions that are logically related to one
another. The transactions are logically related to one
another in the same way that purchases of milk from
the grocery store are logically related to one another:
each transaction involves a transaction in a similar
good for a similar purpose. Beyond that, the
similarities end. DirecTV's position broadens the
joinder rule too far. The multiple defendants in the
actions that DirecTV filed in this Court are clearly
misjoined.

**\*2** DirecTV urges that the Court should sever the
misjoined Defendants rather than dismissing them
without prejudice to DirecTV's ability to refile
separate suits against them. DirecTV's fear is that it
could suffer adverse statute of limitations
consequences if the suits are dismissed without
prejudice. While the Court recognizes the legitimacy
of those concerns, DirecTV's fears may not be well-
founded. Any action that is refiled (provided that it is
refiled relatively quickly) may relate back to the date

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22682354 (N.D.Ill.)

of the original filing for statute of limitations purposes. Even if for some reason it does not, DirecTV would be free to argue that the statute of limitations should be equitably tolled. Additionally, when DirecTV filed these lawsuits, it was aware (or at least it should have been aware) that its strategy of joining unrelated defendants in the same lawsuit carried with it a risk that the suits would be dismissed without prejudice for improper joinder under <u>Rule 21</u>. Finally, it is unclear what "severance" means in the context of DirecTV's request: will the severed cases proceed under the original case number? Will DirecTV pay filing fees in each of the "severed" cases? Parties must bear the risks of their own litigation choices.

## CONCLUSION

For the reasons set forth in this opinion, Defendant's Motion is granted. The complaint is dismissed without prejudice against all of the Defendants except for the first-named Defendant.

N.D.Ill.,2003.
Directv, Inc. v. Serio
Not Reported in F.Supp.2d, 2003 WL 22682354 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT "C"

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1470282 (N.D.Ill.)

℃Hussain v. TCF Bank
N.D.Ill.,2004.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
Arshad HUSSAIN, Haroon Bheri, and Izhar Ahmad,
Plaintiff,
v.
TCF BANK, and TCF Financial Corporation,
Defendants.
**No. 03 C 9404.**

June 30, 2004.

Ronald Barry Schwartz, Hedberg, Tobin, Flaherty &
Whalen, P.C., Kamran A. Memon, Law Offices of
Edward T. Stein, Chicago, IL, for Plaintiffs.
Julie Badel, Jason A. Schmidt, Epstein, Becker &
Green, Chicago, IL, for Defendants.

*MEMORANDUM OPINION*

DERYEGHIAYAN, J.
**\*1** This matter is before the court on Defendant TCF
Bank's ("TCF") motion to sever Plaintiffs' claims or
alternatively, to separate the trials. For the reasons
stated below, we grant the motion to sever.

BACKGROUND

Plaintiffs allege in the first amended complaint that
TCF employed Plaintiff Arshad Hussain ("Hussain")
as a Branch Manager. (A Compl. 9). Plaintiffs claim
that Hussain opposed employment discrimination that
he discovered at TCF in September of 2002. (A
Compl. 10). Plaintiffs also claim that because of
Hussain's opposition to the discrimination, and
because of Hussain's religion, national origin, race,
and ancestry, he was denied a promotion to a
Regional Manager position. (A Compl. 11). Plaintiffs
also allege that Hussain was unlawfully denied a
promotion to a Senior Manager position, and put on
probation. (A Compl. 14). In addition, Plaintiffs
allege that Hussain complained to the Regional
Manager about discrimination on March 3, 2003, and
that on March 18, 2003, Hussain informed the
Regional Manager that he was filing a discrimination

and retaliation complaint with the Illinois Department
of Human Rights. (A Compl. 15, 16). Plaintiffs
further allege that on March 19, 2003, Hussain was
fired. (A Compl. 17)

Plaintiffs allege that TCF employed Plaintiff Haroon
Bheri ("Bheri") from October of 1998 to February of
2003 and that he was an Assistant Manager From
February of 2001 to February of 2003. (A Compl.
19). Plaintiffs also allege that between May of 2001
and Novermber of 2002, Bheri was denied a
promotion to a Branch Manager position at the
Danada location on four occasions and that "younger,
non-Pakistani, non-Muslim" applicants were chosen
each time for the position. (A Compl. 20). Plaintiffs
contend that Bheri was not chosen for the positions
because he complained about discrimination and
because of his religion, national origin, ancestry,
race, and age. (A Compl. 21, 22). Bheri claims that
he complained about harassment at work and that he
was thereafter transferred and then terminated in
February of 2003. (A Compl. 22).

Plaintiffs also allege that TCF employed Plaintiff
Izhar Ahmad ("Ahmad") as an Assistant Manager
from 2001 until May of 2003. (A Compl. 24).
Plaintiffs allege that in 2002 and 2003, Ahmad was
not promoted to vacant Branch Manager positions
because of his religion, national origin, race,
ancestry, and because Ahmad complained about
discrimination. (A Compl. 28). Plaintiffs also claim
that Ahmad's Regional Manager harassed him
starting in July of 2002. (A Compl. 25) Plaintiffs
contend that in August of 2002, Ahmad complained
about the harassment to the Assistant Director of
Human Resources and that subsequently, Ahmad was
transferred repeatedly. (A Compl. 27). Plaintiffs do
not allege that TCF terminated Ahmad's employment.
Instead Plaintiffs allege that in May of 2003, Ahmad
was constructively discharged. (A Compl. 30).

LEGAL STANDARD

Federal Rule of Civil Procedure 20(a) provides:

**\*2** (a) Permissive Joinder. All persons may join in
one action as plaintiffs if they assert any right to

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1470282 (N.D.Ill.)

Page 2

relief jointly, severally, or in the alternative in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all these persons will arise in the action. All persons (and any vessel, cargo or other property subject to admiralty process in rem) may be joined in one action as defendants if there is asserted against them jointly, severally, or in the alternative, any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all defendants will arise in the action. A plaintiff or defendant need not be interested in obtaining or defending against all the relief demanded. Judgment may be given for one or more of the plaintiffs according to their respective rights to relief, and against one or more defendants according to their respective liabilities.

Fed.R.Civ.P. 20(a). Although a court cannot dismiss an action due to misjoinder, "[p]arties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just ... [and][a]ny claim against a party may be severed and proceeded with separately."Fed.R.Civ.P. 21. See also Rice v. Sunrise Express, Inc., 209 F.3d 1008, 1016 (7th Cir.2000)(stating that "[i]t is within the district court's broad discretion whether to sever a claim under Rule 21."); Aiello v. Kingston, 947 F.2d 834, 835 (7th Cir.1991)(stating that "Fed.R.Civ.P. 21 allows a court to sever claims that are logically distinct....").

### DISCUSSION

In the instant action, the claims of the three named plaintiffs do not rise from "the same transaction, occurrence, or series of transactions or occurrences...."Fed.R.Civ.P. 20(a). The named plaintiffs each advance a claim that involves distinct employment actions and involves a unique sets of circumstances. Plaintiffs argue that they can join Plaintiffs' actions merely because Plaintiffs were allegedly discriminated against by some of the same supervisors during the same general period. While such an approach may be convenient to Plaintiffs' counsel, and it requires Plaintiffs to only file one filing fee rather than three filing fees, such an approach is not in accordance with the law. The joinder rule is intended to serve judicial efficiency.Vasilakos v. Corometrics Medical Systems, Inc., 1993 WL 390283, at *4 (N.D.Ill.1993). Such a purpose will not be served if we proceed in this action on what are clearly three entirely separate employment discrimination actions.

There are many factual differences between the claims that illustrate that Plaintiffs' claims are indeed entirely separate claims arising from different occurrences. Hussain was employed in a different position than Bheri and Ahmad. The time period of alleged discrimination for each Plaintiff does not directly coincide. Plaintiffs allege a variety of adverse employment actions taken against them which include being denied a promotion, being put on probation, being transferred, and being terminated. Unlike Hussain and Bheri, Ahmad resigned from his position and argues that he was constructively discharged.

*3 Each individual Plaintiff has advanced claims that will require a separate analysis of the plaintiff's work performance, qualifications, and the actions taken against him. The court will also need to consider the qualifications of other employees that each individual plaintiff competed with for the promotions and consider each of the plaintiff's supervisor's conduct and history with that particular plaintiff. The sets of transactions and occurrences involved in each of Plaintiff's claims are entirely distinct. Clearly, Plaintiffs have improperly sought to join three distinct claims in one action. Therefore a severance of Bheri's claims and Ahmad's claims into separate actions is warranted in this instance.

### CONCLUSION

Based on the foregoing analysis, we grant the motion to sever.

N.D.Ill.,2004.
Hussain v. TCF Bank
Not Reported in F.Supp.2d, 2004 WL 1470282 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT "D"

Westlaw.

Page 1

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2577852 (S.D.Miss.)

**H**McFarland v. State Farm Fire & Cas. Co.
S.D.Miss.,2006.
Only the Westlaw citation is currently available.
United States District Court,S.D.
Mississippi,Southern Division.
Wesley McFARLAND, et al, Plaintiffs
v.
STATE FARM FIRE & CASUALTY CO., et al,
Defendants.
**Civil Action No. 1:06CV466-LTS-RHW.**

Sept. 6, 2006.

David Zach Scruggs, The Scruggs Law Firm, PA,
Oxford, MS, Derek A. Wyatt, Don John W. Barrett,
Marshall H. Smith, Jr., Barrett Law Offices,
Lexington, MS, for Plaintiffs.
Robert C. Galloway, Butler, Snow, O'Mara, Stevens
& Cannada, PLLC, Gulfport, MS, W. Scott Welch,
III, Tiffanee Nicole Wade-Henderson, William N.
Reed, Baker, Donelson, Bearman, Caldwell &
Berkowitz, PC, Jackson, MS, for Defendants.

### ORDER OF SEVERANCE

ROBERT H. WALKER, Magistrate Judge.
**\*1** Before the Court is Plaintiffs' complaint filed on
May 9, 2006. There are hundreds of Plaintiffs joined
in a single lawsuit, each asserting claims that arise
out of damage to property caused by Hurricane
Katrina. The Court *sua sponte* raised the issue of
whether to sever each of the claims for damaged
property into a separate cause of action. On July 13,
2006, the Court entered a Show Cause Order
permitting the parties an opportunity to brief the issue
of whether the Court should enter an order severing
the Plaintiffs' claims into individual lawsuits. The
parties have filed responses.

Generally, permissive joinder of plaintiffs under
Fed.R.Civ.P. 20 is at the option of the plaintiffs,
assuming that they meet the requirements set forth in
Rule 20. *Applewhite v. Reichhold Chemicals,* 67 F.3d
571, 574 (5th Cir.1995). Under Rules 20 and 21, the
district court has the discretion to sever an action if it
is misjoined or might otherwise cause delay or
prejudice. *Id.* The central purpose of Rule 20 is to

promote trial convenience and expedite the resolution
of disputes, thereby eliminating unnecessary lawsuits.
*Alexander v. Fulton County,* 207 F.3d 1303, 1322
(11th Cir.2000)(en banc). The Supreme Court has
instructed lower courts to employ a liberal approach
to permissive joinder of claims and parties in the
interest of judicial economy. *See United Mine
Workers v. Gibbs,* 383 U.S. 715, 724 (1966).

A party seeking joinder of claimants under Rule 20
must establish (1) a right to relief arising out of the
same transaction or occurrence, or series of
transactions or occurrences, and (2) some question of
law or fact common to all persons seeking to be
joined. *See* Fed.R.Civ.P. 20(a). The Court may
consider the following factors when deciding whether
claims should be severed pursuant to Rule 21:(1)
whether the claims arise out of the same transaction
or occurrence; (2) whether the claims present some
common questions of law or fact; (3) whether
settlement of the claims or judicial economy would
be facilitated; (4) whether prejudice would be
avoided if severance were granted; and (5) whether
different witnesses and documentary proof are
required for separate claims. *See Morris v. Northrop
Grumman Corp.,* 37 F.Supp.2d 556, 580
(S.D.N.Y.1999).

The Court concludes that the Plaintiffs should be
required to file separate complaints. Although there
may be some common issues of law and fact, the
Court finds that the Plaintiffs have not met the same
transaction or occurrence prong of Rule 20(a). In a
superficial sense, the hurricane was a common
occurrence; however, the storm was vastly different
in its effect depending on the specific geographic
location of each particular home. Although Plaintiffs
each held basically the same standard homeowner's
policy, each insurance contract is a separate
transaction. *See Coleman v. Conseco, Inc.,* 238
F.Supp.2d 804, 819 (S.D.Miss.2002). Likewise, any
alleged negligent or fraudulent misrepresentations by
insurance agents constitute separate transactions or
occurrences. *See Reed v. American Medical Secuirty
Group, Inc.,* 324 F.Supp.2d 798, 804-05
(S.D.Miss.2004); *Grennell v. Western Southern Life
Ins. Co.,* 298 F.Supp.2d 390, 398 (S.D.W.Va.2004).

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2577852 (S.D.Miss.)

Page 2

**\*2** In essence, Plaintiffs have filed what amounts to a quasi-class action lawsuit but without regard for the rigid requirements for class certification. This Court recently denied an attempt to certify class for Hurricane Katrina cases in *Guice v. State Farm Fire & Casualty Co.*, 2006 WL 2359474 (S.D.Miss.2006). In denying class certification, U.S. District Judge L.T. Senter, Jr. stated that

[t]his Court's insurance docket can be described as a variety package with respect to such factors as the number of lawyers involved, the theories of recovery being pursued, or the geographical location of the loss. A number of removed cases include miscellaneous allegations against local agents for negligence and other actionable conduct, and these cases may be subject to remand to state court because of a lack of diversity jurisdiction.

In another opinion, Judge Senter wrote that "[e]ach property owner in Mississippi who had real and personal property damaged in Hurricane Katrina is uniquely situated. No two property owners will have experienced the same losses. The nature and extent of the property damage the owners sustain from the common cause, Hurricane Katrina, will vary greatly in its particulars, depending on the location and condition of the property before the storm struck and depending also on what combination of forces caused the damage."*Comer v. Nationwide Mutual Ins. Co.*, Civil Action No. 1:05cv436. The undersigned finds that the same considerations that applied in *Guice* and *Comer*, apply to the instant case as well.

Accordingly, the Court finds that the Plaintiffs' individual claims should be divided into separate lawsuits requiring separate complaints. Each complaint should correspond to a single damaged property. In other words, if more than one person owns a particular property, there will be one complaint for that property, even though there may be multiple individual plaintiffs pursuing the claim on that property.

The Court recognizes that even though it is requiring separate complaints to be filed, the Court may consolidate issues for trial pursuant to Fed.R.Civ.P. 42. The Court will continue to explore this avenue in an attempt to streamline the litigation process.

IT IS THEREFORE ORDERED that

(1) By agreement of the parties, the claims of Dr. Wesley and Rosemary McFarland and the claims of James and Linda Desporte shall be severed immediately as these two causes of action have been set for trial on an expedited basis. These Plaintiffs shall file an amended complaint and pay filing fees as soon as their cases have been severed.

(2) Within twenty (20) days of this Order, Plaintiffs shall file a list of each property that is subject to this lawsuit and identify the Plaintiffs who are asserting a claim as to each property.

(3) All Plaintiffs' claims in Civil Action No. 1:06cv466 shall then be severed into individual actions, one for each property; and the Clerk shall assign a new civil action number for each severed claim.

**\*3** (4) The Clerk shall copy the pleadings and exhibits from Civil Action No. 1:04cv466, which shall then be included as part of the record for the severed action. Each of the previous filings will be deemed filed in the new cases as of the dates shown on the docket sheet for Civil Action No. 1:04cv466.

(5) Pending motions in the captioned cause are terminated by this order and shall be resubmitted as necessary in each new case.

(6) The current case shall be closed upon the individual cases being severed and replaced by the new filings.

(7) Within (30) days of providing the Court with the list required in subpart (2) of this Order, Plaintiffs shall file an amended complaint and filing fee in each new civil action.

(8) All pre-discovery disclosure of case information or other cooperative discovery devices provided for by the Uniform Local Rules of the United States District Courts of Mississippi 26.1(A) and Federal Rules of Civil Procedure 26(a)(1) which have not been previously furnished by the parties shall be disclosed pursuant to said rules. In the event that the court finds that common questions of law or fact exist in separate cases, the court may then order that those cases be consolidated as provided in Fed.R.Civ.P.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2577852 (S.D.Miss.)

42(a).

(9) An in-person case management conference for each severed action (other than the cases of the McFarlands and Desportes already set for trial) is hereby scheduled for November 1, 2006 at 9 a.m.

(10) All severed cases shall remain assigned to United States District Judge L.T. Senter, Jr. and United States Magistrate Judge Robert H. Walker.

SO ORDERED, this the 6th day of September, 2006.

S.D.Miss.,2006.
McFarland v. State Farm Fire & Cas. Co.
Not Reported in F.Supp.2d, 2006 WL 2577852 (S.D.Miss.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT "E"

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 24232530 (N.D.Ill.)

Page 1

Directv, Inc. v. Delaney
N.D.Ill.,2003.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
DIRECT TV, INC., Plaintiff,
v.
Richard DELANEY, Ricardo Desantiago, Julio
Garcia, Adrian Guerra, Michael Harris, Joseph Knur,
Patrick Labrizzi, Slawomir Majkut, Bob O'Connell,
Mike Price and Adam Pudlo, Defendants.
**No. 03 C 3444.**

Nov. 20, 2003.

Ernie Burden, David L. Laporte, Anne M. Belanger,
Timothy R. Rabel, Paul Alan Rettberg, Adam C.
Toosley, Querrey & Harrow, Ltd., Chicago, IL, for
Plaintiff.

### MEMORANDUM OPINION

KOCORAS, Chief J.
*1 This matter comes before the Court on the
motions of Defendants Richard Delaney, Michael
Harris, and Adam Pudlo to dismiss Counts III and IV
of the complaint as well as the motions of Harris and
Pudlo to dismiss or sever the claims against
them.[FN1] For the reasons set forth below, the motion to
dismiss Count IV is denied and the motions to
dismiss Count III and to sever the claims against
Harris and Pudlo are granted. Pursuant to Federal
Rule of Civil Procedure 21, we also order that claims
against Defendants Ricardo DeSantiago, Julio Garcia,
Adrian Guerra, Joseph Knur, Patrick Labrizzi,
Slawomir Majkut, Bob O'Connell, and Mike Price be
severed into eight additional suits. Only the first
named individual, Richard Delaney, shall be left as a
party to this case.

> FN1. We note that the papers submitted by
> Delaney, Harris, and Pudlo do not conform
> with the requirements of Local Rule 5.2(a).
> We alert these parties to Local Rule 5.2(b),
> which allows the court to strike filed
> documents that do not comply with the
> spacing requirements listed. Although the

plaintiff did not raise the issue, and it would
be wasteful to strike these papers now, when
the motion has been fully briefed, we
caution Defendants that any future
noncompliance with the Local Rules of this
district will not be countenanced.

### BACKGROUND

We accept the following allegations in the complaint
as true for the purposes of this motion. Directv, Inc.
("Directv"), a California-based corporation,
distributes hundreds of channels to customers
nationwide. To provide this service, Directv relays
digital signals from the United States to satellites in
space, then back to the States. Each signal is
encrypted while in space to prevent unauthorized
usage. Only through the use of what Directv terms an
"access card" can its viewers unscramble the satellite
programming to which they have subscribed.
Technology exists that thwarts satellite providers'
efforts to limit access to its programming and allows
persons to unscramble satellite broadcasting, which
deprives Directv of its subscription fees. Directv
describes this technology as "pirate access devices."

The complaint alleges that several major distributors
of illegal pirate access devices rely on the same mail
shipping facility. With the help of local law
enforcement, on May 25, 2001, Directv obtained
shipping records, credit card receipts, e-mail
communications, and other documents from this
facility that indicated that each of the defendants
named in this suit had purchased pirate access
devices. Directv then launched a five-count
complaint against these defendants, claiming that
each purchased different pirate access devices at
different times.

### LEGAL STANDARD

A Rule 12(b)(6) motion to dismiss is used to test the
legal sufficiency of a complaint. *Gibson v. City of
Chicago*, 910 F.2d 1510, 1520 (7th Cir.1990). In
ruling on a motion to dismiss, a court must draw all
reasonable inferences in favor of the plaintiff,
construe allegations of a complaint in the light most

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 24232530 (N.D.Ill.)

favorable to the plaintiff, and accept as true all well-pleaded facts and allegations in the complaint. *Bontkowski v. First Nat'l Bank of Cicero,* 998 F.2d 459, 461 (7th Cir.1993); *Perkins v. Silverstein,* 939 F.2d 463, 466 (7th Cir.1991). The allegations of a complaint "should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). With these principles in mind, we turn to the motion at hand.

## DISCUSSION

### 1. Private Right of Action under 18 U.S.C. § 2512

**\*2** The second and third counts of the instant complaint are based on alleged violations of the Wiretap Act. 18 U.S.C. §§ 2510-22. Count II, which is not challenged by Defendants' motion, claims a violation of 18 U.S.C. § 2511. This provision states, in pertinent part, that intentional interception, disclosure, or use of electronic communications; endeavors to accomplish those activities; or the procurement of another person to perform or endeavor to perform any of those activities is a criminal act. Count III, which Defendants argue does not state a claim for relief, seeks to recover damages for alleged violations of 18 U.S.C. § 2512(1)(b). This statute provides, in pertinent part, that manufacture, assembly, possession, or sale of any device that is primarily useful for surreptitiously intercepting electronic communications is also a criminal violation.[FN2] The parties agree, as they must, that 18 U.S.C. § 2512 is a criminal statute and by itself does not allow a private party to recover damages for behavior that would violate its terms. However, the prayer for relief refers to a later section, 18 U.S.C. § 2520, as the premise of the claim for damages. This section provides, in pertinent part, that:

> FN2. This section also requires that the alleged violator either know or have reason to know that the device in question is designed in such a way to make it primarily useful for surreptitious interception. 18 U.S.C. § 2512.

[A]ny person whose ... electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter may in a civil action recover from the person or entity, other than the United States, which engaged in that violation such relief as may be appropriate.

The essence of the motion to dismiss Count III is that § 2520 does not provide a private right of action for violations of § 2512.

Several other courts, including two others in our district, have considered this very question and reached conflicting results. The seminal case supporting Directv's position is *Oceanic Cablevision, Inc. v. M.D. Electronics,* 771 F.Supp. 1019 (D.Neb.1991). In *Oceanic,* the court was faced with a 12(b)(6) challenge to two counts of a complaint against a distributor of cable descramblers: one premised on § 2511 and another premised on § 2512. In its analysis of the viability of the § 2511 count, the court concluded that the plaintiff had not stated a cognizable claim because the distributor was not alleged to have engaged in any of the activities listed in § 2520-interception, disclosure, or use. The court examined an appellate court decision that had concluded that a party who merely sold devices capable of intercepting electronic communications did not violate either § 2511 or § 2512, despite the plaintiff's argument that such a sale could be construed as procuring another to perform prohibited interception, disclosure, or use, in violation of the plain language of the then-existing terms of §§ 2511 and 2520. *Flowers v. Tandy Corp.,* 773 F.2d 585 (4th Cir.1985). The *Oceanic* court questioned the continued vitality of *Flowers,* noting that it was decided at a time when § 2520 contained language that directly mirrored the activities listed in § 2511, including procurement of another to intercept, disclose, or use another's communication. Subsequent to the decision in *Flowers,* Congress amended § 2520 to eliminate any mention of civil liability based on procuring interception, disclosure, or use. The *Oceanic* court attempted to capture the different situations by stating that, "Clearly, § 2520 only confers a private cause of action upon persons when the action is brought against parties that have violated the provisions of §§ 2510-2521." The court ignored the fact that this statement is not accurate even in the limited context of § 2511 actions. The removal of the reference to procuring another person to intercept, etc. from § 2520 was not accompanied by a removal of the analogous language from § 2511; a person who procures another to perform the acts prohibited by § 2511 still faces criminal liability, even though the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 24232503 (N.D.Ill.)

possibility of civil liability has clearly been eliminated. However, the *Oceanic* court, in its subsequent discussion of a private right of action under § 2512, took its preceding statement at face value. The examination is limited solely to the issue of whether sale of cable descramblers, as opposed to some other device more directly associated with wiretapping, constituted a violation of § 2512. The court concluded that a violation was stated. However, the court then concluded that because a cable descrambler could be a device whose design "renders it primarily useful for the purpose of surreptitious interception of wire, oral, or electronic communications," there must be a private right of action under § 2520 for violations of § 2512, without any further analysis of whether such a sale was equivalent to an interception, disclosure, or intentional use of a communication in violation of the Act. We respectfully disagree that without such analysis, the court's conclusion that the statute confers a private right of action for violations of § 2512 is tenuous at best.

**\*3** Later courts have followed in *Oceanic's* footsteps, relying on the erroneous statement in that opinion that any violation of the provisions of the Wiretap Act will allow the potential of civil recovery under § 2520. *See,e.g.,Directv v. EQ Stuff, Inc. ., 207 F.Supp.2d 1077, 1084 (C.D.Cal.2002); Directv v. Gatsiolis, 2003 WL 22111097, at \*2 (N.D.Ill. Sept.10, 2003)* (stating that a plaintiff can pursue relief from a defendant who violates any subsection of the Wiretap Act). In view of the plain language of § 2520, we cannot come to a like conclusion. The private right of action, by its own terms, attaches only after the fact of interception, disclosure, or use in violation of the Wiretap Act. After this initial act is complete, the aggrieved party may pursue civil remedies against the person who engaged in that violation, i.e., that interception, disclosure, or use. Section 2512 criminalizes only the production, sale, or possession of devices whose primary purpose is to perform the interception. These acts occur separate and apart from any actual interception, and persons who engage in them may never engage in the violations cited in § 2520-interception, disclosure, or use prohibited by the Wiretap Act. As such, we agree with those courts who have concluded that § 2520 does not confer a private right of action for violations of § 2512. *See,e.g.,Flowers, 773 F.2d at 588-89;Directv v. Cardona, 275 F.Supp.2d 1357, 1362-70 (M.D.Fla.2003); Directv v. Amato, 269 F.Supp.2d*

*688, 689-91 (E.D.Va.2003).*

Directv's arguments that Count III is salvaged by their allegations that the intercepted communications were actually used are misplaced. While we agree that the complaint contains such allegations, they go only to the viability of Count II, which is predicated on a violation of § 2511, not Count III, the count challenged by this motion. Accordingly, Count III is dismissed.

## 2. Common-Law Conversion

The 12(b)(6) motion also attacks the validity of Count IV, which purports to state a claim for common-law conversion. To state such a claim, Directv must allege that it has a right to the property, it has an absolute and unconditional right to the immediate possession of the property, it has made a demand for possession, and Defendants have wrongfully and without authorization assumed control, dominion, or ownership over the property. *Cirrincione v. Johnson, 184 Ill.2d 109, 234 Ill.Dec. 455, 703 N.E.2d 67, 70 (Ill.1998).* Delaney, Harris, and Pudlo argue that the property at issue in this case, i.e., intangible electronic impulses, is not a proper subject for a conversion claim. The argument centers of the intangibility of the property and the resulting discordance with other requirements such as possession. Defendants rely on a statement of the Illinois Supreme Court in the case of *In re Thebus* to the effect that "an action for conversion lies only for personal property which is tangible, or at least represented by or connected with something tangible."108 Ill.2d 255, 91 Ill.Dec. 623, 483 N.E.2d 1258, 1260 (Ill.1985). However, Defendants fail to note that the quoted language was not the words of the Court itself but instead a passage contained in *American Jurisprudence.Id.* In addition, the full quote indicates that this is not a hard and fast rule, but only that "[i]t is ordinarily held" to be true. In assimilating this language with the other sources it examined, the Court pronounced its own take, that "the subject of conversion is required to be an identifiable object of property of which the plaintiff was wrongfully deprived."*Id.* A later appellate case, *Stathis v. Geldermann, Inc.,* unequivocally announced that in Illinois, "parties may recover for conversion of intangible assets."295 Ill.App.3d 844, 229 Ill.Dec. 809, 692 N.E.2d 798, 807 (Ill.App.Ct.1998).

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 24232530 (N.D.Ill.)

**\*4** This result comports with that in *Conant v. Karris*, 165 Ill.App.3d 783, 117 Ill.Dec. 406, 520 N.E.2d 757, 763 (Ill.App.Ct.1987). In *Conant*, a claim for conversion was allowed to stand on the allegation only that the contents of a printout were shown to an unauthorized party, not that the actual printout had changed hands. *Id.* The result in neither of these cases conflicts with the actual holding of the Supreme Court in *In re Thebus*, namely that conversion requires that the plaintiff be wrongfully deprived of an identifiable object of property. Here, Directv has alleged that Defendants wrongfully deprived it of its encrypted programming, an identifiable object of property, to which it had the right of exclusive control, i.e. possession. Viewing the allegations of the complaint in the light most favorable to Directv, as we must, we conclude that Count IV states a cognizable claim for conversion. Accordingly, the motion to dismiss this count is denied.

### 3. Joinder of Parties

Directv has filed at least forty-four [FN3] lawsuits similar to this one throughout the country. The complaint does not provide a specific explanation as to why these particular defendants are grouped together. As such, Harris and Pudlo claim that they should not be joined as a party to this suit and move for dismissal or severance of the claims against them pursuant to Fed. R. Civ. Proc. 20.

> FN3. The current tally may be as high as 82. *Directv, Inc. v. Pickert,*2003 U.S. Dist. LEXIS 18263 (N.D.Ill. Oct. 14, 2003).

Rule 20 provides that multiple parties can be joined in a single action if two criteria are satisfied. First, the right to relief must arise out of "the same transaction, occurrence, or series of transactions or occurrences."*Id.* Second, there must be a question of law or fact common to all defendants.*Id.* If either criterion is not present, joinder is not permitted. 7 Charles Alan Wright, et. al., Federal Practice & Procedure § 1953 (3d ed.2001). The policy underlying joinder of parties is judicial economy. *Elmore v. Henderson,* 227 F.3d 1009, 1012 (7th Cir.2000). Joinder of parties must also comport with fundamental fairness. *Intercon Research Assocs., Ltd. v. Dresser Indus., Inc.,* 696 F.2d 53, 58 (7th Cir.1982). A district court has discretion to deny joinder if it would not further the policies of the Rule and would cause prejudice, expense, or delay. Wright, at § 1952.

In ruling on permissive joinder, courts conduct a case-by-case analysis and avoid "hard and fast" rules. *Id.* at § 1953. Courts often look to Fed. R. Civ. Proc. 13(a), governing compulsory counterclaims, for guidance on the first prong. *Id.* Under Rule 13(a), the term "transaction" has a flexible meaning, which may include a series of many occurrences, related not so much by their immediate connection as by their logical relationship. *Id.* Thus, all "logically related events" that give rise to a cause of action are usually considered to constitute a transaction or occurrence. *Id.*

#### a. Same Transaction or Occurrence

We first consider whether the claims against the individual defendants arise out of the same transaction, occurrence, or series of transactions or occurrences. Directv argues that because all the records came from a single writ of seizure, from a single warehouse, and the defendants all purchased the illegal devices within a narrow time frame. However, this prong turns on the nature of the plaintiff's right to relief, not the source of the evidence. Directv's case against each defendant will depend not on the date of the raid of Fulfillment Plus warehouse or whether a single writ was issued; rather, any trial in this case will likely center on whether each defendant actually ordered, possessed, manufactured, assembled, modified, and/or used each device in dispute, or converted the Directv's satellite communications, and whether each such device or behavior violates federal law. Specifically, the jury must decide whether DeSantiago, Garcia, Guerra, Harris, Knur, Labrizzi, Majkut, O'Connell, Price, and Pudlo (1) received unauthorized reception of satellite programming, (2) received unauthorized programming of electronic communications, (3) possessed or manufactured illegal access devices, (4) willfully assembled or modified such devices, and (5) is liable for civil conversion. The jury's resolution of these fact-specific questions as to a given defendant is completely independent of its tasks in answering those questions with regard to the other defendants. Therefore, because each defendant made different purchases and none of the named defendants is alleged to have acted in connection with any other,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 24232530 (N.D.Ill.)

we agree with Harris and Pudlo that the claims against these defendants are not logically related. See *Movie Systems, Inc. v. Abel*, 99 F.R.D. 129, 130 (D.Minn.1983).

*b. Common Question of Law or Fact*

**\*5** Even if Directv had been able to show a common transaction, they must still establish an issue of law or fact common to all defendants. Directv argues that it will present substantially identical information at trial for each defendant, such as information regarding the procedure of ordering and shipping illegal access devices as well as the purpose of the devices and the process by which they are sold. Directv's arguments, however, do not satisfy the rule. While Directv may plan on presenting this evidence, the questions of law and fact will have to be tailored to the particulars of each individual defendant's actions, rather than being common to all.

Finally, Directv also argues that joinder in this case promotes judicial economy and serves fundamental fairness. In light of the potential for vastly different cases litigated at one time, in addition to the satellite litigation that has been generated by the eighty-odd cases like this one that Directv has filed, this argument rings rather hollow. In any event, judicial economy is a factor to be taken into account, not an independent basis to allow joinder under Rule 20 where the previous two factors are lacking.[FN4] Furthermore, there is nothing fundamentally unfair about Directv litigating what are really separate claims in separate lawsuits. See *Beaulieu v. The Concord Group Ins. Co.*, 208 F.R.D. 478, 480 (D.N.H.2002); *Movie Systems*, 99 F.R.D. at 130.

> FN4. We also note that of the district courts that have squarely confronted Directv's attempt to join parties in a manner similar to this suit, we were unable to find any that allowed joinder of the parties under these circumstances. In the Southern District of Iowa, the court in *Directv v. Loussaert,* 2003 U.S. Dist. LEXIS 18017 (S.D.Iowa Oct. 2, 2003) found the acts of similarly situated defendants to be separate and distinct. In the Northern District of Ohio, *Directv, Inc. v. Hunt* clearly indicated its interpretation of Rule 20(a) did not permit Directv to file an action against five persons accused of individually violating federal communications and wiretapping laws because each defendant made purchases of different devices at different times and they did not act together. See Def.'s Mot. at App. A. In the Eastern District of New York, *Directv v. Armellino* held joinder of similarly situated parties to be improper because each defendant allegedly engaged in "separate" and "discrete" incidents. 216 F.R.D. 240 (E.D.N.Y. July 28, 2003). See also *Directv, Inc. v. Blahuta,* 2003 WL 22225585 (N.D.Ill. Sept.25, 2003); *Directv, Inc. v. Smith,* No. 03 C 3540 (N.D.Ill. Sept. 18, 2003); *Directv, Inc. v. Cardona,* 2003 WL 21910578 (M.D.Fla. July 8, 2003); *Directv, Inc. v. Davidson,* No. 03 C 03459 (N.D. Ill. June 6, 2003); *Directv, Inc. v. Garbutt,* No. 03 C 3499 (N.D. Ill. June 3, 2003); *Directv, Inc. v. Montes,* No. 03 C 3463 (N.D. Ill. June 6, 2003).

*c. Remedy for Misjoinder*

Having concluded that joinder of the parties is not permissible in this case, we are left with the issue of the proper remedy. Harris and Pudlo have moved to dismiss the claims against them or, in the alternative, to sever them into a separate action. Rule 21 states that misjoinder of parties is not ground for dismissal of an entire action. Instead, parties are to be dropped or added to an action as necessary, either on motion by a party or by the court's own initiative. The rule does not identify the specific mechanism by which "dropping" is to occur, and it would seem that either dismissal or severance could be appropriate in many cases. In this case, however, we have the added wrinkle of a potential statute of limitations issue if the defendants other than Delaney are dismissed without prejudice and Directv attempted to file new complaints against them. In such an instance, a district court is "duty-bound" to sever rather than dismiss claims that are improperly joined to avoid gratuitous harm to the parties. *Elmore,* 227 F.3d at 1012. Accordingly, we conclude that severance is the proper remedy for Directv's misjoinder of the defendants other than Delaney.

CONCLUSION

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 24232530 (N.D.Ill.)

Page 6

Based on the foregoing analysis, we grant the motion to dismiss Count III and deny the motion to dismiss Count IV. We deny Harris and Pudlo's motion to dismiss pursuant to Fed. R. Civ. Proc. 21 but grant their motions to sever. Pursuant to Fed. R. Civ. Proc. 21, we also sever Defendants DeSantiago, Garcia, Guerra, Knur, Labrizzi, Majkut, O'Connell, and Price. Only the first named defendant, Richard Delaney, shall remain a party to this suit.

N.D.Ill.,2003.
Directv, Inc. v. Delaney
Not Reported in F.Supp.2d, 2003 WL 24232530 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.